Matthew G. Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, MT 59718
Tele.: (406) 570-2949; Fax: (406) 551-6919
Attorney for the County Central Committee Plaintiffs

James E. Brown
The James Brown Law Office, PLLC
30 S. Ewing St., Suite 100
Helena, MT 59601
Tele.: (406) 449-7444; Fax: (406) 443-2478
Attorney for Plaintiff Montana Republican Party

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMMITTEE, GALLATIN COUNTY REPUBLICAN CENTRAL COMMITTEE, SANDERS COUNTY REPUBLICAN CENTRAL COMMITTEE, DAWSON COUNTY REPUBLICAN CENTRAL COMMITTEE, STILLWATER COUNTY REPUBLICAN CENTRAL COMMITTEE; RICHLAND COUNTY REPUBLICAN CENTRAL COMMITTEE; CARBON COUNTY REPUBLICAN CENTRAL COMMITTEE; FLATHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE; MADISON COUNTY REPUBLICAN CENTRAL COMMITTEE; BIG HORN COUNTY REPUBLICAN CENTRAL COMMITTEE; MONTANA REPUBLICAN PARTY, <br><br> Plaintiffs, <br><br> v. <br><br> LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, *et al.*, <br><br> Defendants. | Case No. CV 14-0058-H-BMM <br><br> **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... iii

TABLE OF EXHIBITS ............................................................................... v

PRELIMINARY STATEMENT .................................................................. 1

STATEMENT OF FACTS ........................................................................... 2

ARGUMENT ................................................................................................ 9

I    MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST
AMENDMENT BY ALTERING CANDIDATE MESSAGES........................ 9

    A.    Union Efforts to Push Non-Republican Voters Into
Republican Primaries Change Candidate Messages ............................... 13

    B.    Lack of Party Registration Alters Candidate Messages ......................... 16

    C.    Members of Congress from Open Primary States Are More
Moderate than Those From Closed Primary States ................................ 18

    D.    Republican Candidates in Open Primaries Are Less
Subject to Party Discipline ....................................................................... 19

II    MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST
AMENDMENT BY ALTERING ELECTION OUTCOMES ........................ 22

III    A PRELIMINARY INJUNCTION IS WARRANTED ............................... 25

    A.    The Party is Likely to Succeed on the Merits ......................................... 25

    B.    The Party Will Suffer Irreparable Harm During the
2016 Primaries if Relief is Not Granted ................................................... 26

    C.    The Balance of Equities Tips in Favor of the Party ................................ 26

    D.    Enjoining an Unconstitutional Primary Election in
2016 is in the Public Interest .................................................................... 27

CONCLUSION ............................................................................................ 28

# TABLE OF AUTHORITIES

**Cases:**

*Arizona Libertarian Party v. Bayless*,
    351 F.3d 1277 (9th Cir. 2003) ..................................................................12, 22

*California Democratic Party v. Jones*,
    530 U.S. 567 (2000) ................................................................................*passim*

*California Democratic Party v. Jones*,
    984 F.Supp. 1288 (E.D. Cal. 1997), *aff'd* 169 F.3d 646
    (9th Cir. 1999), 530 U.S. 567 (2000).........................................................*passim*

*Clingman v. Beaver*,
    544 U.S. 581 (2005).........................................................................................17

*Democratic Party of Washington State v. Reed*,
    343 F.3d 1198 (9th Cir. 2003) .........................................................................12

*Doe v. Harris*,
    772 F.3d 563 (9th Cir. 2014) ...........................................................................27

*Idaho Republican Party v. Ysursa*,
    765 F.Supp. 2d 1266 (D. Idaho 2011) .............................................................22

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) .....................................................................11, 21

*Miller v. Brown*,
    503 F.3d 360 (4th Cir. 2007) .....................................................................12, 26

*Monterey Mechanical Co v. Wilson*,
    125 F.3d 702 (9th Cir. 1997) ...........................................................................26

*Sanders County Republican Cent. Comm. v. Bullock*,
    698 F.3d 741 (9th Cir. 2012) .....................................................................25, 27

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .........................................................................26

*Thalheimer v. City of San Diego*,
   645 F.3d 1109 (9th Cir. 2011) ................................................... 27-28

**Statutes & Rules:**

MONTANA CODE ANNOTATED
   § 13-1-104 .................................................................................... 3
   § 13-1-107 .................................................................................... 3
   § 13-1-201 .................................................................................... 3
   § 13-10-209 .................................................................................. 3
   § 13-10-301 .................................................................................. 3
   § 13-10-601 .................................................................................. 3

CALIFORNIA ELECTION CODE
   § 2150(8) .................................................................................... 17

# TABLE OF EXHIBITS

| Description of Document | Exhibit No. |
|---|---|

Transcript of Deposition of Montana GOP Executive Director
Chris Shipp & Deposition Exhibits (7/24/15) ............................................................1

Report of Plaintiffs' Experts, Prof. Kyle Saunders &
Prof. Steven Greene (6/4/15)....................................................................................2

Report of Defendants' Expert, Prof. Christopher Muste (7/14/15)...........................3

Transcript of Deposition of Senate Majority Leader
Matthew Rosendale (8/3/15) ....................................................................................4

Transcript of Deposition of MEA-MFT President Eric Feaver &
Deposition Exhibits (6/26/15) ..................................................................................5

Transcript of Deposition of Scott Boulanger (7/23/15)............................................6

Declaration of Brad Molnar (5/29/15).......................................................................7

Declaration of Republican House Majority Leader
Keith Regier (5/28/15)...............................................................................................8

Declaration of Republican Senate Majority Leader
Matthew Rosendale (5/29/15) ...................................................................................9

Transcript of Deposition of Prof. Kyle Saunders (7/30/15) ...................................10

Declaration of Scott Boulanger (6/3/15) .................................................................11

# INTRODUCTION

This case involves a First Amendment challenge by Plaintiffs[1] to enjoin enforcement by Defendants[2] of Montana's open primary system as applied to the Montana Republican Party. This system requires the Party to allow non-members to select its nominees for public office. The Constitution prohibits such intrusion because the First Amendment's freedom of association "would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000). Montana's mandatory open primaries inflict two distinct First Amendment injuries upon the Party.

First, they compel the Party's primary candidates to change their campaign messaging. As demonstrated below, the threat of union intervention deters candidates from supporting, for example, right-to-work issues even though the Republican Platform contains a plank endorsing them. Exacerbating this problem is a new policy by the MEA-MFT intended to help "fracture" the Republican Party

_____

[1] Plaintiffs shall be referred to collectively as the "Montana Republican Party" or the "Party."

[2] Defendants shall be referred to collectively as the "State" unless the context dictates otherwise.

by "aggressively promoting" candidates in contested Republican primaries who support the union's agenda rather than the Party's platform. Ex. 5, p. 33, 85.

Large institutional players like the MEA-MFT have learned to exploit Montana's open primary system. Republican candidates know this and respond with self-censorship, thereby injuring the Party's First Amendment rights.

Second, Montana's open primaries affect primary election results. The average crossover voting rate is 10 percent for voters who are self-described Democrats, a rate that increases to 20 to 30 percent if independent voters are included. This crossover rate invariably affects the results of close Republican primary elections, resulting in Republican nominees who are not favored by a majority of Republican voters. This constitutes a separate constitutional violation of the Montana Republican Party's associational rights. *Jones,* 530 U.S. at 581 ("There is simply no substitute for a party's selecting its own candidates"). The Party is therefore entitled to a preliminary injunction pending a final disposition of this case.

## STATEMENT OF FACTS

Montana's Secretary of State, Defendant Linda McCulloch, is the State's chief election officer. As such, she is responsible to "obtain and maintain uniformity in the application, operation, and interpretation of the election laws" of

Montana.  Mont. Code Ann. § 13-1-201.[3]  She also oversees primary elections held in June of every even-numbered year.  §§ 13-1-104(1)(a); 13-1-107(1).

Montana voters receive a complete set of party ballots during primary elections.  § 13-10-209(7).  Each voter may cast votes on only one party ballot and must dispose of the other ballot.  § 13-10-301(2).  These rules enable every voter to choose their party primary and therefore establish what is commonly referred to as an "open" primary.  *Jones,* 530 U.S. at 576 n.6.  Montana requires the two major parties to participate in this system.  § 13-10-601(1); Ex. 1 at 56.

The State does not register voters' party affiliation.  Ex. 1, p. 16; Ex. 2, p. 8; Ex. 3, p. 24.  The Party therefore cannot effectively identify all its members or turn them out at the polls and its candidates lack comprehensive voter lists that are limited to Republican voters.  Ex. 1, pp. 16-17, 26-27, 29, 60-61, 64.  Republican primary candidates respond by diluting their messages.  Ex. 4, pp. 71-72.

The MEA-MFT is the Montana affiliate of the National Education Association and is the largest union in the state with 18,000 members spread throughout every legislative district.  Ex. 5, p. 20, 40.  The union contributed over $55,000 to the Democratic Party in the last election cycle but none to the Republican Party.  Ex. 2, pp. 19-20; Ex. 5, p. 105.  The MEA-MFT endorsed 11 Democrats during the 2012 primaries but refused to endorse any Republicans.  Ex.

---

[3] All subsequent statutory references are to the Montana Code Annotated unless otherwise noted.

5, p. 41, 43. The union later endorsed candidates in all 125 legislative races for the 2012 general election, all of whom were Democrats. *Id.,* pp. 43-44, 167. It has not endorsed a Republican over a Democrat for statewide office since 1996. Ex. 5, p. 62.[4]

The Republican Party considers the MEA-MFT to be "downright hostile" and assumes union members oppose the Party and its Platform. Ex. 1, p. 74. The Republican Platform differs markedly from the union's policy goals on several issues, including right to work, school choice, and pension reform. Compare Ex 1, pp. 117-30 with Ex. 5, pp. 191-94.

MEA-MFT President Eric Feaver credited what he called a "handful of Responsible Republicans" with advancing the union's policy goals in the 2013 legislative session:

> Despite passing stuff we did not like much, stuff the governor had to veto, stuff we have had to challenge in court, the fact is the [2013] legislature (1) passed the largest school funding bill in history, (2) rejected all but one school privatization bill, (3) saved and amortized our teacher and public employee defined benefit retirement systems, (4) wasted no time on anti-union legislation, and (5) passed the largest increase in state employee base pay in memory. *Without a handful of "Responsible Republican" legislators the last legislature could have been a far different and radically ugly affair.*

(Ex. 5, p. 204, emphasis added).

---

[4] The union endorsed both a Democrat and a Republican for Secretary of State in 2000, a strategy that the union's president acknowledges did not go over well. Ex. 5, p. 64 ("all I got was bitching and moaning…I will never do that again").

The union believes Democrats will not win a legislative majority in the near future and recognizes the existence of Republican districts in which Republican primary victors consistently win in the general election. Ex. 5, pp. 55, 94. It therefore began endorsing candidates in certain Republican legislative primaries in 2014. *Id.*, p. 84. It analyzed prior election results, determined that a dozen Republican legislative districts would be "in play" for the 2014 primaries, and endorsed the "responsible" Republican in each of the districts. *Id.*, pp. 55, 84, 184. As President Feaver explained:

> if [the Republican Party] is going to fracture along some ideological fissure points, I would prefer that the folks that fracture against our interests are in the minority in the Republican Party. And insofar as I can help make that happen, I'll help make that happen.

*Id.*, p. 85.

The MEA-MFT "aggressively promote[s]" candidates it endorses. Ex. 5, p. 33. This includes mailing political brochures to each union member residing in the candidate's district. *Id.*, pp. 39-40, 196-97. The union canvasses members at its local meetings and through one-on-one efforts conducted by its field organizers. *Id.*, p. 33. Volunteers armed with detailed scripts contact members through phone banks and tabulate their voting preferences. *Id.*, pp. 111-112, 198-200. Union members also post yard signs and campaign door-to-door. *Id.*, pp. 40-41. On Election Day, union organizers "chase ballots" and "work really hard to get our members to the polls." *Id.*, p. 47. The union stated, both through the press and on

an individual basis, that "those who usually vote Democratic should consider voting in the GOP primary to support the Republican that most clearly reflects their views." *Id.*, pp. 56-57, 185.

Additionally, President Feaver emails political exhortations using a list containing 6,000 to 8,000 email addresses of members. Ex. 5, p. 78. On May 5, 2014, Feaver blasted an email with the following subject line: "Republican Party legislative primaries may make all the difference." *Id.*, p. 201. He assured his members that "not all Republicans are alike" and that "[y]our vote in Republican Party primaries for legislative candidates who believe government must play a positive role in our society is absolutely essential." *Id.*

Three weeks later, President Feaver blasted another email to his members. Ex. 5, p. 189. He again assured them that not all Republicans are bad: "Vote for solution driven, problem solving, responsible Republicans. *They do exist you know.*" *Id.* (emphasis added). "Responsible" Republicans "helped secure huge bills to fund public schools and state employee pay. They helped amortize and save pubic employee and teacher pensions. They helped kill all but one nasty public school privatization bill. They have earned voter affirmation big time." *Id.* He also noted that "the complexion of the next legislature may well be decided June 3, one Republican legislative primary after another" and that members who failed to heed the union's call "are hereby not authorized to bitch about the outcome." *Id.*

The following day, citing a newspaper article detailing the Republican Party's internal conflicts, President Feaver exhorted his members to vote for "responsible Republican legislators" who "chose NOT to drive the government/public school bus off the cliff." *Id.*, p. 212 (emphasis in original).

The union portrays itself as a "decision maker" and "we're always going to say we were the deciding factor in everything that we possibly can claim." Ex. 5, p. 46. To that end, the union publicizes its endorsements in the press as well as details about its mobilization efforts. *Id.*, p. 33; see also *id.,* p. 185 (union president's statements to the *Billings Gazette* describing emails and postcards sent to members in support of union-endorsed Republicans). The union also uses its magazine to publicize its alleged successes. After the 2012 primaries, the union's magazine contained the following:

> MEA-MFT played a big role in Montana's June 5 primary, working in 11 contested primary legislative campaigns. Our endorsed candidates won in all but two of those races....We mailed postcards and called members to let them know which candidates are endorsed by MEA-MFT members because of their support for workers; rights, public education, and public employees. MEA-MFT staff, governance, and members statewide rolled up their sleeves to help pound yard signs, go door to door, and make phone calls for endorsed candidates. More than 40 members volunteered to call other members in all 11 districts.

Ex 5, p. 165 (internal punctuation omitted). The union's magazine similarly trumpeted success after the 2014 primaries:

MEA-MFT members were instrumental in electing recommended candidates in a number of primary elections this spring. Our members cast the deciding votes in about a dozen contested primary races this year. Union members vote in higher percentages than any other group in Montana. We're proud of that. Our members make the difference in elections. We couldn't be happier with the results.

*Id.*, p. 181.

The MEA-MFT will likely seek to influence Republican primary elections again in 2016. *Id.*, pp. 63, 68. The Party, its candidates and its campaign consultants are all cognizant of the MEA-MFT's efforts. See, *e.g.*, Ex. 1, p. 74, Ex. 4, pp. 64; Ex. 6, pp. 43-44; Ex. 7, ¶¶ 13, 15. Republican consultants and top elected officials advise candidates to avoid issues that encourage union members to crossover into Republican primaries, such as right-to-work and school choice. Ex. 4, p. 66; Ex. 7, ¶¶ 8-9, 15. Candidates who can persuade non-Republicans voters to vote for them in a Republican primary have an advantage over Republican candidates who lack such appeal. Ex. 7, ¶ 12. Most Republican primary candidates avoid campaigning on right-to-work issues, even though the Party Platform includes a right-to-work plank. *Id.*, ¶ 14.

Republicans have held a majority of seats in Montana's legislative chambers for the past several sessions, including 29 of 50 Senate seats and 59 of 100 House seats in the 2015 session. Ex. 8, ¶ 2; Ex. 9, ¶ 4. Yet, 11 of the 59 Republican members routinely voted against the Party on key bills during the 2015 legislative

session. Ex. 8, ¶ 5. This included a vote to allow exceptions to the 60-vote "blast motion" rule that has existed for nearly 30 years (a rule similar to the 60-vote cloture rule in the U.S. Senate), thereby making it easier for Democrats and "responsible" Republicans to bring bills to the House floor that had been defeated in Republican-controlled committees. *Id.*, ¶¶ 7-8. They used these exceptions to pass the Democrats' three high-priority bills and other bills. *Id.* ¶¶ 14-16.

Seven members of the Republican Senate caucus consistently voted with the 21 Senate Democrats to enact Gov. Bullock's legislative agenda. Ex. 9, ¶¶ 7, 9. This included the Democrats' three high-priority bills as well as many others. *Id.*, ¶¶ 9-13. One of the dissident Republicans, Sen. Llew Jones, told the Republican leadership that he and the other six dissidents would join Democrats in removing Republican Sen. Debby Barrett as Senate President unless the Republican caucus agreed to assign "his guys" to "acceptable" committees. *Id.*, ¶ 21.

## ARGUMENT

### I   MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST AMENDMENT BY ALTERING CANDIDATE MESSAGING

The First Amendment "protects the freedom to join together in furtherance of common political beliefs." *Jones*, 530 U.S. at 574. This "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Id.* (citations omitted). Thus "a

corollary of the right to associate is the right not to associate." *Id.* (citations omitted). These rights "would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *Id.* (citations omitted).

Protection of associational rights is particularly important for political parties when selecting their nominees. *Jones*, 530 U.S. at 575 ("In no area is the political association's right to exclude more important than in the process of selecting its nominee"). A primary system that forces parties to "adulterate their candidate-selection process – the basic function of the party – by opening it up to persons wholly unaffiliated with the party ... has the likely outcome ... of changing the parties' message." *Id.* at 581. There is "no heavier burden on a political party's associational freedom." *Id.* at 582.

A party's message changes when its primaries are opened to non-members because a nominee "will have prevailed by taking somewhat different positions - and, should he be elected, will continue to take somewhat different positions in order to be *re*nominated." *Jones*, 530 U.S. at 580. This "encourages candidates – and officeholders who hope to be renominated – to curry favor with persons whose views are more 'centrist' than those of the party base" and "simply move[s] the general election one step earlier in the process, at the expense of the parties' ability to perform the basic function of choosing their own leaders." *Id.*

Though *Jones* involved California's blanket primary,[5] the same reasoning

applies to open primaries. *Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006)

("[k]nowing that voters unaffiliated with the plaintiffs' party will participate in

their primary dramatically changes the plaintiffs' decisions about campaign

financing, messages to stress, and candidates to recruit" and thus "*the mere*

*existence of the open primary law causes these decisions to be made differently*

*than they would absent the law*") (emphasis added); see also *Jones*, 530 U.S. at

597-98 (Stevens, J., dissenting) ("given that open primaries are supported by

essentially the same state interests that the Court disparages today and are not as

'narrow' as nonpartisan primaries, there is surely a danger that open primaries will

fare no better against a First Amendment challenge than blanket primaries have").

The obvious infringement of First Amendment rights caused by open primaries

compelled Virginia authorities to concede in later proceedings in *Miller* that "if a

political party is compelled to select its candidates by means of a state-run primary,

the State may not force the party to include voters in that primary." *Miller v.*

*Brown*, 503 F.3d 360, 368 (4th Cir. 2007) ("*Miller II*").

---

[5] In a blanket primary, all candidates from each party are included on one ballot, thereby enabling voters to, for example, support a Republican for governor and a Democrat for attorney general. *Jones*, 530 U.S. at 576 n.6. Montana's open primary, by contrast, involves a voter selecting one party's ballot and marking all of his or her choices for partisan offices on that ballot. *Id.*

Like the Fourth Circuit, the Party's experts in this case conclude that "the very existence of open primaries and crossover voting affects the nature of candidates and representation, regardless of whether crossover voters actually change the outcome of a race" and that "strategic position-taking in a more moderate direction has been occurring in Montana." Ex. 2, p. 13. Although the Montana Republican Party agrees with the Fourth Circuit that forced association in a primary election between a political party and non-members unconstitutionally alters candidate speech as a matter of law,[6] the Party has nevertheless marshaled considerable evidence demonstrating that open primaries affect candidate speech by:

- enabling powerful interest groups opposed to the Republican Platform, such as the MEA-MFT, to potentially mobilize blocs of non-Republicans to vote in Republican primaries,

- forcing Republican primary candidates to dilute their messages due to Montana's refusal to register voters' party affiliation and the resulting lack of reliable lists of party voters,

---

[6] There appears to be an intra-circuit conflict in the Ninth Circuit on whether the constitutionality of forced association of parties and non-members is an issue of law or requires supporting evidence from plaintiffs. Compare *Democratic Party of Washington State v. Reed*, 343 F.3d 1198, 1203 (9th Cir. 2003) (*Jones* "does not set out an analytic scheme whereby the political parties submitted evidence establishing that they were burdened. Instead, *Jones* infers the burden from the face of the blanket primary statutes") with *Arizona Libertarian Party v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003) ("*Jones* treated the risk that nonparty members will skew either primary results or candidates' positions as a factual issue, with the plaintiffs having the burden of establishing that risk").

- compelling members of Congress from open primary states to be more centrist than their counterparts from closed primary states,

- emboldening dissident Republicans to ignore the Republican Platform.

This evidence is described in detail below.

A   Union Efforts to Push Non-Republican Voters Into Republican Primaries Change Candidate Messages

As demonstrated by the evidence in this case, the mere threat of crossover voting in open primaries is enough to move candidate messaging to the center. *California Democratic Party v. Jones*, 984 F.Supp. 1288, 1299 (E.D. Cal. 1997), *aff'd* 169 F.3d 646 (9th Cir. 1999), *rev'd on other grounds*, 530 U.S. 567 (2000) ("the possibility of a decisive cross-over vote - whether or not that vote materializes - could well affect the conduct of elections and elected officials"). Thus, one reason that "strategic position-taking in a more moderate direction has been occurring in Montana" is that "outside influence - whether from the opposing party or via affiliated groups - can attempt to persuade non-Republican open primary voters to crossover and vote in the Republican primary. The candidates running for office know this, and have a strategic incentive to modify their message accordingly because this setting can affect their electoral prospects." Ex. 2, pp. 13, 16.

An example of this phenomenon is the threat of unions intervening in the Party's primaries. Republican consultants and top elected officials advise

candidates to avoid issues that encourage union members to crossover into Republican primaries and vote for their opponents. Ex. 7, ¶¶ 8-9, 15; Ex. 9, p. 66. Not surprisingly, most Republican primary candidates do not campaign on issues opposed by unions, particularly right-to-work issues. Ex. 7, ¶ 14. The threat of union intervention in Republican primaries is therefore chilling the Party's message concerning key planks in the Party's platform.

The MEA-MFT's well-publicized intervention in Republican primaries will exacerbate this problem and "clearly has the potential to do damage to the Republican brand and is more likely to occur under an open primary system." Ex. 2, p. 21. The MEA-MFT is the largest union in Montana and is solidly aligned with the Democratic Party.[7] The Montana Republican Party rightly considers the union "downright hostile." Ex. 1, p. 74; see also Ex. 2, p. 20 ("It is fair to say that the MEA-MFT is not an ally of the Republican Party.") The union's description of its efforts to promote endorsements as "fairly aggressive" is an understatement. Ex. 5, pp. 33, 39-41, 47, 111-12. It is particularly aggressive in encouraging non-Republicans to support its Republican endorsees. *Id.* at pp. 56-57 (union president's press statement that "those who usually vote Democratic should consider voting in the GOP primary to support the Republican that most clearly

---

[7] See pp. 3-4, *supra.*

reflects their views"); see also *id.*, pp. 189, 196-97, 201, 204, 212, 214, 217, 218-19, 220.

As noted by Plaintiffs' experts, the MEA-MFT's "behavior does demonstrate overt attempts at outside influence on the part of this group, which is easier to do in an open primary system." Ex. 2, p. 22. The union's efforts are overt because, in aggressively promoting its endorsements to *union members*, the MEA-MFT also aggressively informs the *public* of its efforts. *Id.*, p. 33, 165, 181, 185. Simply put, the union sells itself as a "decision maker" in electoral politics and thus "we're always going to say we were the deciding factor in everything that we possibly can claim." Ex. 5, p. 46.

The MEA-MFT's efforts "effectively raised the salience of these primary elections, thereby increasing the potential for crossover voting to occur and affect the outcome of the race." Ex. 2, pp. 28-29. The union's 18,000 members reside in all of Montana's legislative districts, and the union therefore has, on average, 360 members in each of the 50 state senate districts and 180 members in each of the 100 state house districts. Ex. 5, p. 20, 40. Even taking at face value the union's claim that 40 percent of its members are Republican, the union has on average a 216-member non-Republican voting bloc in each senate district that can potentially decide a Republican primary. In the 2014 primary election for SD-43, the union-

endorsed candidate defeated a more conservative Republican by 34 votes (50.36% to 49.64%). Ex. 11, ¶¶ 11, 12, 16.

The MEA-MFT says it will likely intervene in Republican primaries again in 2016. Ex. 5, p. 63, 68. While the union cannot *prove* its prior efforts decided the SD-43 race or any of the other close Republican primary races in 2014, it doesn't need such proof to affect candidate behavior in the future. The union's potential threat is not lost on the Montana Republican Party, its candidates, or its consultants. Ex. 1, p. 74, Ex. 4, pp. 64-65; Ex. 6, pp. 43-44, Ex. 7, ¶ 15. Thus, Party consultants will "continue advising candidates in contested Republican primaries to refrain from promoting (for example) pro right-to-work issues in order to diminish the threat of unions encouraging their members to crossover and vote against them." Ex. 7, ¶ 15. The aggressive and very public efforts of sophisticated institutional players such as the MEA-MFT to muscle large blocs of non-Republican members into Republican primaries will therefore cause even more self-censorship by Republican candidates.

## B. Lack of Party Registration in Montana Changes Candidate Messages

Montana's open primary system distorts candidate speech even more than California's blanket primary system found unconstitutional in *Jones*. Unlike Montana, California registers voters' party affiliation – and did so when its blanket

primary law was in effect. Cal. Elec. Code § 2150(8); *Jones*, 984 F.Supp. at 1289-

90. As the State's expert correctly opines, party registration is a "boon" to, *inter*

*alia*, party organizations and candidates who "benefit from easy access to

information about voters' political preferences." Ex. 3, p. 5; see also *Clingman v.*

*Beaver*, 544 U.S. 581, 604 (2005) (O'Connor, J., concurring) ("a reasonably fixed

party-related electoral base from the close of registration until the date of the

vote...facilitates campaign planning").

Senate Majority Leader Matthew Rosendale explained how a reliable list

containing only Republicans would change his messaging regarding, for example,

mailings targeted exclusively to Republican voters:

> You just obviously are able to use language that...that would help
> you to incite more energy, enthusiasm, and support and it would
> give you the ability to use some language that was more aggressive.

Ex. 4, pp. 71, 72.

Montana's open primary system lacks any provision for party registration.

Ex. 1, p. 16; Ex. 2, p. 8; Ex. 3, p. 24. Without it, the Party cannot identify

members or effectively turn them out for elections and spends "much more of our

time and our money trying to identify voters rather than turning out people we

know to be Republicans." Ex. 1, pp. 17, 26-27, 29. The Party attempts to compile

voter lists but they are never accurate or reliable. *Id.* 1, p. 64. This diminishes

Party cohesion and increases campaign costs. *Id.* 1, p. 35; Ex. 4, p. 70.

Along with these injuries, the lack of party registration causes a more severe First Amendment injury. Republican primary candidates who must rely upon lists that include non-Republicans dilute their messages. Republican consultants encourage their primary candidates to emphasize broad-based issues appealing to non-Republicans, such as hunting rights on public lands. Ex. 7, ¶¶ 11-12. Candidates are deterred from using more robust (or, as Sen. Rosendale puts it, "aggressive") messaging.

The State requires the Montana Republican Party to participate in its open primary system. Not only does that system prevent the Party from limiting participation to Party members, it prevents the Party from even identifying those members. The resulting change Republican candidates must make to their campaign messaging is another First Amendment injury traceable to Montana's open primary system.

C.   Members of Congress from Open Primary States Are More Moderate than Those From Closed Primary States

As stated previously, "the very existence of open primaries and crossover voting affects the nature of candidates and representation, regardless of whether crossover voters actually change the outcome of a race" and "strategic position-taking in a more moderate direction has been occurring in Montana." Ex. 2, p. 13. These effects "are not limited to the 2014 cycle, and are likely to continue to affect

the Republican candidates, campaigns, and policy outcomes in the future." Ex. 2, 14. This conclusion is supported by a study referenced by both parties' experts showing that members of Congress from states with closed primaries take more extreme policy positions than representatives from states with more open primaries. Ex. 10, pp. 103, 141-42, citing Gerber and Morton (1998) "Primary Election Systems and Representation," *Journal of Law Economics & Organization* 14(2): 304–324); see also Ex. 3, p. 31 (citing the same study).

A similar study (by the same author) showing that blanket primaries altered congressional issue positioning was sufficient, standing alone, to persuade the Supreme Court that California's blanket primary caused the "deleterious effect" of "favoring nominees with moderate positions." *Jones*, 530 U.S. at 580. Likewise, the study cited in the previous paragraph regarding the effect of open primaries on congressmen suffices, even without the Montana-specific evidence presented by the Party, to prove such primaries result in similar deleterious issue shifting by Montana candidates.

D.  Republican Candidates in Open Primaries Are Less Subject to Party Discipline

The Supreme Court noted that blanket primaries weaken parties' ability to discipline dissident nominees. *Jones*, 530 U.S. at 581 ("That party nominees will be equally observant of internal party procedures and equally respectful of party

discipline when their nomination depends on the general electorate rather than on the party faithful seems to us improbable"). This reasoning applies with equal force to open primaries:

> …[O]nce elected, candidates may perceive that the cross-over vote makes them less vulnerable at the primary to the wrath of the party organization or party regulars for acts of apostasy. A blanket or *open primary* weakens the "disciplining effect" of the primary challenge in requiring the officeholder to carry out the party philosophy and support the majority position of the party caucus.

*Jones*, 984 F.Supp. at 1299 (internal quotation marks omitted, emphasis added).

Such weak discipline was on display during the 2015 legislative session. Though Republicans held 59 of the Montana House's 100 seats, 11 members consistently joined Democrats to derail the Republican Party's agenda, thereby diluting the votes of Montana citizens who elected a majority Republican Legislature. Ex. 8, ¶¶ 5, 7-8, 14-16. This included the 11 dissidents gutting the 60-vote "blast motion," thereby making it easier for the 41 Democratic members and the dissident Republicans to bring bills to the House floor that had been defeated in House committees. *Id.*, ¶¶ 7-8. This enabled passage of the three bills most strongly opposed by the majority of the House Republican caucus, as well as other bills. *Id.*, ¶¶ 14-16.

The Senate Republican caucus faced similar problems, as seven of its members consistently voted with the 21 Senate Democrats to enact Gov. Bullock's legislative agenda. Ex. 9, ¶¶ 7, 9-13. Party discipline in the Senate was so poor

that "responsible" Republican senators threatened to join Democrats in removing Sen. Debby Barrett as Senate President unless the Republican caucus acceded to their demands for committee assignments. *Id.*, ¶ 21. Party discipline is lower now than in prior sessions. Ex. 9, ¶ 27. Montana's open primaries will continue to encourage dissident candidates to abandon the Party's planks when campaigning during primaries.

The evidence presented by the Montana Republican Party confirms what other courts have held: open primaries shift candidate speech regardless of how much actual crossover voting they cause. *Jones*, 984 F.Supp. at 1299 ("the possibility of a decisive cross-over vote - whether or not that vote materializes - could well affect the conduct of elections and elected officials"); *Miller*, 462 F.3d at 317-18 ("[k]nowing that voters unaffiliated with the plaintiffs' party will participate in their primary dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit" and thus "the mere existence of the open primary law causes these decisions to be made differently than they would absent the law"). Montana's open primary law is therefore unconstitutional.

II   MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST
     AMENDMENT BY ALTERING ELECTION OUTCOMES

The United States Supreme Court "vigorously affirm[s] the special place the

First Amendment reserves for, and the special protection it accords, the process by

which a political party selects a standard bearer who best represents the party's

ideologies and preferences." *Jones,* 530 U.S. at 575 (citations omitted). This is

because "the moment of choosing the party's nominee ... is the crucial juncture at

which the appeal to common principles may be translated into concerted action,

and hence to political power in the community." *Id.*

Not only does Montana's open primary law affect messaging by the Party's

candidates during primary election campaigns, it also affects who the prevailing

nominee is on Election Day. The Supreme Court in *Jones* held that "even a single

election in which the party nominee is selection by nonparty members could be

enough to destroy the party" and, ordinarily, will at least "severely transform" it.

*Jones*, 530 U.S. at 579.

The lower courts in *Jones* relied upon a study showing "the average

crossover rate, excluding independents, is something on the order of 5% of voters

in closed primary states, 10% of voters in open primary states, and 11-15% in

blanket primary states." *Jones*, 984 F.Supp. at 1298; see also *Idaho Republican

Party v. Ysursa*, 765 F.Supp. 2d 1266, 1274 (D. Idaho 2011) (court relied upon

studies demonstrating a 10% rate of crossing over by non-independents, which

rises to 20-30% when independents are included). Thus, "the amount of cross-over voting is greater in a blanket primary than an open primary but not dramatically so." *Id.*; see also *Ysursa*, 765 F.Supp. 2d at 1275 (finding no "meaningful distinction between the open primary in Idaho and the blanket primary found unconstitutional in *Jones*" because a 10% crossover rate "can be devastating to a party"). Further, courts have uniformly held that, in evaluating associational claims, independent voters should be included in the crossover rate. *Jones*, 530 U.S. at 578-79 & n.9; *Bayless*, 351 F.3d at 1282 (*Jones* "focused on the potential for the participation of nonparty members, including registered members of other parties, to influence the choice of the nominee at the primary and to cause partisan candidates to change their message to appeal to a more centrist voter base"); *Ysursa*, 765 F.Supp. 2d at 1274 n.3.

Crossover voting is most likely to occur, and be decisive, when there is "asymmetric competition" arising from one party's primary being competitive while the other party's primary is not. *Jones*, 984 F.Supp. at 1299. Noting that ten California legislative races in 1996 involved a contested primary for one party without a contest in the other and that a crossover rate of 5% could have changed the outcome in some of the races had the crossover voters voted for the same candidate, the court concluded that "it is likely that in the fullness of time some

California primary races will be decided by cross-over voters, even if the number of such occasions is not large." *Id.*

Montana has similar data. The state averages 3.57 legislative races each election cycle involving an uncontested Democratic primary (*i.e.*, either one or zero Democrats running) and a contested Republican primary decided by less than 5% of the vote. Ex. 2, pp. 32-36; Ex. 3, p. 26. Like the experts relied upon by the courts in *Jones* and *Ysursa*, the Party's experts in this case concluded that the average crossover rate for Montana's open primaries, as with the rate in other open primary states, is approximately 10% for partisan voters. Ex. 2, p. 10. When independent voters are included, this rate rises to 20-30%. *Id.* Even with a 10% crossover rate, "the results of the primaries are more likely than not affected by crossover voting." *Id.*, p. 17. When independent voters are factored in, the effects are even more disruptive and result "in more moderate legislators being elected, thus distorting the consistency and broadening the ideological diversity among the Republican Party's officeholders in the Montana Legislature." *Id.*
Thus, "it is likely that in the fullness of time some [Montana] primary races will be decided by cross-over voters, even if the number of such occasions is not large." *Jones*, 984 F.Supp. at 1299.

As the Supreme Court held, "there is simply no substitute for a party's selecting its own candidates." *Jones,* 530 U.S. at 581. The continued application

of Montana's open primary law to the Montana Republican Party will ensure that at least some candidates will be nominated without the votes of a majority or, in races involving three or more candidates, even a plurality of Republican votes. This burden on the Party's First Amendment associational rights is severe and unjustified by any compelling state interest. Montana's open primary law is therefore unconstitutional.

## III  A PRELIMINARY INJUNCTION IS WARRANTED

To obtain injunctive relief, a plaintiff must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is not granted, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is in the public interest. *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) (citations omitted). The Montana Republican Party can satisfy each of these requirements.

### A.  The Party is Likely to Succeed on the Merits

The Party has demonstrated that its forced participation in Montana's open primary system results in its primary candidates being compelled to alter their

campaign messaging.[8]  Open primaries also affect election outcomes.[9]  Each of these results severely burdens the Party's First Amendment rights.

The State therefore must prove that Montana's open primary system achieves a compelling interest and is narrowly tailored. *Jones*, 530 U.S. at 582. None of the interests presented by state authorities in other cases involving forced association between parties and non-members during primary elections have been found to be compelling. *Id.* at 582-85; *Miller II*, 503 F.3d at 370-71.  Montana authorities are unlikely to come up with one, either.  The Party is therefore likely to succeed on the merits.

B.    The Party Will Suffer Irreparable Harm During the 2016 Primaries if Relief is Not Granted

Ongoing or future constitutional violations by a defendant satisfy the irreparable harm requirement because "unlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009); *Monterey Mechanical Co v. Wilson*, 125 F.3d 702, 715 (9th Cir.1997) ("an alleged constitutional infringement will often alone constitute irreparable harm").

---

[8] See Part I, *supra*, pp. 9-21.

[9] See Part II, *supra*, pp. 22-25.

26

As stated previously, Montana's open primary law violates the Party's rights under the First Amendment. This deprivation of constitutional rights will continue until this Court grants relief, relief that cannot be obtained by an award of monetary damages. This factor thus weighs in favor of granting injunctive relief.

## C. The Balance of Equities Tips in Favor of the Party

When First Amendment rights are at stake, the balance of hardships generally tips toward plaintiffs except when they cannot establish a likelihood of success on the merits. *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (chilling of First Amendment rights entitled plaintiff to preliminary injunctive relief even though "there will be some hardship on the State"); *Sanders County Republican Cent. Comm.*, 698 F.3d at 749 (because "Montana's ban on party endorsements of judicial candidates offends the First Amendment, we conclude that the balance of hardships favors the Appellant"). Because the Party has established the likelihood of success on its First Amendment claims, the Court should find the balance of hardships tips in its favor.

## D. Enjoining an Unconstitutional Primary Election in 2016 is in the Public Interest

The Montana Republican Party's First Amendment rights are ones that, if protected, will advance the public interest. *Thalheimer v. City of San Diego*, 645

F.3d 1109, 1129 (9th Cir. 2011) ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles"). This is particularly true in this case. As shown above, Montana has been conducting unconstitutional primary elections that infringe upon the Montana Republican Party's First Amendment rights to control its own messaging. The State will continue to do so absent injunctive relief from this Court. This factor therefore favors granting injunctive relief as well.

## CONCLUSION

For all of the foregoing reasons, all Plaintiffs respectfully request this Court grant their motion and preliminarily enjoin the State from forcing the Montana Republican Party to associate during primary elections with non-members.

DATED: August 28, 2015       Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs


The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party

## CERTIFICATE OF COMPLIANCE WITH L. R. 7.1(d)(2)(E)

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 6,390 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: August 28, 2015

Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs

The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 28th day of August, 2015, that a copy of the foregoing will be delivered this day via the Court's ECF system to the following:

TIMOTHY C. FOX Montana Attorney General
J. STUART SEGREST
PATRICK M. RISKEN
Assistant Attorneys General
JON BENNION
Deputy Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
ssegrest@mt.gov
prisken@mt.gov
jonbennion@mt.gov

DATED: August 28, 2015

Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs

The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party