TIMOTHY C. FOX
Montana Attorney General
J. STUART SEGREST
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
ssegrest@mt.gov; prisken@mt.gov
Phone:  (406) 444-2026, Fax:  (406) 444-3549

COUNSEL FOR DEFENDANTS

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMMITTEE, *et al.*,<br><br>        Plaintiffs,<br>v.<br><br>LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, *et al.*,<br><br>        Defendants. | Case No. 6:14-cv-00058-BMM<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO STRIKE OPINIONS OF PLAINTIFFS' EXPERT WITNESSES** |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

I.  INTRODUCTION ............................................................................1

II.  ARGUMENT AND AUTHORITIES .................................................2

     A.     The Standards For Admissibility Under Fed. R. Evid. 702 .................2

     B.     The Qualifications Of The Experts Alone Is Not Enough ...................3

     C.     The Experts Have Admitted To The Absence Of A Scientific Method..........................................................................................4

          1.     Targeted Research ...................................................................8

          2.     The Opinions Offered By Plaintiffs' Experts Would Not Survive Peer Review ...............................................................9

          3.     There Is No Evidence Connecting The Experts' Theories To The Events Of 2014...........................................................11

          4.     Reliability Is Absent When The Expert Fails To Eliminate Other Possible Explanations.....................................12

          5.     The MEA-MFT Speech Evidence Is Irrelevant........................14

     D.     Prof. Saunders' *Ysursa* Opinions Destroy the Reliability of His Methods and Opinions Here.................................................15

     E.     The Foundation For Plaintiffs' Expert Opinions Is Inadequate..........18

     F.     "Reverse Roll Off" Is A Complete Fiction ........................................19

CONCLUSION...................................................................................21

CERTIFICATE OF SERVICE .............................................................22

CERTIFICATE OF COMPLIANCE......................................................23

# TABLE OF AUTHORITIES

## CASES

*Brown v. Burlington Northern,*
  765 F.3d 765 (7th Cir. 2014) .........................................................................8, 13

*Bruce v. Harley-Davidson Motor,*
  2012 U.S. Dist. LEXIS 3675 (C.D. Cal. 2012) ............................................9, 14

*Bryte v. American Household,*
  429 F.3d 469 (4th Cir. 2005) ................................................................................13

*Clausen v. M/V New Carissa,*
  339 F.3d 1049 (9th Cir. 2003) ..........................................................................5, 13

*Dasho v. City of Federal Way,*
  2015 U.S. Dist. LEXIS 55661 (W.D. Wash. 2015)...........................................11

*Daubert v. Merrell Dow Pharm. (Daubert II),*
  43 F.3d 1311, 1316 (9th Cir. 1995) .................................................... 3, 5, 6, 19

*Daubert v. Merrell Dow Pharmaceuticals,*
  509 U.S. 579 (1993).................................................................................. passim

*Davis v. Unum Life Ins.,*
  444 F.3d 569 (7th Cir. 2006) ...............................................................................18

*Federal Housing Finance Agency v. Nomura Holding America,*
  2015 U.S. Dist. LEXIS 16034 (S.D.N.Y. 2015) ..................................................4

*General Elec. v. Joiner,*
  522 U.S. 136 (1997)................................................................................... 11, 12

*Glastetter v. Novartis Pharm.,*
  252 F.3d 986 (8th Cir. 2001) ...............................................................................12

*Hendrix v. Evenflo,*
  609 F.3d 1183 (11th Cir. 2010) ..........................................................................10

**TABLE OF AUTHORITIES (Cont.)**

*Idaho Republican Party v. Ysursa,*
　　U.S. Dist. Ct., District of Idaho, Case No. 1:08-cv-00165-BLW.............. passim

*Kuhmo Tire v. Carmichael,*
　　526 U.S. 137 (1999)................................................................................ 3, 10, 12

*Lust v. Merrell Dow Pharm.,*
　　89 F.3d 594 (9th Cir. 1996) ............................................................................3, 9

*United States v. Jones,*
　　24 F.3d 1177 (9th Cir. 1994) ............................................................................21

## OTHER AUTHORITIES

Federal Rules of Evidence
　　Rule 702.......................................................................................... 2, 5, 13

Black's Law Dictionary
　　(10th ed. 2014)....................................................................................4

Federal Judicial Center, Reference Manual on Scientific Evidence
　　(3d ed. 2011)........................................................................................4

# I.  INTRODUCTION

Plaintiffs' expert witnesses, political science professors Kyle Saunders and Steven Greene, have submitted a report (Doc. 55-1; refiled as 71-2) and have each testified under oath regarding their opinions.  For the purpose of this motion each will be referred to as "Saunders" or "Greene."  Prof. Saunders deposition testimony is found at Doc. 71-10.  Excerpts of Prof. Greene's deposition testimony is attached to the *Declaration of Patrick Risken re:  Daubert Motions,* filed herewith.

According to Saunders and Greene, crossover voting "is a pervasive feature of primary elections."  *See* Doc. 55-1 at 13.  It occurs in any type of primary election:  closed or open.  *Saunders Dep.* at 16, 65.  Because crossover voting occurs in both open and closed primaries it is the Plaintiffs' burden to prove that crossover voting occurs in open primaries in numbers that have an actual negative affect on the outcomes of Republican Party primary elections--an impossible burden.  First, there is no record or data specific to Montana regarding the numbers of registered voters that are affiliated with a particular party in Montana.  Second, aside from the actual ballots chosen by voters for the primary election, there is no way to tell who is affiliated with any particular party.  Third, because of the absence of party registration, there is no data upon which to base any analysis of voting behaviors, including so-called "crossover voting."

As admitted by the Plaintiffs' expert witnesses, the absence of reliable data renders any analysis of crossover voting and Montana voting behaviors mere guesswork based solely on scholarly literature.  Even though this case is set for trial by the Court, for the following reasons and based in large part on the testimony of the Plaintiffs' experts, the Defendants herein respectfully submit that the expert opinions offered by the Plaintiffs must be stricken, and their experts prevented from testifying.

## II.  ARGUMENT AND AUTHORITIES

### A.    The Standards for Admissibility under Fed. R. Evid. 702.

*Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), states that expert testimony will be admissible under Fed. R. Evid. 702 if it is "scientific knowledge" and if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert,* 509 U.S. at 590-91.  It is the court's task--referred to as the "gatekeeping function" (*Id.* at 600) (Rehnquist, C.J., dissenting)--to ensure that the proffered testimony rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.  The fatal flaw of the opinions offered by the Plaintiffs' expert witnesses in this case is primarily that of reliability, and this court possesses considerable flexibility in assessing the

reliability of expert testimony.  *Kuhmo Tire v. Carmichael,* 526 U.S. 137, 141 (1999).

The *Daubert* court provided certain factors for consideration regarding the admissibility of expert opinions, including whether the theory can be tested, whether it has been subject to peer review and publication, an assessment of the known or potential rate of error, the existence of standards, and the "general acceptance" within the scientific community.  *Daubert,* 526 U.S. at 593-94.  Of course, these considerations are not a "definitive checklist or test."  *Id.* at 593.  In the end the court's gatekeeping inquiry must be tied to the facts of a particular case.  *Id.* at 591.  Therefore, the party presenting the expert must demonstrate that the expert's findings are based on sound principles and are capable of some objective, independent validation.  *Lust v. Merrell Dow Pharm.,* 89 F.3d 594, 598 (9th Cir. 1996); *Daubert v. Merrell Dow Pharm.,* ("Daubert II"), 43 F.3d 1311, 1316 (9th Cir. 1995).

For the reasons explained below, and based almost entirely on the testimony of Plaintiffs' experts, the opinions of Drs. Saunders and Greene should be stricken under the *Daubert* standard of reliability and ultimate admissibility.

### B.    <u>The Qualifications of the Experts Alone Is Not Enough.</u>

While both Professors Greene and Saunders are political scientists qualified in their field of expertise, neither has authored articles in the field of primary

election laws and crossover voting. *Saunders* at 36; *Greene* at 12-14. Prof.
Saunders has never researched or taught associational rights (*Saunders at* 189) and
Prof. Greene might mention crossover voting once every three semesters in a five
minute segment of one class that he teaches. *Greene* at 14-16. Therefore, neither
Saunders nor Greene is an authority on the specific issue of crossover voting in any
type of primary election. As explained below, the methods employed by these
experts, their targeted research and the limited inquiry that they pursued render all
of their opinions unreliable.

### C.  The Experts Have Admitted to the Absence of a Scientific Method.

The "scientific method" is defined as "the process of generating hypotheses
and testing them through experimentation, publication, and replication." *Black's
Law Dictionary* 1547 (10th ed. 2014), cited in *Federal Housing Finance Agency v.
Nomura Holding America,* 2015 U.S. Dist. LEXIS 16034 at * 15-16 (S.D.N.Y.
2015).

> A good study design compares outcomes for subjects who are exposed
> to some factor (the treatment group) with outcomes for other subjects
> who are not exposed (the control group). . . . [D]ata from a treatment
> group without a control group generally reveal very little and can be
> misleading. Comparisons are essential. . . . Observational studies
> succeed to the extent that the treatment and control groups are
> comparable--apart from the treatment. . . . There are . . . some basic
> questions to ask when appraising causal inferences based on empirical
> studies [, such as,] [w]as there a control group? Unless comparisons
> can be made, the study has little to say about causation.

*Federal Judicial Center, Reference Manual on Scientific Evidence,* 218, 220,

222 (3d ed. 2011) (emphasis added); *Id.* In this case, as admitted by the Plaintiffs'

experts, there is no "control group" in the sense that there is no data to compare

races, primaries, parties or years. Their opinions are entirely theoretical since

there is no basis for comparison to test those theories. *See Expert Report of*

*Christopher P. Muste, Ph.D.,* (Doc. 71-3) at 2 n.5, and at 8, 11, 24.

One very important factor to consider is whether the experts have prepared

their opinions expressly for the purpose of testifying, as opposed to research

independent of the litigation. *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056

(9th Cir. 2003). The experts' own testimony explains that they tell only half the

story, and their opinions or conclusions cannot be tested. Fed. R. Evid. 702

permits opinion testimony by experts as to matters amounting to "scientific

knowledge." *Daubert II,* 43 F.3d at 1316. While absolute certainty is not required,

an inference or assertion must be derived by the scientific method. *Id.* Where the

proffered testimony is not based on independent research, in order to be admissible

as "scientific knowledge," it must be supported by "objective, verifiable evidence

that the testimony is based on 'scientifically valid principles.'" *Id.* at 1318.

Saunders and Greene cannot express "scientific knowledge" because neither

employed the "scientific method." Rather, the professors merely targeted their

research and then recited what suited their clients' needs.

5

While both admitted that analysis and understanding of electorate behavior is important (*Saunders* at 10; *Greene* at 110), neither the experts nor the Plaintiffs themselves collected data or performed an independent statistical analysis relative to Montana primary elections. *Greene* at 31, 110; *Saunders* at 44.  Admittedly survey data would have been beneficial to their analysis, and it should have started in 2013.  *Saunders* at 118-19, 152-53; *Greene* at 28-29.  Without data the experts were left to "scholarly conclusions" based upon literature not specific to Montana voting behavior or elections.  *Greene* at 77, 113.  Prof. Greene also admitted that he would never draw broad conclusions from a single election.  *Greene* at 29-30.  Yet that is precisely what these experts did in this case.  *Saunders* at 141-43.

Greene stated that his own published research always involves his original research of data and analysis.  *Greene* at 43-44.  Saunders' preference is a statewide survey and as to particular House and Senate Districts as well.  *Saunders* at 14-15.  Greene suggested a phone survey of party affiliation.  *Greene at* 87.  None of that was provided in this case.  Therefore the opinions are only inferences drawn from literature (*Saunders* at 119-20); merely generalizations.  *Saunders* at 13.  Because neither expert incorporated Montana--specific data into their opinions there is no vehicle to determine a potential or acceptable rate of error.  *Daubert II* at 1317.  Without the ability to test the opinions, they are merely theory.

Neither checked the credentials of the persons supplying the election results or verified the data provided. *Greene* at 45-47; *Saunders* at 46-47.  Saunders had no idea if Mr. Ponte (Doc. 55-6 at18-19) had selected races to achieve a desired result. *Saunders* at 48-50.  For all Greene knew the data was "entirely made up." *Greene* at 51-52, 55-56.  Further, neither compared the data provided by Plaintiffs' counsel with other states' results (*Saunders* at 171-72) and neither compared the 2014 primary results historically with the results from previous Montana primary elections. *Saunders* at 141-42.

More compelling is the admission that the research was biased in favor of the Plaintiffs' claims. *Greene* at 26, 41-43.  "We focused on the evidence that we felt was most supportive of the case we were making." *Greene* at 98.  The "evidence," as it turns out, was merely journal articles. *Saunders* at 127-28; *Greene* at 68-69.  None of this "evidence" is specific to Montana. *Greene* at 69-70.  The conclusion that crossover voting could reach 30 percent is based only on literature and is merely an "estimate." *Saunders* at 119-20; *Greene* at 88.

Finally, Prof. Greene admitted that it is not an accepted political science standard to merely take information and data from unknown sources and incorporate it into a report for peer review (*Greene* at 53), such as the information received from Messrs. Ponte, Butcher, Rosendale and Regier (Doc. 55-6).  Saunders refused to answer that question. *Saunders* at 56-60.  Neither did anything

7

to verify either the credentials of those sources or the accuracy of that data. *Greene* at 46; *Saunders* at 46-47, 52.

While Professor Saunders hedged, Professor Greene candidly admitted that if this report had been his to perform as a scholarly research paper, it would have been done differently. *Greene* at 30, 38-39, 43-44, 98. Both admitted to preferring to use hard data, and yet neither asked for it in this case. That the experts failed to follow their own stated methods leads to the reasonable conclusion that the experts failed to follow a reliable method. *Brown v. Burlington Northern,* 765 F.3d 765, 775 (7th Cir. 2014).

### 1.    Targeted Research

Saunders had no idea of the history and policies behind Montana's 1913 passage of an open primary system, stating dismissively: "That was a long time ago. By 2015 I would imagine the political circumstances have changed." *Saunders* at 40-41. The present-day Montana Republican Party prefers a convention, or "a very narrow selectorate." *Saunders* at 22. That would lead to the elimination of moderates. *Id.* at 172. Voters should be loyal and ideologically coherent with the platform and agenda. *Id.* at 23. Under these experts' focus, "the [voters are] more of a constraint on the elites of the party." *Saunders* at 114. Therefore, the analysis was performed only from the perspective of the Republican Party. *Saunders* at 19-21.

8

An expert's unpublished opinions, formed exclusively for the purpose of litigation, are unreliable. *Bruce v. Harley-Davidson Motor,* 2012 U.S. Dist. LEXIS 36723 at \*18 (C.D. Cal. 2012). Because Plaintiffs' experts concentrated only on literature that supported the Plaintiffs' claims, the report and opinions are targeted and therefore inadmissible. *Lust v. Merrell Dow Pharms.,* 89 F.3d 594, 597-98 (9th Cir. 1996).

### 2. The Opinions Offered By Plaintiffs' Experts Would Not Survive Peer Review.

Ordinarily, a key inquiry in determining whether a theory is scientific knowledge is whether it can be (and has been) tested. *Daubert,* 509 U.S. at 593. Hypotheses must be tested to see if they can be falsified. *Id.* The report submitted by the Plaintiffs' experts, and their opinions, would not survive peer scrutiny for a number of reasons.

First, the report and opinions would not survive peer review because it was incomplete, lacking a discussion of weaknesses in its research. *Greene* at 42-43, 98. The report is admittedly vague on related literature. *Greene* at 38-39. Both Greene and Saunders admitted that they have no data against which to test their opinions, or data that supports their opinions that crossover voting occurred in the 2014 Montana primary election in such numbers that it affected the outcome of any race. *Saunders* at 27, 86, 118-19; *Greene* at 31, 77, 80. By these admissions it is clear that neither Saunders nor Greene "employ[ed] in [their report] the same level

of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire v. Carmichael,* 526 U.S. at 152.

Further, the methodology employed by the two professors is suspect. Greene described the methodology as "reading, thinking, writing." *Greene* at 41. He did not describe any manner of testing their hypotheses. Both admitted that their opinions are based solely on academic literature without Montana-specific data. *Saunders* at 13-14, 27; *Greene* at 30-31. Their conclusions are based almost solely on inferences drawn from generalities. *Saunders* at 110-11. Neither Greene nor Saunders gathered actual voter survey data (*Greene* at 31) though Saunders would have suggested a survey had the issue been presented in 2013. *Saunders* at 119. And neither expert independently researched or verified *any* facts relative to the claims made by the Republican Party. *Saunders* at 44, 170-71; *Greene* at 45-46.

By merely learning of the Plaintiffs' claims, thinking about them, targeting their research and then writing their report, Saunders and Greene merely expect this court to "take their word for it." *Hendrix v. Evenflo,* 609 F.3d 1183, 1201 (11th Cir. 2010). This approach renders the Plaintiffs' expert opinions unreliable and inadmissible. *Id.*

### 3. There Is No Evidence Connecting The Experts' Theories To The Events Of 2014.

An analytical connection between the data, the methodology and the expert's conclusions is absent from the Plaintiffs' case. *See General Elec. v. Joiner*, 522 U.S. 136, 146 (1997).  Lack of data specific to Montana primary voting, from which to test these experts' opinions, is fatal to their admissibility. *See Dasho v. City of Federal Way,* 2015 U.S. Dist. LEXIS 55661 at *12-13 (W.D. Wash. 2015) (determining experts' "global opinion" lacked functional support and was inadmissible.).

While Saunders has previously implored a different court with the absolute necessity of reliable voter preference survey data (s*ee* Section D, *infra,* and Ex. B to Risken Declar.) neither he nor Greene independently researched facts or data relevant to the claims (*Saunders* at 44, 47, 55-56; *Greene* at 45-46), and neither verified the scant data provided. *Saunders at* 170-71.  Rather, Saunders cavalierly stated that he was "comfortable generalizing from the scholarly literature" without survey data. *Saunders* at 118.  Yet without data specific to Montana, explained by the literature and tested, any conclusion is a guess.  The analysis submitted by these experts is incomplete.[1]  Plaintiffs cannot prove that this method was

---

[1] Saunders admits that he would have recommended an appropriate survey had the issue been presented to him in 2013. *Saunders* at 119.  Since Montana has used the open primary system since 1913 there was ample time to prepare and present actual data to support Plaintiffs' claims.

generally accepted in the political science community.  *Daubert,* 509 U.S. at 593-94.

To be reliable the evidence must provide a "valid . . . connection to the pertinent inquiry."  *Kuhmo Tire,* 526 U.S. at 149 (quoting *Daubert,* 509 U.S. 592). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion offered."  *General Elec. v. Joiner,* 522 U.S. 136, 146 (1997).  Saunders' admitted generalization is nothing if not *ipse dixit.*  When none of the Plaintiffs' expert opinions can be tested, the scientific method is eliminated.  The Plaintiffs' experts' opinions are based solely on their own "subjective speculation that masquerades as scientific knowledge."  *Glastetter v. Novartis Pharm.,* 252 F.3d 986, 989 (8th Cir. 2001).  *See also Muste Report* (Doc. 71-3) at 2 n.5, and 8, 11, 20, 24.

### 4.  Reliability Is Absent When The Expert Fails To Eliminate Other Possible Explanations.

In their report, Profs. Saunders and Greene examine what they describe as "the strange case" of the 2014 primary election between Scott Boulanger and Pat Connell in Montana Senate District 43 (Doc. 55-1, at 26-27) which in fact was the *only* election that they reviewed.  Saunders admits that he was not aware of a variety of factors that might have influenced the narrow defeat of Mr. Boulanger.

*Saunders* at 88-90.  "It's hard to know what considerations [voters] made on this" (*Id.* at 89) and he admitted that "unfortunately we don't have the data to necessarily test" the conclusion that crossover voting caused Boulanger's defeat. *Id.* at 86.  Rather, that conclusion is just an inference drawn from the result of the election.  *Saunders* at 86.  While admitting that blaming the loss on crossover voting "is a difficult inference to draw if you don't have individual-level data" (*Saunders* at 90-91) that "inference" was in fact their target.  Prof. Saunders continued to circle back to election speech activity(see Sec. C.5 below) and assumed crossover voting as the "likely explanation" of Boulanger's defeat. *Saunders* at 89, 92-95.

Failure to explain and eliminate other potential alternative causes renders the expert's methods unreliable and the opinions inadmissible.  *Clausen v. M/V New Carissa,* 339 F.3d at 1058 ; *see also, Brown v. Burlington Northern,* 765 F.3d 765, 773-75 (7th Cir. 2014).  Plaintiffs chose to bring this lawsuit without "individual level" data and presented only one 2014 primary election race as their prime example of the mischief of crossover voting.  Because Plaintiffs' experts failed to explore any explanation other than crossover voting, their conclusions are nothing more than targeted speculation and cannot be reconciled with the reliability mandate of Fed. R. Evid. 702.  *Bryte v. American Household,* 429 F.3d 469, 476-77 (4th Cir. 2005).

13

### 5.    The MEA-MFT Speech Evidence Is Irrelevant.

Likewise, the Plaintiffs' experts place great weight on electioneering activity, or free speech, by the Montana Education Association-Montana Federation of Teachers labor organization prior to the 2014 primary election, even though "campaigning is quite common." *Greene* at 71-72. Based upon a few emails but without any proof that it had an impact (*Saunders* at 148-49), Saunders insists that the MEA-MFT speech had the "potential" to have influence. *Id.* And while Saunders was unaware of any other efforts from "outside organizations" other than the MEA-MFT speech (*Saunders* at 94, 95, 153-54), he merely presumes there were others because "that's how elections work." *Saunders* at 155. Further, that MEA-MFT is "allied" with the Democratic Party is a generalization without historical support. *Saunders* at 155-56, 160; *Greene* at 72. For all they know the MEA-MFT could be made up of a majority of Republicans. *Greene* at 73. Because neither expert provided an explanation for the elimination of other possible causes of Boulanger's defeat, their opinions regarding the cause--crossover voting by non-Republicans--are unreliable and inadmissible. *See also Bruce v. Harley-Davidson* at *19.

Obviously these experts molded the "facts" to fit their needs. In the end, both experts testified that it was impossible to determine what impacted the voters in the Boulanger-versus-Connell primary race because of the lack of data.

14

*Saunders* at 66, 86-87; *Greene* at 73.  Their methodology is fatally flawed and,

therefore, their opinions are not the result of "good science."

### D.    Prof. Saunders' *Ysursa* Opinions Destroy the Reliability of His Methods and Opinions Here.

Professor Saunders acted as an expert witness for the State of Idaho when

its Secretary of State, Ben Ysursa, came under attack by the Idaho Republican

Party on an identical claim:  crossover voting in an open primary election.

*Idaho Republican Party v. Ysursa,* U.S. District Court, District of Idaho,

Case No. 1:08-cv-00165-BLW.  In *Ysursa,* Saunders not only rendered opinions

antithetical to those that he promotes herein, but he also completely disparaged the

means and methodology by which the Idaho Republican Party (IRP) conducted its

data collection in support of its opinions.  *See Report of Andrew D. Martin, Ph.D.*

*and Kyle L. Saunders, Ph.D.,* May 14, 2010 (*Risken Decl.,* Ex. B).  In *Ysursa,*

Saunders insisted that since all of the literature uses survey data in each case, any

comparison without it would be invalid.  Risken Decl., Ex. B at E-5.

The inconsistencies between the *Ysursa* report and that submitted by

Prof. Saunders in this case are many, and what follows here is reference to just a

few.  Significantly, Saunders' *Ysursa* report attacked the IRP's case for its method

of collecting voter survey data, in that the IRP's data failed to measure "partisan

attitude," the "unquestioned standard in scholarly research for nearly 50 years."

Risken Decl., Ex. B, at D-18.  The Plaintiffs' case here is not based on Montana

15

survey data of *any* kind.  In *Ysursa* Prof. Saunders proclaimed that "*this one point alone [faulty survey data] is enough to invalidate [the IRP's study] for any peer-reviewed journal in political science*" (Risken Decl., Ex. B, at D-18 (emphasis original)).  He concluded:  "the literature uses an attitudinal party identification question in each and every case.  Any comparison [without it] would be invalid." *Id.* at E-4, E-5.  This statement alone invalidates the use of only scholarly literature to conjure generalities, as Saunders and Greene have admitted to doing in this case.

Also, without the benefit of data or any analysis of partisanship in Montana, Saunders and Greene generalize that anyone not voting for a Republican is non-Republican.  Doc., 55-1, at 11 first para.  In *Ysursa* Prof. Saunders blistered that overly simplistic approach:

> Although it may be that from the perspective of the Party Organization . . . , everyone who does not vote for a Republican is not a Republican, decades of political science research suggests that this is decidedly not the case.  In fact, had this survey actually measured attitudinal partisanship on the standard seven point scale . . . , we may have seen a much more nuanced picture of identification with their party, especially among Independents, who likely lean toward the Republican Party in Idaho; instead we were given an invalid and false dichotomy used to make a point that, in turn, demonstrates a surprising lack of knowledge of what we know about public opinion and political behavior, . . . .

Risken Decl., Ex. B at D-19.  Saunders explained the proper methodology of survey gathering and analysis at Section E of the *Ysursa* Report, which was

16

omitted entirely from his Montana report herein.  The inconsistency of opinions could not be more glaring, which sheds a great deal of light on the reliability of the Saunders and Greene Montana approach.

Plaintiffs' experts state that under a strict definition ("one side's partisan identifiers voting in another party") average crossover voting based upon the literature alone is roughly 10 percent. Doc. 55-1, at 10; *Greene* at 80.  To reach the greater number of 30 percent of crossover voters Saunders and Greene added all Independent voters to their calculation.  *Saunders* at 70; Doc. 55-1 at 11.  In *Ysursa,* Saunders reported that merely lumping independent voters into the group of so-called crossover voters is not supported by the majority of political scientists. Risken Decl.*,* Ex. B, at E-7.  Here he talked circles around the fact that he had abandoned that position in this case, before ultimately admitting that he supported it "from the perspective of the voter." *Saunders* at 70-74.  This demonstrates the Plaintiffs' experts' willingness to manipulate "facts" in order to achieve the desired result.

As a final example (and there are many other instances) Prof. Saunders concluded, in *Ysursa,* that:

> . . . closing the primary is likely to have the very real and immediate effect of a) excluding part of the general electorate, and their very likely sincere democratic preferences, from the candidate selection process, b) producing more ideologically extreme candidates, and c) reducing political participation in the process.

Risken Decl., Ex. B, at E-18.  "Most crossover voting is an expression of sincere democratic preferences."  *Id.,* at E-15.  These points are completely absent from the Plaintiffs' report herein, presumably because they support Montana's case, highlighting the targeted purpose of his report and its inability to survive peer review.

Because of the glaring inconsistencies between the *Ysursa* report and the report in this case, it appears that Profs. Saunders and Greene are performing as advocates rather than as political science experts rendering objective opinions.  *See Davis v. Unum Life Ins.,* 444 F.3d 569, 577-78 (7th Cir. 2006) (doctor's inconsistent, changing reports showed he acted as an advocate).  Relying on the same base of scholarly literature and without any survey data specific to Montana, Prof. Saunders has abandoned (or ignored) his *Ysursa* opinions in favor of the Republican Party's position in Montana.  His *Ysursa* report is so critical of both the analysis employed and the opinions that he now renders in this case, that his credibility, and the report's reliability, are mortally wounded.

### E.     The Foundation For Plaintiffs' Expert Opinions Is Inadequate.

During his deposition Prof. Saunders' was asked a series of foundation and reliability questions based upon his work in *Ysursa*.  The questions verified the use of data, including polls and surveys, of the nature generally accepted by political scientists in the *Ysursa* case.  *Saunders* at 184-85.  Prof. Saunders then affirmed that

he had used the same "criteria" that he utilized in *Ysursa*. *Id.* at 185-86. "Criteria" was not defined. Merely because the expert testifies that he followed the scientific method does not mean that he actually did. *Daubert II*, 43 F.3d at 1315-316.

Saunders admits that the present Montana case is in a "different context, different state." *Saunders Dep.* at 24. Montana is a "much more typical state than Idaho," classifying Idaho as a "one-party state." *Saunders Dep.* at 72-73. Saunders' *Ysursa* report relied extensively on specific temporal data and survey results specific to Idaho (Risken Decl., Ex. B, Section B with tables) and, in fact, concluded at D-18 that the failure of the Republican Party's data collection in *Ysursa* "alone is enough to invalidate the study."

In this case Saunders admits he would have recommended a party identification survey (*Saunders Dep.* at 119), but the experts also admitted in their report and testimony that there was no time to perform that research. *Saunders* at 13; Doc. 55-1 at 10 n.5. Saunders' criticisms in *Ysursa* show that his opinions here lack foundation.

### F. "Reverse Roll Off" Is A Complete Fiction.

In their report Saunders and Greene discuss "reverse roll off," a phenomenon that analyzes whether "up-ballot races" of greater importance have more turnout that "down-ballot" races, such as the difference between an election for U.S. Senator as opposed to the down-ballot election of a county treasurer.

Doc. 55-1 at 27-28.  Saunders argued that because the Boulanger-versus-Connell primary had a larger number of total votes than the up-ballot race for U.S. Senate or Congress, that "reverse roll off" must have been due to crossover voting by non-Republicans.  *Id.* at 28-29.  Saunders used data prepared by Mr. Ponte (Doc. 55-6, at 18-19) for that purpose.  *Id.*

Notably, in *Ysursa* Saunders wrote extensively about how "reverse roll off" data presented by the IRP was not credible in both collection methodology and analysis, criticizing the IRP for being selective in the races analyzed rather than submitting a random sampling.  He was even more critical that the IRP used only vote totals without considering other alternative explanations for voter behavior. Risken Decl., Ex. B at H-1, H-2.  Here, Saunders did nothing to check the accuracy of Mr. Ponte's data (*Saunders* at 47) and admitted that they had no idea whether Ponte was biased in race selection.  *Saunders* at 49; *Greene* at 55-56. Saunders did not analyze any Democratic primaries for reverse roll off (*Saunders* at 134-35), he did not analyze primary races in all Montana districts (*Id.* at 14, 134), and he simply assumed that reverse roll off did not occur except for the races identified in a newspaper article, or in the races with MEA-MFT endorsements.  *Saunders* at 135-36.  Once again, the research behind the opinions is woefully incomplete.

More striking, however, is Saunders' admission that there is no scholarly literature connecting reverse roll off to crossover voting and that he threw that idea

into the report merely because he thought it was interesting.  *Saunders* at 138-39.

See *Muste Report* (Doc. 71-3) at 21-22.  That alone renders that opinion

inadmissible.  *United States v. Jones,* 24 F.3d 1177, 1179-80 (9th Cir. 1994).

On the whole it is impossible to connect the only race analyzed--Boulanger

versus Connell--to crossover voting by any means.  There is no survey data, no

literature regarding reverse roll off and crossover voting, and no evidence that

MEA-MFT's political speech had any effect on voters.  The opinions expressed, in

short, are nothing more than speculation.


## <u>CONCLUSION</u>

Based upon the foregoing arguments and authorities, and the deposition

testimony and admissions of the Plaintiffs' expert witnesses, the expert opinions

offered by Professors Saunders and Greene should be struck, and those expert

witnesses should be prevented from testifying in this case.

Respectfully submitted this 18th day of September, 2015.

TIMOTHY C. FOX
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401


By:  */s/ Patrick M. Risken*
PATRICK M. RISKEN
Assistant Attorney General
Attorney for Defendants


## CERTIFICATE OF SERVICE
## L.R. 5.2(b)

I hereby certify that I electronically filed the foregoing document with the

clerk of the court for the United States District Court for the District of Montana,

using cm/ecf system.  Participants in the case who are registered cm/ecf users will

be served by the cm/ecf system.

DATED: September 18, 2015          By:  */s/Patrick M. Risken*
PATRICK M. RISKEN

22

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 4,903 words, excluding the caption, certificate of service and certificate of compliance.

                    */s/ Patrick M. Risken*
                    PATRICK M. RISKEN
                    Counsel for Defendants