TIMOTHY C. FOX
Montana Attorney General
J. STUART SEGREST
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
ssegrest@mt.gov; prisken@mt.gov
Phone: (406) 444-2026, Fax: (406) 444-3549

COUNSEL FOR DEFENDANTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

---

| | | |
|---|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMMITTEE, et al., | ) ) | Case No. 6:14-cv-00058-BMM |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... iii

INTRODUCTION ............................................................................................1

STATEMENT OF FACTS ................................................................................2

ARGUMENT ...................................................................................................3

I.     PLAINTIFFS ARE UNABLE TO MEET THEIR BURDEN OF
       PROOF BECAUSE THEY LACK MONTANA-SPECIFIC
       EVIDENCE OF "NON-REPUBLICANS" VOTING IN
       PRIMARY ELECTIONS. ........................................................................4

       A.     Plaintiffs' Claim Is Based on Assumptions, Not Evidence. ...........4

       B.     Plaintiffs, Lacking Specific Evidence, Present a Facial
              Challenge.........................................................................................6

       C.     The Experts' "Perspective" ............................................................8

       D.     The Anecdotal Evidence from the 2014 Primary and 2015
              Legislative Session Fails to Fill the Evidentiary Gap ...................10

       E.     The Premise That Open Primaries Allow Some Increase in
              Crossover Voting Is Insufficient to Meet Plaintiffs' Burden .........14

II.    MONTANA'S OPEN PRIMARY SYSTEM IS
       CONSTITUTIONAL AS A MATTER OF LAW BECAUSE
       VOTERS AFFILIATE BY VOTING A PARTY'S BALLOT ...............16

III.   THE RIGHT OF MONTANA VOTERS TO ASSOCIATE
       OUTWEIGHS THE PARTY'S INTEREST IN GETTING OUT
       THE VOTE .........................................................................................21

# TABLE OF CONTENTS
(Cont.)

IV.   THE STATE'S IMPORTANT REGULATORY INTERESTS
JUSTIFY THE OPEN PRIMARY REQUIREMENT. ...........................23

CONCLUSION...................................................................27

CERTIFICATE OF SERVICE .........................................29

CERTIFICATE OF COMPLIANCE..................................29

# TABLE OF AUTHORITIES

*Addisu v. Fred Meyer*,
     198 F.3d 1130 (9th Cir. 2000) ..........................................................................3, 4

*American Party of Texas v. White*,
     415 U.S. 767 (1974) ...........................................................................15, 20, 23

*Anderson v. Liberty Lobby*,
     477 U.S. 242 (1986) .............................................................................................4

*Armstrong v. State*,
     1999 MT 261, 296 Mont. 361, 989 P.2d 364 ...................................................25

*Arizona Libertarian Party v. Bayless*,
     351 F.3d 1277 (9th Cir. 2003)................................................................. Passim

*Bellotti v. Connolly*,
     460 U.S. 1057 (1983) .........................................................................................22

*Bottomly v. Ford*,
     117 Mont. 160, 157 P.2d 108 (1945).........................................................2, 3, 24

*Democratic Party of Washington State v. Reed*,
     343 F.3d 1198 (9th Cir. 2003) ............................................................................5

*California Democratic Party v. Jones*,
     530 U.S. 567 (2000) ............................................................................... Passim

*Clingman v. Beaver*,
     544 U.S. 581 (2005) ............................................................................... Passim

*Democratic Party of Hawaii v. Nago*,
     982 F. Supp. 2d 1166 (D. Hawaii 2013).................................................. Passim

*Democratic Party of United States v. Wisconsin ex rel. La Follette*,
     450 U.S. 107 (1981) ............................................................................... Passim

# TABLE OF AUTHORITIES
(Cont.)

*Eu v. San Francisco County Democratic Central Committee*,
    489 U.S. 214 (1989) ........................................................................23

*Gryczan v. State*,
    283 Mont. 433, 942 P.2d 112 (1997)................................................25

*Idaho Republican Party v. Ysursa*,
    765 F. Supp. 2d 1266 (D. Idaho 2011) .............................................18

*Idaho Republican Party v. Ysursa*,
    2011 U.S. App. LEXIS 26646 (9th Cir. 2011)....................2, 9, 10, 18

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ..............................................................5

*Montana Republican Party v. Jones*,
    530 U.S. 567 ............................................................................. Passim

*NAACP v. Alabama*,
    357 U.S. 449 (1958) ........................................................................26

*Tashjian v. Republican Party*,
    479 U.S. 208 ....................................................................................26

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ........................................................................23

## OTHER AUTHORITIES

Federal Rules of Civil Procedure
    Fed. R. Civ. P. 56(a).............................................................................3

# TABLE OF AUTHORITIES
 (Cont.)

Montana Code Annotated
 § 13-10-301(2)..............................................................................................17

## **INTRODUCTION**

Plaintiffs ask this Court to do what the courts in *Bayless*[1] and *Nago*[2] refused to do: throw out a century-old primary system based on assumptions without specific evidence. And they do not hide that fact--their experts readily admit they have no Montana-specific data to rely on. Even more, Professor Saunders' report in *Ysursa* undermines his report for Plaintiffs here. There he opined that the failure to produce sufficient data "alone is enough to invalidate the study." Doc. 87-2 at E-9. Plaintiffs have failed to prove the severity of the burden they claim to face, and this Court should therefore grant summary judgment for Defendants. *See Nago*, 982 F. Supp. 2d at 1183-84 (granting summary judgment to state where evidentiary record insufficient).

Not only have Plaintiffs failed to provide evidence of crossover voting or its effect in Montana, they can't do so. As this Court has recognized, voters in Montana "do not register with a party affiliation," Doc. 40 at 4, and there is thus no objective way to determine who qualifies as a "Republican" and whether "non-Republicans" vote in Republican primary elections. Simply assuming there are voters who do not "identify" with the Republican Party, but nevertheless choose to

---

[1] *Arizona Libertarian Party v. Bayless*, 351 F.3d 1277 (9th Cir. 2003).
[2] *Democratic Party v. Nago*, 982 F. Supp. 2d 1166, 1177 (D. Hawaii 2013).

vote in the Republican primary, is insufficient. Such a subjective assessment lacks evidentiary value.

On the other hand, all who vote the Republican primary ballot relinquish the right to vote any other party's ballot, and thereby a voter "is limited to voting for candidates of that party." *California Democratic Party v. Jones*, 530 U.S. 567, 577 (2000). Voting the ballot therefore constitutes an affiliation with the Party, on par with same-day registration in a closed primary. Thus the open primary at most imposes a "lesser burden," met here by the State's important regulatory interests "such as protecting the privacy of a person's vote, and encouraging voter participation by removing barriers to vote." *Nago*, 982 F. Supp. 2d at 1180 (citing *Clingman v. Beaver*, 544 U.S. 581, 593 (2005)). Additionally, an open primary serves the interest of lessening the threat of negative strategic crossover voting, or "raiding," the real "threat" to parties as recognized in Dr. Saunders' *Ysursa* report. On the merits also, summary judgment should be granted for Defendants.

## STATEMENT OF FACTS

The open primary system was adopted by the people of Montana, via initiative, in 1912. *Bottomly v. Ford*, 117 Mont. 160, 178, 157 P.2d 108, 117 (1945) (Adair, J., dissenting). The open primary was adopted as a way to remove the power to select candidates from "the corporation-controlled machine boss," and

return it to the voter. *Id.* Therefore, the convention and caucus systems were abolished, replaced by direct primaries providing for the nomination of candidates by voters "under the protection of the Australian ballot system [i.e., the open primary]." *Id.* at 175-76; 157 P.2d at 116 (emphasis added).

A voter in Montana receives a complete set of party ballots during primary elections. Doc. 83, ¶ 4. Though they have the right to choose which party's ballot they vote, each voter may cast votes on only one party's ballot, and must dispose of the other ballot. *Id.*, ¶ 5. A voter is thereby "limited to voting for candidates of that party." *Jones*, 530 U.S. at 577.

A voter in Montana is not, however, required to register their political party affiliation in order to vote in a primary or general election, and there is no other statutory mechanism to register a person's party affiliation. Doc. 83, ¶ 8. Montana also does not record which primary ballot a particular elector chooses. *Id.*, ¶ 10. While a voter does have to register to vote, registration may take place the day of the primary or general election. *Id.*, ¶ 9.


## **ARGUMENT**

Summary judgment is warranted when, viewing the evidence in the light most favorable to the adverse party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Addisu v. Fred Meyer*, 198 F.3d 1130, 1134 (9th Cir. 2000). If the moving party shows that there are no genuine issues of material fact, the non moving party must go beyond the pleadings and designate facts showing an issue for trial. *Addisu*, 198 F.3d at 1134 (citation omitted). Summary judgment is appropriate, then, where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986).

## I. PLAINTIFFS ARE UNABLE TO MEET THEIR BURDEN OF PROOF BECAUSE THEY LACK MONTANA-SPECIFIC EVIDENCE OF "NON-REPUBLICANS" VOTING IN PRIMARY ELECTIONS.

### A. Plaintiffs' Claim Is Based on Assumptions, Not Evidence.

As held by the Ninth Circuit, whether an open primary system is constitutional "turns on factual questions" regarding "the severity of the burden . . . the primary system imposes on [the party's] associational rights . . . ." *Bayless*, 351 F.3d at 1282 (reversing and remanding summary decision regarding constitutionality of open primary). In other words, "[p]roving a severe burden must be done 'as-applied,' with an evidentiary record . . . ." *Nago*, 982 F. Supp. 2d at 1177. And "the burden of establishing that risk" is on Plaintiffs. *Bayless*, 351 F.3d at 1282 (citing *Jones*, 530 U.S. at 578). Plaintiffs have failed to meet that burden here.

In fact, Plaintiffs admitted, in their prior motion for summary judgment, that "evidence" that non-Republicans voted in primary races "is required for challenges to laws regulating a party's candidates for public office." Doc. 25 at 7 (citing *Bayless*, 351 F.3d 1282) (emphasis in original). Despite this admission, Plaintiffs now half-heartedly argue that the constitutionality of open primaries might be decided "as a matter of law." Doc. 71 at 12. But *Democratic Party of Washington State v. Reed*, 343 F.3d 1198 (9th Cir. 2003), cited as authority for this proposition by Plaintiffs, concerned a blanket primary and thus is distinguishable. And *Miller v. Brown*, 462 F.3d 312, 314 (4th Cir. 2006), discussed the potential harm to plaintiffs where the case had been dismissed by the district court for lack of standing, while remanding "for [a] decision on the merits." Thus *Bayless*, and *Jones*, control and require evidentiary proof.

In *Jones*, the "evidence . . . demonstrate[ed] that under California's blanket primary system, the prospect of having a party's nominee determined by adherents of an opposing party [was] a clear and present danger." 530 U.S. at 578. There the Supreme Court relied on a "survey of *California* voters" in which "37 percent of Republicans said that they planned to vote in the 1998 Democratic gubernatorial primary, and 20 percent of Democrats said they planned to vote in the 1998 Republican United States Senate primary." *Id.* (emphasis added). As importantly, voters in California did register their party affiliation. *Id.* Therefore, the Court

could rely on a study showing that "the total votes cast for party candidates in some races was more than double the total number of registered party members." *Id*. (emphasis in the original).

Plaintiffs and their experts in this case, on the other hand, present no Montana-specific data.[3]   Doc. 55-1 at 10 fn 5 ("We have no survey data specific to Montana because a credible, well done survey would have to be done during the election cycle.") (emphasis added).  Dr. Saunders, Plaintiffs' expert, further admitted in his deposition that a Montana-specific survey would "have increased our knowledge about the amount of crossover voting," and that he would have recommended a survey had "the issue been brought to [him] in 2013."  Doc. 71-10 at 118-19.  More generally, Dr. Saunders admitted that a survey "is a necessary tool to measure [the electorate's] behavior."  *Id*. at 10.

## B.     Plaintiffs, Lacking Specific Evidence, Present a Facial Challenge.

"In short, [Plaintiffs'] arguments rest on assumptions about voter behavior that cannot be judged without evidence."  *Nago*, 982 F. Supp. 2d at 1183; *see* Doc. 71-10 at 119-20 (Dr. Saunders explaining that their conclusions are based on assuming prior political science literature "generalizes to Montana"; in other

---

[3] For this and other reasons, Defendants' are submitting a *Daubert* motion to exclude the report of Drs. Saunders and Greene.

words, "using social science findings to develop our best inference for what's going on in Montana, absent survey data.").

Lacking Montana-specific data, Plaintiffs essentially present a facial challenge to Montana's open primary. They argue that open primaries allow more crossover voting than closed primaries based on inferences from "political science scholarship [that] for the most part is not all that interested in crossover voting as a question." Doc. 87-1 (Greene Dep. at 104-05). From here, without relying on Montana-specific data, or even specific political science scholarship, they make the "logical conclusion" that Montana's open primary infringes Plaintiffs' associational rights. *Id.* In other words, Plaintiffs' case boils down to a claim that all open primaries systems are *per se* unconstitutional.

Not only do Plaintiffs lack Montana-specific evidence of crossover voting, they don't have a specific means to identify the party affiliation of voters in Montana's primaries, as they have not performed a survey. *Id.* at 86 (admitting that to identify primary voters Dr. Green would perform a "phone survey" asking "Are you a Democrat, Republican, or independent?"); see also Ex. 1 (Hr'g Tr) at 25 (admitting there is no way to identify Republicans). Absent survey information, the only way to identify a voter is by the ballot chosen. *Id.* at 86-87.

Like the Democratic Party of Hawaii in *Nago*, Plaintiffs "liken [Montana's] open primary to the blanket primary that *Jones* struck down," and then claim "the

open primary [imposes] a severe burden per se." *Nago*, 982 F. Supp. 2d at 1177.

But they have not come close to showing that in all factual circumstances their

associational rights are "severely burdened" by Montana's open primary. *Id*. at

1180. This problem is magnified where the evidence relied on in *Jones*

demonstrated "[t]he impact of voting by nonparty members is much greater upon

minor parties," as opposed to major parties like the Montana Republican Party.

*Jones*, 530 U.S. at 578 (emphasis added).

## C. The Experts' "Perspective"

Defendants' expert, Dr. Chris Muste with the University of Montana, after

reviewing the Saunders and Greene report prepared for Plaintiffs, recognized that

"no empirical evidence or relevant research is cited to support this idea [that closed

primaries will limit primary voters to 'the party's loyal followers'] or the effects

that would result from a closed primary." Doc. 71-3 at 5. Instead of "empirical

evidence," the Saunders/Greene report relies "on assumptions, probability and

logic." *Id*. Specifically, "none of the evidence presented in the SG report actually

measures Montana voters' party identification." *Id*. at 8. This lack of data "makes

it impossible to know whether crossover voting has occurred, by whom and with

what motivation, and what if any impact this has had on election outcomes." *Id*.;

*see also id*. at 11 (without survey or "equivalent high-quality data, there simply is

no credible evidence presented by plaintiffs that demonstrates crossover voting in Montana.").

Dr. Saunders' previous report prepared in the *Ysursa* case also supports Defendants' position that Plaintiffs present insufficient evidence to determine the level of burden, if any, to Plaintiffs' associational rights. There Dr. Saunders was critical of the methods used by the Idaho Republican Party, including reliance on data from a survey that was performed long after the relevant election, lacked specificity, and failed to pose an important "identity question." Doc. 71-10 at 11 12; Doc. 87-2 at E-5. He then determined that the findings of the *Ysursa* survey could not be relied upon as any "conclusion drawn from the analysis" would be "highly questionable." Doc. 87-2 at E-5. In this case, again, Dr. Saunders would recommend a survey "around the 2016 election cycle." Doc. 71-10 at 12. We are not faced with a poorly done survey, here, but with no survey data at all. Consequently no conclusions may be drawn. Doc. 87-2 at E-5.

Dr. Saunders also stated in his *Ysursa* report that "[m]ost political scientists would not consider any Independents [to be] crossover voters," and in fact "leaners [toward a particular party] are considered partisans in the [political science] literature." *Id.* at E-7. Therefore, at least without reliable survey data, any comparison between "GOP and non-GOP voters . . . is at best fallacious." *Id.* Dr. Saunders also agreed in his *Ysursa* report with Dr. Muste that "negative

strategic voting" is the type of crossover voting "that should be considered as a threat." *Id.* at E-9. Further, research has shown that "negative strategic crossover voting" is more prevalent in closed primaries. Doc. 71-10 at 17-18; Doc. 71-3 at 10.

Dr. Saunders' only explanation as to why his *Ysursa* report is contrary to his report for Plaintiffs here is that his "perspective" has changed. In his *Ysursa* report, he claims he "was writing from the perspective . . . of voters," while his report in this case "is written from the perspective of party." Doc. 71-10 at 24, 115. But Dr. Saunders still "would agree with what I wrote in the *Ysursa* report," in particular "that most scholars would agree that independents are not crossover voters if you're thinking about it from their perspective." *Id.* at 74. Dr. Saunders does not explain why the perspective of the party should control in Montana, but not in Idaho, except that here his client desired that perspective. *Id.* at 115.

### D.    The Anecdotal Evidence from the 2014 Primary and 2015 Legislative Session Fails to Fill the Evidentiary Gap.

Plaintiffs' experts suggest that "empirical evidence" backs up their "theoretical" claims regarding the effects of closed primaries. Doc. 71-2 at 3. But this "empirical evidence" is entirely anecdotal, or, when based on voting statistics, fails to "meet basic scientific standards." Doc. 71-3 at 11. Hence it is unreliable, does not lead to defensible conclusions, and fails to meet Plaintiffs' evidentiary burden.

For example, Plaintiffs rely on the claim that MEA-MFT may have influenced certain Republican primary elections by encouraging their members to vote in those elections. Doc. 71 at 13-16; Doc. 71-2 at 19-22. Putting aside the significant fact that a voter that votes the Republican ballot thereby affiliates with the Republican Party (see discussion in part II below), Plaintiffs have not proven that the messaging by MEA-MFT caused a single voter to "switch" his or her primary ballot selection. Doc. 71-10 at 66, 97 (Dr. Saunders admitting "we do not know, because we do not have individual data on that."); Doc. 87-1 at 72 (Dr. Greene admitting he has "no way of knowing" if anyone acted on messaging); 71-3 at 18. What's more, they have not proven that MEA-MFT's efforts caused any particular electoral victory. Doc. 71-10 at 98 (Dr. Saunders admitting "we don't know definitively").

Lacking hard evidence, Plaintiffs instead rely on the "potential" to "influence" election outcomes and strategy in an open primary setting. Doc. 71-10 at 149. In fact, in their second preliminary injunction brief, Plaintiffs focus not on the actual results of MEA-MFT's efforts, but on the effect on strategy posed by "the mere threat of crossover voting in open primaries." Doc. 71 at 13. Their proof of this "phenomenon" is again not survey results or any hard data, but indirect anecdotal evidence in the form of the consulting advice of Brad Molnar. *Id*. at 13-16. Why one former Republican official's opinion is sufficient to meet

their burden of proof is unanswered. Further, the evidentiary value of Mr. Molnar's campaign advice is undercut by the fact that his suggestion to "emphasize broad based issues" is aimed at general, as well as primary, elections. Doc. 71-7 at ¶ 8; Doc. 71-3 at 24.

Outside sources trying to influence elections, by exercising their First Amendment right to political speech, is nothing new. Doc. 71-3 at 18 ("sources outside political parties always try to influence elections."). Plaintiffs' speculation about the likelihood of MEA-MFT influencing elections is further compromised by the fact that outside influence is only one of many factors that may influence an election. Others include how competitive the race is; the information available to voters; incumbency; name recognition; campaign funds; work ethic; likeability; and whether other significant races are on the ballot. Doc. 71-3 at 2; Doc. 71-4 at 74. None of these additional factors were analyzed, or even considered, by Plaintiffs' experts. Therefore the assertions of Plaintiffs, and their experts, "of how 'likely' any resulting crossover voting is rests on a series of assumptions that are not supported by compelling evidence about voters." Doc. 71-3 at 19.

Concerning the 2014 Boulanger/Connell primary contest in particular, while both candidates were technically incumbents, only Connell had previously been elected by the voters of Ravalli County to a legislative seat, and in fact he had defeated Boulanger in the primary election for HD 87. Doc. 83 (Stipulated Facts),

¶¶ 11-14. Not only that, but Boulanger was appointed by the Ravalli County Commissioners, *id.*, ¶ 16, who by 2014 were embroiled in controversy surrounding the County Treasurer, Valerie Stamey. Doc. 71-3 at 22; Ex. 2 (Bitterroot Star article). Voters may well have been influenced by the fact that the same County Commissioners who appointed (or perhaps hired) the embattled Treasurer also appointed Boulanger. Doc. 71-3 at 22; Doc. 71-6 at 64-65. And in fact Boulanger appears to have publicly supported Stamey. Doc. 71-6 at 66-68; Ex. 2 (Bitterroot Star article).

Plaintiffs also point to certain legislative votes from the 2015 Montana legislative session as proof that an open primary weakens party discipline. Doc. 71 at 20-21. Plaintiffs posit that "Party discipline is lower now than in prior sessions." *Id.* at 21. But Montana has had an open primary in place since 1912, including these "prior sessions" where Party discipline was apparently higher. As explained by Dr. Muste: "Given that Montana has used the open primary system for decades, it logically cannot now be causing the problems currently facing the Republican legislative caucus." Doc. 71-3 at 21.

Additionally, these allegations are subjective judgments made by Representative Regier and Senator Rosendale, not objective facts. As explained by Senator Rosendale, it is not the number of times a Republican legislator votes with

or against the Party that begets the "dissident Republican" label, or any other objective standard, but "the issue and the impact of the issue." Doc. 71-4 at 30-31.

Furthermore, the "agenda" itself was created by the Party's legislative leadership, not by the caucus as a group. *Id*. at 40-44. Though all legislative members were initially provided an opportunity to identify "their priorities," the final decision was made by the leadership without any votes, discussion, or debate. *Id*. The lack of "discussion, compromise, voting, promised support on other bills" or any other method of consensus building runs counter to the methods typically used "to increase cooperation and agreement within . . . legislative caucuses in the American political system." Doc. 71-3 at 4-5, 12. It is therefore no wonder that some members of the caucus disagreed with some aspects of the "agenda."

### E. The Premise That Open Primaries Allow Some Increase in Crossover Voting Is Insufficient to Meet Plaintiffs' Burden.

As explained above, Plaintiffs present no data-based evidence that Montana's open primary system has caused or is causing any crossover voting. As important, Plaintiffs' experts admit they cannot specifically determine the percentage difference between open and closed primaries, and admit closed primaries also facilitate crossover voting. Doc. 71-10 at 16, 65; Doc. 87-1 at 105-107; Doc. 87-2 at F-5. The inability to quantify the degree of the burden is a fatal evidentiary flaw in Plaintiffs' case. Bayless, 351 F.3d at 1282.

In addition, Montana allows same-day registration.  Doc. 83, ¶ 9.  As admitted by Plaintiffs, a closed primary with same-day registration is functionally the same as an open primary, because voters can change registration the day they vote.  Hr'g Tr. at 80.  Plaintiffs' argument thus boils down to the proposition that any degree of increased crossover voting, whether significant or not, violates their associational rights.  By this logic the primary requirement, and any attendant procedural rule, such as the date of the election, is also an unconstitutional infringement.

In fact, the root of the problem (i.e. leadership's lack of control) is not the open primary, but the primary itself, or more specifically the requirement that parties select nominees via a state-run primary wherein "voters [often select] candidates who are less ideological than party leaders and who then are more responsive to the voters than the organization."  Doc. 71-3 at 4-5, 7.  The Supreme Court has nevertheless recognized that it is beyond argument that a state may limit each party to one candidate and require a primary election, despite its wresting control over the nominee from the parties' internal processes.  *American Party of Texas v. White*, 415 U.S. 767, 781 (1974).  Consequently, Plaintiffs' constitutional infringement by inference argument must fail.

Because the burden is on Plaintiffs to prove Montana's open primary imposes a substantial burden (beyond that inherent in any primary system), and

because Plaintiffs present no scientifically valid evidence to meet their burden of proof, summary judgment should be granted for Defendants as a matter of law.

## II.     MONTANA'S OPEN PRIMARY SYSTEM IS CONSTITUTIONAL AS A MATTER OF LAW BECAUSE VOTERS AFFILIATE BY VOTING A PARTY'S BALLOT.

The Committees have not only failed to provide any evidence that "non Republicans" have voted in Republican primaries, they have also failed to demonstrate that, under Montana law, "non-Republicans can vote" in Republican primaries.  Doc. 40 at 7 (emphasis added).  This is so because, in Montana, "voters do not register with a party affiliation." *Id*. at 4; Doc. 83, ¶ 8.  Indeed, Plaintiffs admitted at the prior summary judgment hearing that they cannot identify "Republican" voters.  Hr'g Tr. at 25.  Because the Committees are unable to show that "non-Republicans" have voted or can vote for Republican committeemen, they cannot show that their associational rights are infringed, and thus "cannot succeed on the merits."  Doc. 40 at 7.

Instead of publicly registering their affiliation with the Republican Party, a voter in Montana affiliates with the Party when the voter casts a Republican ballot in the primary.  *See Jones*, 530 U.S. at 577 n. 8 ("The act of voting in the Democratic primary [in an open primary system] can be described as an act of affiliation with the Democratic Party") (quoting *Democratic Party of United*

*States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 130 n. 2 (1981) (Powell, J.,

dissenting)); *id*. at 598 (Stevens, J., dissenting) ("In the real world, however,

anyone can 'join' a political party merely by asking for the appropriate ballot at the

appropriate time . . . neither past voting history nor the voter's race, religion, or

gender can provide a basis for the party's refusal to 'associate' with an unwelcome

new member.").

When voting a particular party's ticket, a Montana voter not only positively

associates with the chosen party, but also forgoes the right to vote for the

candidates of the other party. Doc. 83, ¶ 5; Mont. Code Ann. § 13-10-301(2). A

Montana voter is thereby "limited to voting for candidates of that party." *Jones*,

530 U.S. at 577. In this respect Montana's open primary is like a closed primary,

and "qualitatively different" from a blanket primary. *Id*.

For the limited purpose of the primary election, each voter who votes the

Republican ballot, regardless of their past voting practices, is a "Republican."

Instead of publicly stating their party preference prior to receiving the ballot, they

state their preference, privately, by choosing to vote a particular party's ballot.

*See Nago*, 982 F. Supp. 2d at 1178 ("a closed primary may be virtually

indistinguishable from [an] open primary where voters can 'affiliate' with a party

on the day of the primary."). In fact, the Committees admitted at the hearing that

Montana's open primary system is functionally equivalent to a closed primary

where a voter may change registration the day of the election.  Hr'g Tr. at 80;

*see also* Doc. 71-3 at 9 (noting no "statistically significant" difference between

crossover voting in open and closed primaries, as even in closed primaries

"individuals can and do find ways" to cross over).

In closed primaries also, voters can easily pick their preferred primary.

Voters "who wish to vote in [a certain party's] primary simply need to file a form

with the county election board secretary to change their registration." *Clingman*,

544 U.S. at 591 (2005) (citing *Jones*, 530 U.S. at 596 (Stevens, J., dissenting)

("anyone can 'join' a political party merely by asking for the appropriate ballot at

the appropriate time or (at most) by registering within a state-defined reasonable

period of time before an election.")).  Changing affiliation would take "only

nominal effort." *Id*.  While the "effort" required to vote in a particular party's

primary in Montana is likewise not great, nothing more is required under *Jones* and

*Clingman*.

The Court in *Nago*, therefore, held that the facial challenge to Hawaii's open

primary failed.  982 F. Supp. 2d at 1177-78.  And while the Court in *Ysursa* came

to a different conclusion, that opinion was vacated on appeal as moot.  *Idaho*

*Republican Party v. Ysursa*, 2011 U.S. App. LEXIS 26646 (9th Cir. 2011).  In any

case, the *Ysursa* court's comments regarding "affiliation" were based on "the

evidence of crossover voting" submitted at trial.  *Ysursa*, 765 F. Supp. 2d 1266,

1276 (D. Idaho 2011); *see also id.* at 1272 (refusing to "simply borrow the statistics, opinions, and surveys from *Jones* . . . .").

Even if the *Ysursa* opinion remained valid, it should not be persuasive to this Court. The *Ysursa* opinion fails to address the statement, in *Jones*, that "[i]n this sense, the blanket primary also may be constitutionally distinct from the open primary . . . in which the voter is limited to one party's ballot." *Jones*, 530 U.S. at 577 n. 8 (citing to Justice Powell's dissent in *La Follette*, 450 U.S. at 130 n. 2, describing the act of voting in a party's primary "as an act of affiliation with" that party); *see also La Follette*, 450 U.S. at 120-21 ("the Wisconsin Supreme Court *may well be correct*" in determining that the open primary is constitutional) (emphasis added). For the reasons explained above, the open primary, like the closed primary, is qualitatively different from the blanket primary. The party loses some control over its candidates, but that loss is due to the primary system itself, not whether the primary is open or closed. Doc. 71-3 at 4-5, 7.

Nevertheless, Plaintiffs' experts propose that open primaries necessarily facilitate more crossover voting, because there is "no lasting consequences to the voter." Doc. 71-2 at 12. But this proposition, posed without citation, focuses solely on what they term the "psychological cost," i.e. the consequence of publicly identifying as a Republican.

The Saunders/Greene report fails to recognize the true practical cost of voting one party's ballot--forgoing the opportunity to vote in the other party's primary. See Doc. 72-3 at 18 (Montana's competitive races make it unlikely a voter would forgo the chance to "influence" the party they identify with). This cost was recognized by the Court in *Jones*, 530 U.S. at 577, where the Court specifically acknowledged that being limited to one party's ballot creates a distinction with the blanket primary. *Id*. n. 8. Moreover, the "psychological cost" of publicly registering with the state actually weighs in favor of open primaries, which protect "the privacy of a person's vote." *Nago*, 982 F. Supp. 2d at 1180; *see also* discussion in part IV.

Likewise, Plaintiffs' experts suggest that "in no meaningful way does the act of voting in a Republican primary make one a 'Republican.'" Doc. 71-2 at 12. This statement, though, is based on a voter's subjective self-identification. *Id*. at 12-13. The same can be said of primaries in general, which facilitate the ability of the voter to choose which party he or she wishes to affiliate with, and waters down the party's control over its candidates. Doc. 71-3 at 9. This is especially true when an open primary is compared to a closed primary in a state like Montana with same-day registration. As discussed above, the right of the state to require primaries, and thus assert control over the parties' affiliates, is well-settled. *White*, 415 U.S. at 781; *see also Clingman*, 544 U.S. at 601 (O'Connor, J., concurring)

("The act of casting a ballot in a given primary may, for both the voter and the party, constitute a form of association that is at least as important as the act of registering.").

Ultimately, a state may dictate how voters affiliate with political parties, *see White*, 415 U.S. at 781, and Montana voters have chosen (since 1912) to do so by the ballot voted as opposed to public registration. As with the decision of a state to require primaries in general, this does not violate the Party's right of association where the voter is limited to voting only one party's ballot. Defendants are therefore entitled to judgment as a matter of law.

## III. THE RIGHT OF MONTANA VOTERS TO ASSOCIATE OUTWEIGHS THE PARTY'S INTEREST IN GETTING OUT THE VOTE.

Though Plaintiffs bemoan their inability to "identify members or effectively turn them out for elections," Doc. 71 at 17, association is a two-way street. Montana's open primary system prioritizes the right of the voter to choose what party they associate with, in private, over the Party's right to identify "Republican" voters. The Party's right to identify all "Republican" voters (to the extent such a right exists), and the corresponding right to exclude voters, is necessarily inferior to the voter's right to associate because "neither past voting history nor the voter's race, religion, or gender can provide a basis for the party's refusal to 'associate'

with an unwelcome new member." *Jones*, 530 U.S. at 598 (Stevens, J.,

dissenting); *see also Bellotti v. Connolly*, 460 U.S. 1057, 1063 (1983) (Stevens, J.,

dissenting) ("[The state] has a significant interest in protecting the First

Amendment associational and voting rights of its citizens.").

Providing the Party absolute control over the candidate selection process

poses a real problem, as recognized by this Court during the prior hearing. Hr'g

Tr. at 58 ("don't we run the risk of these political parties trying to purify

themselves to the degree that we start to exclude people who have a right to

vote."). The First Amendment does not require that the State ensure that only the

"right" or most loyal partisans are allowed to choose a party's candidates.

*See Clingman*, 544 U.S. at 602 (O'Connor, J., concurring) (questioning "whether

judicial inquiry into the genuineness, intensity, or duration of a given voter's

association with a given party is a fruitful way to approach constitutional

challenges to [primary voting] regulations").

Moreover, there is no state law that prevents the Party from internally

registering those who wish to affiliate with the Republican Party. While the Party

could not limit its primary elections to just these people under Montana law, it

could limit other Party functions, such as internal voting and seats on internal

committees, to those who have officially registered with the Party, and could focus

on those registered when it seeks to "get out the vote." Doc. 71 at 17. Though

state-run (and state-funded) partisan registration may be a simpler means to accomplish the Party's goals, the burden, if any, is insubstantial.

## IV.  THE STATE'S IMPORTANT REGULATORY INTERESTS JUSTIFY THE OPEN PRIMARY REQUIREMENT.

Before assessing Montana's interests in the open primary system, this Court must first "apply a balancing test." *Bayless*, 351 F.3d at 1281.  Where the burden is less than "severe," a state law "is subject to less exacting review, and 'important regulatory interests' are sufficient to justify it." *Id*.  "Less exacting review" is appropriate here for the reasons explained above:  Plaintiffs lack Montana-specific evidence of "non-Republicans" voting in primary elections; voters affiliate with the Republican Party when they vote the Party's ballot, and thereby forgo the right to vote in another party's primary; and Montana voters' rights of association outweigh the Party's interest in purifying its ranks.

A state has broad power to regulate elections, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 451 (2008), and "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231-32, (1989) (listing cases upholding restrictions on elections).  Further, as discussed above, a state has the uncontested right to require candidates be elected by primary. *White*, 415 U.S. at 781.

Important regulatory interests thus support Montana's open primary system. The open primary system was adopted by the people of Montana, to address several concerns, including: "to secure and protect the purity of the ballot," *Bottomly*, 117 Mont. at 173 74, 157 P.2d at 115, "to . . . perfect the direct power of the voters over their state and local government in all its branches and officers that the people may rule," *id*. at 175, 157 P.2d at 116, and, correspondingly, to "destroy[] the power of the corporation-controlled machine boss." *Id*.

As explained by the Court in *Nago*, "the open primary is clearly supported by important and legitimate State rights such as protecting the privacy of a person's vote, and encouraging voter participation by removing barriers to vote." 982 F. Supp. at 1180. As admitted by Plaintiffs' experts, there are "clear psychological costs" to publicly registering in order to vote in a party's primary. Doc. 71-2 at 12. This burden infringes on a voter's privacy and also places barriers on a person's right and ability to vote in primary elections. See Doc. 71-3 at 5-6, 25; *La Follette*, 450 U.S. 107, 136 (Powell, J., dissenting) (noting "Wisconsin has determined that some voters are deterred from participation by a public affiliation requirement").

Montana's open primary system also addresses the real "threat" of negative strategic crossover voting. Doc. 87-2 at E-9. This type of malicious voting, also

known as "raiding,"[4] where a voter votes in a party's primary in order to cause harm to the party, is more likely to occur in closed primaries than in open primaries. Doc. 71-10 at 17-18; Doc. 71-3 at 10. Montana's open primary thus protects the parties, and by extension the voters, from the most significant crossover voting risk. This is clearly an important regulatory interest.

Even if this Court determines, lack of Montana-specific proof notwithstanding, that the burden placed on Plaintiffs is "severe," the open primary survives strict scrutiny. Montana's Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Art. II, § 10.

Montana's right of privacy is "one of the most stringent protections of its citizens' right to privacy in the United States--exceeding even that provided by the federal constitution [and] one of the most important rights guaranteed to the citizens of [Montana]." *Armstrong v. State*, 1999 MT 261, ¶ 34, 296 Mont. 361, 989 P.2d 364 (citing *Gryczan v. State*, 283 Mont. 433, 449, 455, 942 P.2d 112, 122, 125 (1997)). This important Constitutional protection will be infringed if voters are required to publicly register their party affiliation with the State prior to being allowed to vote in a primary election. *See* Doc. 71-3 at 5-6 (noting public registration would impose "a severe cost . . . on Montanans and their privacy

---

[4] *See La Follette*, 450 U.S. at 136, n. 12 (Powell, J., dissenting).

rights").  Indeed, Montana's Constitution also specifically provides:  "All elections by the people shall be by secret ballot."  Art. IV, § 1.

Likewise, the Supreme Court has recognized "the vital relationship between freedom to associate and privacy in one's associations."  *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).  More than just a basic right to associate without public notice, Montana's open primary also protects against public hostility resulting from registration with a particular party.  *See Tashjian*, 479 U.S. at 215, n.5 ("public affiliation may subject the members of political organizations to public hostility or discrimination") (citations omitted).

Because the right to privacy is one of the strongest protections enshrined in Montana's Constitution, the State's interest in protecting voters' privacy is compelling.  The State's interest is also narrowly tailored because voters are required to affiliate with a particular party by voting that party's ticket, and consequently not voting any other party ticket.  There is no other means to determine voter affiliation, and Plaintiffs have not proposed any, that maintains a voter's right to privately associate with a party.  Thus even under strict scrutiny, the open primary passes muster.

Of course, this Court need not go that far.  To deem the burden of Montana's open primary system as severe "would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable

elections, and compel federal courts to rewrite state electoral codes." *Clingman*, 544 U.S. at 593.  Plaintiffs may prefer a closed primary with mandated registration and a "months in advance" registration-change deadline (they noted at the hearing that three months prior to the election may be sufficient in their view (Hr'g Tr. at 35, 76)) "[b]ut the Constitution leaves that choice to the democratic process, not to the courts."[5]  *Id*. at 598.

## CONCLUSION

This Court should grant summary judgment for Defendants because (1) Plaintiffs' cannot meet their burden of proof without Montana-specific survey evidence; (2) the lack of party registration in Montana prevents an accurate determination of the number of "Republicans" or others voting in Montana's primary elections; and (3) a voter that chooses to vote the Republican ballot thereby affiliates with the Republican Party.

---

[5] In this respect, it is worth noting that the Republican Party controlled both houses of the Montana Legislature in the 2015 session.  Doc. 83, ¶ 24.

Respectfully submitted this 18th day of September, 2015.

TIMOTHY C. FOX
Montana Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

By: */s/ J. Stuart Segrest*
    J. STUART SEGREST
    Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the clerk of the court for the United States District Court for the District of Montana by using cm/ecf system.

Participants in the case who are registered cm/ecf users will be served by the cm/ecf system.

Dated: <u>September 18, 2015</u>          <u>/s/  J. Stuart Segrest</u>
                                                              J. STUART SEGREST
                                                              Assistant Attorney General

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(d)(2)(E) of the United States District Court Local Rules of Procedure for the District of Montana, I certify that this Response is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,222 words, excluding certificate of service and certificate of compliance.

                                                       <u>/s/ J. Stuart Segrest</u>
                                                       J. STUART SEGREST
                                                       Assistant Attorney General