Matthew G. Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, MT 59718
Tele.: (406) 570-2949; Fax: (406) 551-6919
Attorney for the County Central Committee Plaintiffs

James E. Brown
The James Brown Law Office, PLLC
30 S. Ewing St., Suite 100
Helena, MT 59601
Tele.: (406) 449-7444; Fax: (406) 443-2478
Attorney for Plaintiff Montana Republican Party

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMMITTEE, GALLATIN COUNTY REPUBLICAN CENTRAL COMMITTEE, SANDERS COUNTY REPUBLICAN CENTRAL COMMITTEE, DAWSON COUNTY REPUBLICAN CENTRAL COMMITTEE, STILLWATER COUNTY REPUBLICAN CENTRAL COMMITTEE; RICHLAND COUNTY REPUBLICAN CENTRAL COMMITTEE; CARBON COUNTY REPUBLICAN CENTRAL COMMITTEE; FLATHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE; MADISON COUNTY REPUBLICAN CENTRAL COMMITTEE; BIG HORN COUNTY REPUBLICAN CENTRAL COMMITTEE; MONTANA REPUBLICAN PARTY,<br><br>　　　　Plaintiffs,<br>　　v.<br><br>LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, *et al.*,<br><br>　　　　Defendants. | Case No. CV 14-0058-H-BMM<br><br>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

TABLE OF EXHIBITS .......................................................................................iv

INTRODUCTION ................................................................................................1

STATEMENT OF FACTS ...................................................................................2

ARGUMENT .......................................................................................................9

I    FORCING THE PARTY TO SELECT NOMINEES IN A PRIMARY
WITHOUT REGISTERING VOTERS' AFFILIATION SEVERELY
BURDENS THE PARTY'S ASSOCIATIONAL RIGHTS BY
PREVENTING IT FROM IDENTIFYING REPUBLICAN VOTERS ..........10

II   MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST
AMENDMENT BY ALTERING CANDIDATE MESSAGES.....................14

    A.    Union Efforts to Push Non-Republican Voters Into
Republican Primaries Change Candidate Messages ...............................16

    B.    Lack of Party Registration Alters Candidate Messages .........................19

    C.    Members of Congress from Open Primary States Are More
Moderate than Those From Closed Primary States ................................21

    D.    Republican Candidates in Open Primaries Are Less
Subject to Party Discipline ....................................................................22

III  MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST
AMENDMENT BY ALTERING ELECTION OUTCOMES ......................24

CONCLUSION ..................................................................................................27

# TABLE OF AUTHORITIES

## Cases:

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................10

*Arizona Libertarian Party v. Bayless*,
    351 F.3d 1277 (9th Cir. 2003) ................................................15, 25

*California Democratic Party v. Jones,*
    530 U.S. 567 (2000) ...............................................................*passim*

*California Democratic Party v. Jones*,
    984 F.Supp. 1288 (E.D. Cal. 1997), *aff'd* 169 F.3d 646
    (9th Cir. 1999), *rev'd on other grounds*, 530 U.S. 567 (2000)................*passim*

*Clingman v. Beaver,*
    544 U.S. 581 (2005)..........................................................1, 11, 12

*Democratic Party of Washington State v. Reed*,
    343 F.3d 1198 (9th Cir. 2003) ......................................................15

*Idaho Republican Party v. Ysursa*,
    765 F.Supp. 2d 1266 (D. Idaho 2011) .....................................25, 27

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ............................................ 14-15, 23

*Miller v. Brown*,
    503 F.3d 360 (4th Cir. 2007) ......................................................15

## Statutes & Rules:

CALIFORNIA ELECTION CODE
    § 2150(8)...............................................................................11

# TABLE OF EXHIBITS

| Description of Document | Exhibit No. |
|---|---|

Transcript of Deposition of Montana GOP Executive Director
Chris Shipp & Deposition Exhibits (7/24/15) ...........................................................1

Report of Plaintiffs' Experts, Prof. Kyle Saunders &
Prof. Steven Greene (6/4/15)......................................................................................2

Report of Defendants' Expert, Prof. Christopher Muste (7/14/15) ..........................3

Transcript of Deposition of Senate Majority Leader
Matthew Rosendale (8/3/15) .....................................................................................4

Transcript of Deposition of MEA-MFT President Eric Feaver &
Deposition Exhibits (6/26/15) ...................................................................................5

Transcript of Deposition of Scott Boulanger (7/23/15)............................................6

Declaration of Brad Molnar (5/29/15).......................................................................7

Declaration of Republican House Majority Leader
Keith Regier (5/28/15)...............................................................................................8

Declaration of Republican Senate Majority Leader
Matthew Rosendale (5/29/15) ...................................................................................9

Transcript of Deposition of Prof. Kyle Saunders (7/30/15) ...................................10

Declaration of Scott Boulanger (6/3/15) .................................................................11

# INTRODUCTION

This case involves a First Amendment challenge by Plaintiffs[1] to Montana's open primary system as applied to the Montana Republican Party. This system requires the Party to allow non-members to select its nominees for public office. The Constitution prohibits such intrusion because the First Amendment's freedom of association "would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *California Democratic Party v. Jones,* 530 U.S. 567, 574 (2000). Montana's open primaries inflict several First Amendment injuries upon the Party.

First, Montana's open primary system lacks any registration of voters' party affiliation, thereby preventing the Party from identifying and effectively communicating with its members. This severely burdens the Party's ability to perform its basic functions during primary elections. *Clingman v. Beaver,* 544 U.S. 581, 595 (2005).

Second, open primaries compel the Party's primary candidates to change their campaign messaging. As demonstrated below, the threat of union intervention deters candidates from supporting, for example, right-to-work issues

---

[1] Plaintiffs shall be referred to collectively as the "Montana Republican Party" or the "Party."

even though the Republican Platform endorses them.  Exacerbating this problem is a new policy by the MEA-MFT intended to help "fracture" the Republican Party by "aggressively promoting" candidates in contested Republican primaries who support the union's agenda rather than the Party's platform.  Ex. 5, p. 33, 85.  Large institutional players like the MEA-MFT have learned to exploit Montana's open primary system.  Republican candidates know this and respond with self-censorship, thereby injuring the Party's First Amendment rights.

Third, Montana's open primaries affect primary election results.  As evidenced below, Montana's crossover voting rate invariably affects the results of close Republican primary elections, resulting in Republican nominees who are not favored by a majority of Republican voters.  This constitutes a separate constitutional violation of the Party's associational rights.  *Jones,* 530 U.S. at 581 ("There is simply no substitute for a party's selecting its own candidates").  The Party is therefore entitled summary judgment.

## STATEMENT OF FACTS

Montana's Secretary of State, Defendant Linda McCulloch, is the State's chief election officer.[2]  Doc. 83 (Stip. Fact #1).  As such, she is responsible to obtain and maintain uniformity in the application, operation, and interpretation of

---

[2] Defendants shall hereinafter be referred to collectively as the "State" unless the context dictates otherwise.

the election laws of Montana. *Id.* (Stip. Fact #2). She also oversees primary elections held in June of every even-numbered year. *Id.* (Stip. Fact #3).

Montana voters receive a complete set of party ballots during primary elections. Doc. 83 (Stip. Fact #4). Each voter may cast votes on only one party ballot and must dispose of the other ballot. *Id.* (Stip. Fact #5). These rules enable every voter to choose their party primary, thereby establishing an "open" primary. *Id.* (Stip. Fact #6). Montana requires the two major parties to participate in this system. *Id.* (Stip. Fact #7).

The State does not register voters' party affiliation. Doc. 83 (Stip. Fact #8). Nor does it record which primary ballot a particular voter chooses. *Id.* (Stip. Fact #10). The Montana Republican Party therefore cannot effectively identify all its members or turn them out at the polls and its candidates lack comprehensive voter lists that are limited to Republican voters. Ex. 1, pp. 16-17, 26-27, 29, 60-61, 64. Republican primary candidates respond by diluting their messages. Ex. 4, pp. 71-72.

The MEA-MFT is the Montana affiliate of the National Education Association and is the largest union in the state with 18,000 members spread throughout every legislative district. Doc. 83 (Stip. Fact #23); Ex. 5, p. 20, 40. The union made contributions to the Democratic Party in the last election cycle but none to the Republican Party. Ex. 2, pp. 19-20; Ex. 5, p. 105-107. The MEA-

MFT endorsed 11 Democrats during the 2012 primaries but refused to endorse any Republicans. Ex. 5, p. 41, 43. The union later endorsed candidates in all 125 legislative races for the 2012 general election, all of whom were Democrats. *Id.,* pp. 43-44, 167. It has not endorsed a Republican over a Democrat for statewide office since 1996. Ex. 5, p. 62.

The Republican Party considers the MEA-MFT to be "downright hostile" and assumes union members oppose the Party and its platform. Ex. 1, p. 74. The Republican Platform differs markedly from the union's policy goals on several issues, including right to work, school choice, and pension reform. Compare Ex 1, pp. 117-30 with Ex. 5, pp. 191-94.

MEA-MFT President Eric Feaver credited what he called a "handful of Responsible Republicans" with advancing the union's policy goals in the 2013 legislative session:

> Despite passing stuff we did not like much, stuff the governor had to veto, stuff we have had to challenge in court, the fact is the [2013] legislature (1) passed the largest school funding bill in history, (2) rejected all but one school privatization bill, (3) saved and amortized our teacher and public employee defined benefit retirement systems, (4) wasted no time on anti-union legislation, and (5) passed the largest increase in state employee base pay in memory. *Without a handful of "Responsible Republican" legislators the last legislature could have been a far different and radically ugly affair.*

(Ex. 5, p. 204, emphasis added).

4

The union believes Democrats will not win a legislative majority in the near future and recognizes the existence of Republican districts in which Republican primary victors consistently win in the general election. Ex. 5, pp. 55, 94. The union therefore began endorsing candidates in certain Republican legislative primaries in 2014. *Id.*, p. 84. It analyzed prior election results, determined that a dozen Republican legislative districts would be "in play" for the 2014 primaries, and endorsed the "responsible" Republican in each of the districts. *Id.*, pp. 55, 84, 184. As President Feaver explained:

> if [the Republican Party] is going to fracture along some ideological fissure points, I would prefer that the folks that fracture against our interests are in the minority in the Republican Party. And insofar as I can help make that happen, I'll help make that happen.

*Id.*, p. 85.

The MEA-MFT "aggressively promote[s]" candidates it endorses. Ex. 5, p. 33. This includes mailing political brochures to each union member residing in the candidate's district. *Id.*, pp. 39-40, 196-97. The union canvasses members at its local meetings and through one-on-one efforts conducted by its field organizers. *Id.*, p. 33. Volunteers armed with detailed scripts contact members through phone banks and tabulate their voting preferences. *Id.*, pp. 111-112, 198-200. Union members also post yard signs and campaign door-to-door. *Id.*, pp. 40-41. On Election Day, union organizers "chase ballots" and "work really hard to get our members to the polls." *Id.*, p. 47. The union stated, both through the press and on

an individual basis, that "those who usually vote Democratic should consider voting in the GOP primary to support the Republican that most clearly reflects their views." *Id.*, pp. 56-57, 185.

Additionally, President Feaver emails political exhortations using a list containing 6,000 to 8,000 email addresses of members. Ex. 5, p. 78. On May 5, 2014, Feaver blasted an email with the following subject line: "Republican Party legislative primaries may make all the difference." *Id.*, p. 201. He assured his members that "not all Republicans are alike" and that "[y]our vote in Republican Party primaries for legislative candidates who believe government must play a positive role in our society is absolutely essential." *Id.*

Three weeks later, President Feaver blasted another email to his members. Ex. 5, p. 189. He again assured them that not all Republicans are bad: "Vote for solution driven, problem solving, responsible Republicans. *They do exist you know.*" *Id.* (emphasis added). "Responsible" Republicans "helped secure huge bills to fund public schools and state employee pay. They helped amortize and save pubic employee and teacher pensions. They helped kill all but one nasty public school privatization bill. They have earned voter affirmation big time." *Id.* He also noted that "the complexion of the next legislature may well be decided June 3, one Republican legislative primary after another" and that members who failed to heed the union's call "are hereby not authorized to bitch about the outcome." *Id.*

The following day, citing a newspaper article detailing the Republican Party's internal conflicts, President Feaver exhorted his members to vote for "responsible Republican legislators" who "chose NOT to drive the government/public school bus off the cliff." *Id.*, p. 212 (emphasis in original).

The union portrays itself as a "decision maker" and "we're always going to say we were the deciding factor in everything that we possibly can claim." Ex. 5, p. 46. To that end, the union publicizes its endorsements in the press as well as details about its mobilization efforts. *Id.*, p. 33; see also *id.,* p. 185 (union president's statements to the *Billings Gazette* describing emails and postcards sent to members in support of union-endorsed Republicans). The union also uses its magazine to publicize its alleged successes. After the 2012 primaries, the union's magazine contained the following:

> MEA-MFT played a big role in Montana's June 5 primary, working in 11 contested primary legislative campaigns. Our endorsed candidates won in all but two of those races….We mailed postcards and called members to let them know which candidates are endorsed by MEA-MFT members because of their support for workers; rights, public education, and public employees. MEA-MFT staff, governance, and members statewide rolled up their sleeves to help pound yard signs, go door to door, and make phone calls for endorsed candidates. More than 40 members volunteered to call other members in all 11 districts.

Ex 5, p. 165 (internal punctuation omitted). The union's magazine similarly trumpeted success after the 2014 primaries:

> MEA-MFT members were instrumental in electing recommended

candidates in a number of primary elections this spring. Our members cast the deciding votes in about a dozen contested primary races this year. Union members vote in higher percentages than any other group in Montana. We're proud of that. Our members make the difference in elections. We couldn't be happier with the results.

*Id.*, p. 181.

The MEA-MFT will assuredly seek to influence Republican primary elections again in 2016. *Id.*, pp. 63, 68. The Party, its candidates, and its campaign consultants are all cognizant of the MEA-MFT's efforts. See, *e.g.*, Ex. 1, p. 74, Ex. 4, pp. 64; Ex. 6, pp. 43-44; Ex. 7, ¶¶ 13, 15. Republican consultants and top elected officials advise candidates to avoid issues that encourage union members to crossover into Republican primaries, such as right-to-work and school choice. Ex. 4, p. 66; Ex. 7, ¶¶ 8-9, 15. Many Republican primary candidates engage in self-censorship by avoiding right-to-work issues, even though the Party Platform includes a right-to-work plank. *Id.*, ¶ 14.

Republicans have held a majority of seats in Montana's legislative chambers for the past several sessions, including 29 of 50 Senate seats and 59 of 100 House seats in the 2015 session. Ex. 8, ¶ 2; Ex. 9, ¶ 4. Yet, 11 of the 59 Republican members routinely voted against the Party on key bills during the 2015 legislative session. Ex. 8, ¶ 5. This included a vote to allow exceptions to the 60-vote "blast motion" rule that has existed for nearly 30 years (a rule similar to the 60-vote cloture rule in the U.S. Senate), thereby making it easier for Democrats and

"responsible" Republicans to bring bills to the House floor that had been defeated in Republican-controlled committees. *Id.*, ¶¶ 7-8. They used these exceptions to pass the Democrats' three high-priority bills and other bills. *Id.* ¶¶ 14-16.

Seven members of the Republican Senate caucus consistently voted with the 21 Senate Democrats to enact Gov. Bullock's legislative agenda. Ex. 9, ¶¶ 7, 9. This included the Democrats' three high-priority bills as well as many others. *Id.*, ¶¶ 9-13. One of the dissident senators told the Republican leadership that he and the other six dissidents would join Democrats in removing Republican Sen. Debby Barrett as Senate President unless the Republican caucus agreed to assign "his guys" to "acceptable" committees. *Id.*, ¶ 21.

## ARGUMENT

A party may move for summary judgment on all claims or defenses or a part of a claim or defense. Fed.R.Civ.P. 56(a). Parties "may file a motion for summary judgment at any time until 30 days after the close of discovery." Fed.R.Civ.P. 56(b). Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is

that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).

The First Amendment "protects the freedom to join together in furtherance of common political beliefs." *Jones*, 530 U.S. at 574. This "necessarily presupposes the freedom to identify the people who constitute the association, and to limit the association to those people only." *Id.* (citations omitted). Thus "a corollary of the right to associate is the right not to associate." *Id.* (citations omitted). These rights "would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being." *Id.* (citations omitted). Protection of associational rights is particularly important for political parties when selecting their nominees. *Jones*, 530 U.S. at 575 ("In no area is the political association's right to exclude more important than in the process of selecting its nominee"). As shown below, Montana's open primary system severely burdens those rights as applied to the Montana Republican Party.

I FORCING THE PARTY TO SELECT NOMINEES IN A PRIMARY WITHOUT REGISTERING VOTERS' AFFILIATION SEVERELY BURDENS THE PARTY'S ASSOCIATIONAL RIGHTS BY PREVENTING IT FROM IDENTIFYING REPUBLICAN VOTERS

The First Amendment protects "the freedom to join together in furtherance of common political beliefs" which "necessarily presupposes the freedom to

*identify* the people who constitute the association and limit the association to those people only." *Jones,* 530 U.S. at 574 (emphasis added). When the state forces a party to choose its nominees in a state-run primary, the party requires lists of registered party voters in order to identify its members. *Clingman,* 544 U.S. at 595 ("It is undisputed that the voter registration lists, *with voter affiliation information*, provide *essential information* to the party state committees") (emphasis added). Such lists are needed for "direct solicitation of party members - by mail, telephone, or face-to-face contact, and by the candidates themselves or by their active supporters," which is "part of any primary election campaign." *Id.* They are also necessary "for other campaign and party-building activities, including canvassing and fundraising." *Id.* The absence of party registration lists not only reduces parties' ability to raise funds, it also requires parties to "risk expending precious resources to turn out party members who may have decided to cast their votes elsewhere." *Id.* at 596.

The *Jones* decision involved California's blanket primary.[3] California registers voters' party affiliation – and did so when its blanket primary law was in effect. Cal. Elec. Code § 2150(8); *California Democratic Party v. Jones*, 984

---

[3] In a blanket primary, all candidates from each party are included on one ballot, thereby enabling voters to, for example, support a Republican for governor and a Democrat for attorney general. *Jones*, 530 U.S. at 576 n.6. Montana's open primary, by contrast, involves a voter selecting one party's ballot and marking all of his or her choices for partisan offices on that ballot. *Id.*

F.Supp. 1288, 1289-90 (E.D. Cal. 1997), *aff'd* 169 F.3d 646 (9th Cir. 1999), *rev'd on other grounds,* 530 U.S. 567 (2000).  Thus, even though California's blanket primary unconstitutionally permitted non-party members to select party nominees, California at least provided essential party affiliation information to enable political parties and candidates to conduct primary election activities.

Montana's open primary system burdens party associational rights even more than California's unconstitutional blanket primary because Montana refuses to register voters' party affiliation.  Doc. 83 (Stip. Fact #8).  Nor does it record which primary ballot a particular voter chooses.  *Id.* (Stip. Fact #10).  The State thus forces the Party into a state-run primary producing the Party's nominees - its "ambassador[s] to the general electorate in winning it over to the Party's views," *Jones*, 530 U.S. at 574, but deprives the Party of "essential information" to conduct primary election activities.  *Clingman,* 544 U.S. at 595.

Nor is the Party able through its own efforts to identify members or effectively turn them out for elections.  It attempts to compile voter lists but they are never accurate or reliable.  Ex. 1, p. 64.  Complicating this endeavor is that "people move, people get married, people die and that changes, and their affiliations change."  *Id*., p. 26.  The absence of such information diminishes Party cohesion and increases campaign costs.  *Id*., p. 35; Ex. 4, p. 70.  The Party is forced to spend "much more of our time and our money trying to identify voters rather

than turning out people we know to be Republicans." Ex. 1, pp. 26-27. As a result, the Party cannot maximize turnout during primaries. *Id*., p. 60. An inability to identify members also hinders the Party's fundraising. The Party maintains a membership mailing list that is used for fundraising purposes. *Id*., p. 15. Because the list can never encompass all Montana Republicans, however, the Party's fundraising solicitations can never reach all potential contributors.

Additionally, the Party's inability to communicate effectively with its members during primary elections can severely injure the party when candidates harboring abhorrent views run in its primaries. *Jones*, 530 U.S. at 579 ("being saddled with an unwanted, and possibly antithetical, nominee would…severely transform [the party]"). While the Party usually does not take sides in primaries, there are exceptions, such as a recent primary in which a white supremacist sought a Republican nomination. Ex. 1, pp. 18, 22. The candidate did not "represent the Republican Party, that's not what we're about." *Id.* But without having reliable party affiliation information, the Party cannot adequately warn its members in the future of candidates whose nomination would devastate the Party's reputation.

The State requires the Montana Republican Party to participate in its open primary system. Not only does that system prevent the Party from limiting participation to Party members, it prevents the Party from even identifying those members. This deprivation severely burdens the Party's associational rights.

## II  MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST AMENDMENT BY ALTERING CANDIDATE MESSAGING

A primary system that forces parties to "adulterate their candidate-selection process – the basic function of the party – by opening it up to persons wholly unaffiliated with the party … has the likely outcome … of changing the parties' message." *Id.* at 581.  There is "no heavier burden on a political party's associational freedom." *Id.* at 582.

A party's message changes when its primaries are opened to non-members because a nominee "will have prevailed by taking somewhat different positions - and, should he be elected, will continue to take somewhat different positions in order to be *re*nominated." *Jones*, 530 U.S. at 580.   This "encourages candidates – and officeholders who hope to be renominated – to curry favor with persons whose views are more 'centrist' than those of the party base" and "simply move[s] the general election one step earlier in the process, at the expense of the parties' ability to perform the basic function of choosing their own leaders." *Id.*

The reasoning in *Jones* concerning blanket primaries applies to open primaries. *Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006) ("[k]nowing that voters unaffiliated with the plaintiffs' party will participate in their primary dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit" and thus "*the mere existence of the open primary law causes these decisions to be made differently than they would absent*

*the law*") (emphasis added). The obvious infringement of First Amendment rights caused by open primaries compelled Virginia authorities to concede in later proceedings in *Miller* that "if a political party is compelled to select its candidates by means of a state-run primary, the State may not force the party to include voters in that primary." *Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) ("*Miller II*").

Like the Fourth Circuit, the Party's experts in this case conclude that "the very existence of open primaries and crossover voting affects the nature of candidates and representation, regardless of whether crossover voters actually change the outcome of a race" and that "strategic position-taking in a more moderate direction has been occurring in Montana." Ex. 2, p. 13. Although the Montana Republican Party agrees with the Fourth Circuit that forced association in a primary election between a political party and non-members unconstitutionally infringes upon First Amendment rights as a matter of law,[4] the Party has nevertheless marshaled considerable evidence demonstrating that open primaries affect candidate speech by:

---

[4] There appears to be an intra-circuit conflict in the Ninth Circuit on this issue. Compare *Democratic Party of Washington State v. Reed*, 343 F.3d 1198, 1203 (9th Cir. 2003) (*Jones* "does not set out an analytic scheme whereby the political parties submitted evidence establishing that they were burdened. Instead, *Jones* infers the burden from the face of the blanket primary statutes") with *Arizona Libertarian Party v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003) ("*Jones* treated the risk that nonparty members will skew either primary results or candidates' positions as a factual issue, with the plaintiffs having the burden of establishing that risk").

- enabling powerful interest groups opposed to the Republican Platform, such as the MEA-MFT, to potentially mobilize blocs of non-Republicans to vote in Republican primaries,

- forcing Republican primary candidates to dilute their messages due to Montana's refusal to register voters' party affiliation and the resulting lack of reliable lists of party voters,

- compelling members of Congress from open primary states to be more centrist than their counterparts from closed primary states,

- emboldening dissident Republicans to ignore the Republican Platform.

This evidence is described in detail below.

A    Union Efforts to Push Non-Republican Voters Into Republican Primaries Change Candidate Messages

As demonstrated by the evidence in this case, the mere threat of crossover voting in open primaries is enough to move candidate messaging to the center. *California Democratic Party v. Jones*, 984 F.Supp. 1288, 1299 (E.D. Cal. 1997), *aff'd* 169 F.3d 646 (9th Cir. 1999), *rev'd on other grounds*, 530 U.S. 567 (2000) ("the possibility of a decisive cross-over vote - whether or not that vote materializes - could well affect the conduct of elections and elected officials"). Thus, one reason that "strategic position-taking in a more moderate direction has been occurring in Montana" is that "outside influence - whether from the opposing party or via affiliated groups - can attempt to persuade non-Republican open primary voters to crossover and vote in the Republican primary. The candidates running for office know this, and have a strategic incentive to modify their

message accordingly because this setting can affect their electoral prospects." Ex. 2, pp. 13, 16.

An example of this phenomenon is the threat of unions intervening in the Party's primaries. Republican consultants and top elected officials advise candidates to avoid issues that encourage union members to crossover into Republican primaries and vote for their opponents. Ex. 7, ¶¶ 8-9, 15; Ex. 9, p. 66. Not surprisingly, many Republican primary candidates do not campaign on issues opposed by unions, particularly right-to-work issues. Ex. 7, ¶ 14. The threat of union intervention in Republican primaries is therefore chilling the Party's message concerning key planks in the Party's platform.

The MEA-MFT's well-publicized intervention in Republican primaries will exacerbate this problem and "clearly has the potential to do damage to the Republican brand and is more likely to occur under an open primary system." Ex. 2, p. 21. The MEA-MFT is the largest union in Montana and is solidly aligned with the Democratic Party.[5] The Montana Republican Party rightly considers the union "downright hostile." Ex. 1, p. 74; see also Ex. 2, p. 20 ("It is fair to say that the MEA-MFT is not an ally of the Republican Party.") The union's description of its efforts to promote endorsements as "fairly aggressive" is an understatement. Ex. 5, pp. 33, 39-41, 47, 111-12. It is particularly aggressive in encouraging non-

_____

[5] See pp. 3-4, *supra*.

Republicans to support its Republican endorsees. *Id.* at pp. 56-57 (union president's press statement that "those who usually vote Democratic should consider voting in the GOP primary to support the Republican that most clearly reflects their views"); see also *id.*, pp. 189, 196-97, 201, 204, 212, 214, 217, 218-19, 220.

As noted by Plaintiffs' experts, the MEA-MFT's "behavior does demonstrate overt attempts at outside influence on the part of this group, which is easier to do in an open primary system." Ex. 2, p. 22. The union's efforts are overt because, in aggressively promoting its endorsements to *union members*, the MEA-MFT also aggressively informs the *public* of its efforts. *Id.*, p. 33, 165, 181, 185. Simply put, the union sells itself as a "decision maker" in electoral politics and thus "we're always going to say we were the deciding factor in everything that we possibly can claim." Ex. 5, p. 46.

The MEA-MFT's efforts "effectively raised the salience of these primary elections, thereby increasing the potential for crossover voting to occur and affect the outcome of the race." Ex. 2, pp. 28-29. The union's 18,000 members reside in all of Montana's legislative districts, and the union therefore has, on average, 360 members in each of the 50 state senate districts and 180 members in each of the 100 state house districts. Ex. 5, p. 20, 40. Even taking at face value the union's claim that 40 percent of its members are Republican, the union has on average a

216-member non-Republican voting bloc in each senate district that can potentially decide a Republican primary. In the 2014 primary election for SD-43, the union-endorsed candidate defeated a more conservative Republican by 34 votes (50.36% to 49.64%). Ex. 11, ¶¶ 11, 12, 16.

The MEA-MFT will assuredly intervene in Republican primaries again in 2016. Ex. 5, p. 63, 68. While the union cannot *prove* its prior efforts decided any particular Republican primary race in 2014, it doesn't need such proof to affect future candidate speech. The Party, its candidates, and its consultants recognize the union's threat. Ex. 1, p. 74, Ex. 4, pp. 64-65; Ex. 6, pp. 43-44, Ex. 7, ¶ 15. Thus, Party consultants will "continue advising candidates in contested Republican primaries to refrain from promoting (for example) pro right-to-work issues in order to diminish the threat of unions encouraging their members to crossover and vote against them." Ex. 7, ¶ 15. The very public efforts of institutional players such as the MEA-MFT to muscle large blocs of non-Republican members into Republican primaries will therefore cause even more self-censorship by Republican candidates.

B. Lack of Party Registration in Montana Changes Candidate Messages

Montana's open primary system distorts candidate speech even more than California's blanket primary system found unconstitutional in *Jones* because Montana refuses to register voters' party affiliation. Doc. 83 (Stip. Fact #8).

Senate Majority Leader Matthew Rosendale explained how a reliable list containing only Republicans would change his messaging regarding, for example, mailings targeted exclusively to Republican voters:

> You just obviously are able to use language that…that would help you to incite more energy, enthusiasm, and support and it would give you the ability to use some language that was more aggressive.

Ex. 4, pp. 71, 72.

The Party, however, cannot identify members or effectively turn them out for elections. It attempts to compile voter lists but they are never accurate or reliable.[6] *Id*. 1, p. 64. As a result, Republican primary candidates who must rely upon lists that include non-Republicans dilute their messages. Republican consultants encourage their primary candidates to emphasize broad-based issues appealing to non-Republicans, such as hunting rights on public lands. Ex. 7, ¶¶ 11-12. Candidates are deterred from using more robust (or, as Sen. Rosendale puts it, "aggressive") messaging.

Not only does Montana's open primary system prevent the Party from limiting participation to Party members, it also prevents the Party from identifying those members or even knowing who is selecting the Party's nominees. The resulting change Republican primary candidates must make to their campaign messaging is another First Amendment injury.

---

[6] See p. 12, *supra*.

C.    Members of Congress from Open Primary States Are More
      Moderate than Those From Closed Primary States

As stated previously, "the very existence of open primaries and crossover voting affects the nature of candidates and representation, regardless of whether crossover voters actually change the outcome of a race" and "strategic position-taking in a more moderate direction has been occurring in Montana." Ex. 2, p. 13. These effects "are not limited to the 2014 cycle, and are likely to continue to affect the Republican candidates, campaigns, and policy outcomes in the future." Ex. 2, 14. This conclusion is supported by a study referenced by both parties' experts showing that members of Congress from states with closed primaries take more extreme policy positions than representatives from states with more open primaries. Ex. 10, pp. 103, 141-42, citing Gerber and Morton (1998) "Primary Election Systems and Representation," *Journal of Law Economics & Organization* 14(2): 304–324); see also Ex. 3, p. 31 (citing the same study).

A similar study (by the same author) showing that blanket primaries altered congressional issue positioning was sufficient, standing alone, to persuade the Supreme Court that California's blanket primary caused the "deleterious effect" of "favoring nominees with moderate positions." *Jones*, 530 U.S. at 580. Likewise, the study cited in the previous paragraph regarding the effect of open primaries on congressmen suffices, even without the Montana-specific evidence presented by

the Party, to prove such primaries result in similar deleterious issue shifting by Montana candidates.

### D. Republican Candidates in Open Primaries Are Less Subject to Party Discipline

The Supreme Court noted that blanket primaries weaken parties' ability to discipline dissident nominees. *Jones*, 530 U.S. at 581 ("That party nominees will be equally observant of internal party procedures and equally respectful of party discipline when their nomination depends on the general electorate rather than on the party faithful seems to us improbable").  This reasoning applies with equal force to open primaries:

> …[O]nce elected, candidates may perceive that the cross-over vote makes them less vulnerable at the primary to the wrath of the party organization or party regulars for acts of apostasy. A blanket or *open primary* weakens the "disciplining effect" of the primary challenge in requiring the officeholder to carry out the party philosophy and support the majority position of the party caucus.

*Jones*, 984 F.Supp. at 1299 (internal quotation marks omitted, emphasis added).

Such weak discipline was on display during the 2015 legislative session. Though Republicans held 59 of the Montana House's 100 seats, 11 members consistently joined Democrats to derail the Republican Party's agenda, thereby diluting the votes of Montana citizens who elected a majority Republican Legislature.  Ex. 8, ¶¶ 5, 7-8, 14-16.  This included the 11 dissidents gutting the 60-vote "blast motion," thereby making it easier for the 41 Democratic members

and the dissident Republicans to bring bills to the House floor that had been defeated in House committees.  *Id*., ¶¶ 7-8.  This enabled passage of the three bills most strongly opposed by the majority of the House Republican caucus, as well as other bills.  *Id.,* ¶¶ 14-16.

The Senate Republican caucus faced similar problems, as seven of its members consistently voted with the 21 Senate Democrats to enact Gov. Bullock's legislative agenda.  Ex. 9, ¶¶ 7, 9-13.  Party discipline in the Senate was so poor that "responsible" Republican senators threatened to join Democrats in removing Sen. Debby Barrett as Senate President unless the Republican caucus acceded to their demands for committee assignments.  *Id.*, ¶ 21.  Party discipline is lower now than in prior sessions.  Ex. 9, ¶ 27.  Montana's open primaries will continue to encourage dissident candidates to abandon the Party's planks when campaigning during primaries.

The evidence presented by the Montana Republican Party confirms what other courts have held: open primaries shift candidate speech regardless of how much actual crossover voting they cause.  *Jones*, 984 F.Supp. at 1299 ("the possibility of a decisive cross-over vote - whether or not that vote materializes - could well affect the conduct of elections and elected officials"); *Miller*, 462 F.3d at 317-18 ("[k]nowing that voters unaffiliated with the plaintiffs' party will participate in their primary dramatically changes the plaintiffs' decisions about

campaign financing, messages to stress, and candidates to recruit" and thus "the mere existence of the open primary law causes these decisions to be made differently than they would absent the law"). Montana's open primary law is therefore unconstitutional.

## III  MONTANA'S OPEN PRIMARY LAW VIOLATES THE FIRST AMENDMENT BY ALTERING ELECTION OUTCOMES

The United States Supreme Court "vigorously affirm[s] the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party selects a standard bearer who best represents the party's ideologies and preferences." *Jones,* 530 U.S. at 575 (citations omitted). This is because "the moment of choosing the party's nominee … is the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id.*

Not only does Montana's open primary law affect messaging by the Party's candidates during primary election campaigns, it also affects who the prevailing nominee is on Election Day. The Supreme Court in *Jones* held that "even a single election in which the party nominee is selection by nonparty members could be enough to destroy the party" and will at least "severely transform" it. *Jones*, 530 U.S. at 579.

The lower courts in *Jones* relied upon a study showing "the average crossover rate, excluding independents, is something on the order of 5% of voters in closed primary states, 10% of voters in open primary states, and 11-15% in blanket primary states." *Jones*, 984 F.Supp. at 1298; *see also Idaho Republican Party v. Ysursa*, 765 F.Supp. 2d 1266, 1274 (D. Idaho 2011) (court relied upon studies demonstrating a 10% rate of crossing over by non-independents, which rises to 20-30% when independents are included). Thus, "the amount of cross-over voting is greater in a blanket primary than an open primary but not dramatically so." *Id.*; *see also Ysursa*, 765 F.Supp. 2d at 1275 (finding no "meaningful distinction between the open primary in Idaho and the blanket primary found unconstitutional in *Jones*" because a 10% crossover rate "can be devastating to a party"). Further, courts have uniformly held that, in evaluating associational claims, independent voters should be included in the crossover rate. *Jones*, 530 U.S. at 578-79 & n.9; *Bayless*, 351 F.3d at 1282 (*Jones* "focused on the potential for the participation of nonparty members, including registered members of other parties, to influence the choice of the nominee at the primary and to cause partisan candidates to change their message to appeal to a more centrist voter base"); *Ysursa*, 765 F.Supp. 2d at 1274 n.3.

Crossover voting is most likely to occur, and be decisive, when there is "asymmetric competition" arising from one party's primary being competitive

while the other party's primary is not. *Jones*, 984 F.Supp. at 1299. Noting that ten California legislative races in 1996 involved a contested primary for one party without a contest in the other and that a crossover rate of 5% could have changed the outcome in some of the races had the crossover voters voted for the same candidate, the court concluded that "it is likely that in the fullness of time some California primary races will be decided by cross-over voters, even if the number of such occasions is not large." *Id*.

Montana has similar data. The state averages 3.57 legislative races each election cycle involving an uncontested Democratic primary (*i.e.*, either one or zero Democrats running) and a contested Republican primary decided by less than 5% of the vote. Ex. 2, pp. 32-36; Ex. 3, p. 26. Like the experts relied upon by the courts in *Jones* and *Ysursa*, the Party's experts in this case concluded that the average crossover rate for Montana's open primaries, as with the rate in other open primary states, is approximately 10% for partisan voters. Ex. 2, p. 10. When independent voters are included, this rate rises to 20-30%. *Id.* Even with a 10% crossover rate, "the results of the primaries are more likely than not affected by crossover voting." *Id.,* p. 17. When independent voters are factored in, the effects are even more disruptive and result "in more moderate legislators being elected, thus distorting the consistency and broadening the ideological diversity among the Republican Party's officeholders in the Montana Legislature." *Id.*

Even when crossover voting is defined narrowly as members of other parties voting in the Republican primary, Montana has a crossover rate of 10%, the same crossover rate in open primaries as found throughout the country by district courts in *Jones* and *Ysursa*. *Jones*, 984 F.Supp. at 1298; *Ysursa*, 765 F.Supp. 2d at 1274. Thus, "it is likely that in the fullness of time some [Montana] primary races will be decided by cross-over voters, even if the number of such occasions is not large." *Jones*, 984 F.Supp. at 1299.

This similar crossover rate to Idaho's crossover rate in *Ysursa* demonstrates that Montana's open primary system is unconstitutional because, as the Supreme Court held, "there is simply no substitute for a party's selecting its own candidates." *Jones,* 530 U.S. at 581. Further, this high crossover rate dilutes the power of voters who self-identify as Republicans to have their preferred candidate selected as the nominee, which is an injury of constitutional magnitude. The burden on the Party's First Amendment associational rights is severe and unjustified by any compelling state interest. Montana's open primary law is therefore unconstitutional.

## **CONCLUSION**

Both the Montana Republican Party and those voters who identify as Republicans have a constitutional right to associate – a right that includes the right to know who the party is associating with, free from government interference or

mandated direction.  Montana's open primary system allows persons who associate freely with the Democratic Party, as well as independents, to select in every election cycle Republican nominees – the Party's "ambassador[s] to the general electorate in winning it over to the Party's views." *Jones*, 530 U.S. at 574.

The First Amendment forbids this.  For all of the foregoing reasons, Plaintiffs respectfully request this Court grant their motion for summary judgment.

DATED: September 18, 2015 Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs


The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party

## CERTIFICATE OF COMPLIANCE WITH L. R. 7.1(d)(2)(E)

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 6488 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: September 18, 2015

Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs

The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY this 18th day of September, 2015, that a copy of the foregoing will be delivered this day via the Court's ECF system to the following:

TIMOTHY C. FOX Montana Attorney General
J. STUART SEGREST
PATRICK M. RISKEN
Assistant Attorneys General
 215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
ssegrest@mt.gov
prisken@mt.gov


DATED: September 18, 2015

Respectfully submitted,
Monforton Law Offices, PLLC

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for the County Central
Committee Plaintiffs



The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party