Matthew G. Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, MT 59718
Tele.: (406) 570-2949; Fax: (406) 551-6919
Attorney for the County Central Committee Plaintiffs

James E. Brown
The James Brown Law Office, PLLC
30 S. Ewing St., Suite 100
Helena, MT 59601
Tele.: (406) 449-7444; Fax: (406) 443-2478
Attorney for Plaintiff Montana Republican Party

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMMITTEE, GALLATIN COUNTY REPUBLICAN CENTRAL COMMITTEE, SANDERS COUNTY REPUBLICAN CENTRAL COMMITTEE, DAWSON COUNTY REPUBLICAN CENTRAL COMMITTEE, STILLWATER COUNTY REPUBLICAN CENTRAL COMMITTEE; RICHLAND COUNTY REPUBLICAN CENTRAL COMMITTEE; CARBON COUNTY REPUBLICAN CENTRAL COMMITTEE; FLATHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE; MADISON COUNTY REPUBLICAN CENTRAL COMMITTEE; BIG HORN COUNTY REPUBLICAN CENTRAL COMMITTEE; MONTANA REPUBLICAN PARTY,<br><br>            Plaintiffs,<br>    v.<br><br>LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, *et al.*,<br><br>            Defendants. | Case No. CV 14-0058-H-BMM<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STRIKE EXPERT WITNESS OPINIONS** |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. iii

TABLE OF EXHIBITS ......................................................................................v

INTRODUCTION .........................................................................................1

ARGUMENT ...............................................................................................4

I     THE PARTY'S EXPERTS ARE QUALIFIED TO OFFER OPINIONS
CONCERNING MONTANA'S OPEN PRIMARIES .....................................6

II    THE EXPERTS' OPINIONS CONCERNING MESSAGE-SHIFTING
BY CANDIDATES IN OPEN PRIMARIES ARE ADMISSIBLE ................9

      A.    The Opinions Concerning Candidate Message-Shifting in Open
Primaries Are Reliable Because They Are Supported By Peer-
Reviewed Studies As Well As Montana-Specific Evidence ..................9

      B.    The Opinions on Candidate Message-Shifting Resulting From
Montana's Open Primaries Are Highly Relevant ..................................14

III   THE EXPERTS' OPINIONS CONCERNING THE RATE OF
CROSSOVER VOTING ARE ADMISSIBLE ...............................................16

      A.    The Opinions Concerning Crossover Voting Rates Are
Supported By Peer-Reviewed Studies....................................................16

      B.    Evidence of Crossover Voting Rates is Relevant to Show the
Likelihood of Future Republican Primaries Being Decided by
Non-Republicans ...................................................................................22

IV   THE PARTY WILL NOT SEEK ADMISSION OF OPINIONS
CONCERNING "REVERSE ROLL OFF" ....................................................24

CONCLUSION ..............................................................................................24

# TABLE OF AUTHORITIES

## Cases:

*Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,*
    738 F.3d 960 (9th Cir. 2013) ........................................................................18

*Arizona Libertarian Party v. Bayless,*
    351 F.3d 1277 (9th Cir. 2003) .......................................................................20

*Buck v. Ford Motor Co.,*
    810 F.Supp.2d 815 (N.D. Ohio 2011) ...........................................................10

*California Democratic Party v. Jones,*
    530 U.S. 567 (2000) ...............................................................................*passim*

*California Democratic Party v. Jones,*
    984 F.Supp. 1288 (E.D. Cal. 1997), *aff'd* 169 F.3d 646
    (9th Cir. 1999), 530 U.S. 567 (2000)......................................................*passim*

*City of Pomona v. SQM North America Corp.,*
    750 F.3d 1036 (9th Cir. 2014) .........................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993).........................................................................................5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* ("*Daubert II*")
    43 F.3d 1311 (9th Cir. 1995) .................................................................5, 6, 10

*Eclipse Electronics v. Chubb Corp.,*
    176 F.Supp.2d 406 (E.D. Pa. 2001) .................................................................9

*General Electric Co. v. Joiner,*
    522 U.S. 136 (1997).........................................................................................9

*Hangarter v. Provident Life and Acc. Ins. Co.,*
    373 F. 3d 998 (9th Cir. 2004) ........................................................................13

*Idaho Republican Party v. Ysursa,*
    765 F.Supp. 2d 1266 (D. Idaho 2011) ....................................................*passim*

*In re NJOY, Inc.*,
    2015 WL 4881091 (C.D. Cal. 2015) ...............................................................10

*In re Scrap Metal Antitrust Litigation,*
    527 F.3d 517 (6th Cir. 2008) ........................................................................5

*In re Zimmer Nexgen Knee Implant Products Liability Litigation*,
    2015 WL 3669933 (N.D. Ill. 2015) ................................................................10

*McKendall v. Crown Control Corp.*,
    122 F. 3d 803 (9th Cir. 1997) .......................................................................5

*Messick v. Novartis Pharmaceuticals Corp.*,
    747 F.3d 1193 (9th Cir. 2014) ......................................................................6

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ........................................................................1

*Tilstra v. Boumatic*, 791 F.3d 749
    (7th Cir. 2015) ........................................................................................13

*Speaks v. Mazda Motor Corp.*,
    2015 WL 4719905 (D. Mont. 2015) ...............................................................10

*United States v. Gutierrez de Lopez*,
    761 F.3d 1123 (10th Cir. 2014) .....................................................................5

*Woodard v. Stryker Corp.*,
    2012 WL 3475079 (D. Wyo. 2012)................................................................10

## INTRODUCTION

The State moves to exclude Plaintiffs[1] expert opinions concerning crossover voting rates, arguing that "it is the Plaintiffs' burden to prove that crossover voting occurs in open primaries in numbers that have an actual negative affect on the outcomes of Republican Party primary elections--an impossible burden."  Doc. 86, p. 1.  Such proof would certainly demonstrate a First Amendment injury and, contrary to the State's protests, is present in this case.  See Doc. 71, pp. 22-25; Doc. 93, pp. 24-27.

Changes in election outcomes are not, however, the only First Amendment injury resulting from open primaries.  Open primaries inflict upon political parties a separate and distinct injury by rewarding candidates who shift their messaging away from their party's platform in order to appease what they perceive to be a more moderate electorate in the primaries.  *California Democratic Party v. Jones*, 530 U.S. 567, 580 (2000) (a "deleterious effect" of California's blanket primary was to "favor nominees with moderate positions" by rewarding candidates who "curry favor with persons whose views are more 'centrist' than those of the party base").[2]

---

[1] Plaintiffs shall hereinafter be referred to collectively as the "Montana Republican Party" or the "Party."

[2] See also *Miller v. Brown*, 462 F.3d 312, 317-18 (4th Cir. 2006) ("[k]nowing that voters unaffiliated with the plaintiffs' party will participate in their primary

The State's *Daubert* motion ignores the Party's expert opinions relating to candidate message-shifting.  This omission is puzzling given the extensive analysis of candidate message-shifting in the Party's briefs filed in this Court.  See Doc. 71, pp. 9-19; Doc. 93, pp. 14-22.

The Party's experts, Drs. Kyle Saunders and Steven Greene, opine that Montana's open primaries shift candidates' messaging.  See, *e.g.*, Doc. 55-1, p. 13.  This opinion is reliable because it is based upon numerous, peer-reviewed studies as well as sworn testimony by high-level Montana Republicans.  *Id.*; Doc. 55-6; Doc. 71-10, pp. 29, 54, 102-103.  It is relevant because message-shifting is a deleterious effect of Montana's open primaries and a violation of the Party's First Amendment rights.  *Jones,* 530 U.S. at 580.

Montana's open primaries also injure the Party by changing the identity of its nominees.  The Party's experts opine that crossover voting in other states occurs at a rate of 10% for persons who identify as members of one party but vote in another party's primary, a rate that increases to 20 to 30% when independents are

---

dramatically changes the plaintiffs' decisions about campaign financing, messages to stress, and candidates to recruit" and thus "*the mere existence of the open primary law causes these decisions to be made differently than they would absent the law*") (emphasis added); *California Democratic Party v. Jones*, 984 F.Supp. 1288, 1299 (E.D. Cal. 1997), *aff'd* 169 F.3d 646 (9th Cir. 1999), *rev'd on other grounds*, 530 U.S. 567 (2000) ("the possibility of a decisive cross-over vote - whether or not that vote materializes - could well affect the conduct of elections and elected officials.  Under a blanket primary or open primary, the primary election becomes similar to the general election.").

included.  Doc. 55-1, p. 10.  The State claims these figures are unreliable because there are no Montana-specific surveys to review.  It does not explain what makes Montana so different from other open primary states as to render the data of the Party's experts inapplicable to this case, nor does it explain why the Supreme Court and the Ninth Circuit erred in relying upon similar data.  *Jones*, 530 U.S. at 578 (citing crossover data derived from Washington state's blanket primaries to evaluate California's blanket primary); *Jones*, 169 F.3d at 657, *rev'd on other grounds*, 530 U.S. 567 (2000) (citing study showing crossover rates of 5%, 10%, and 11-15% in closed primary states, open primary states, and blanket primary states, respectively).

The State repeatedly accuses the Party's experts of "targeting" data pertaining to crossover voting rates and "mold[ing] the 'facts' to fit their needs." Doc. 86, p. 14.  As shown below, these personal attacks are based upon hyperbole and mischaracterizations of the record.  Indeed, with regard to Dr. Saunders' report in this case as well as the report he coauthored in *Idaho Republican Party v. Ysursa*, 765 F.Supp.2d 1266 (D. Idaho 2011), the State's own expert's "review of the literature on party identification and crossover voting concurs with [those] reports on many points."  Doc. 93-3, p. 7.  The State's expert lauds Dr. Saunders' "very thorough" and "extensive review of the relevant literature" in his *Ysursa* report concerning studies of crossover voting.  *Id.*  He further acknowledges that

Dr. Saunders incorporated the two crossover studies conducted since *Ysursa* for the report he prepared for this case.  *Id.*

Further refuting the State's claims of "targeting" is the consistency between Dr. Saunders' 2010 *Ysursa* report and his report in this case even though he testified *against* Republicans in *Ysursa* and *for* Republicans in this case.  Compare Doc. 55-1, p. 10 with *Ysursa*, 765 F.Supp.2d at 1274.  This consistency demonstrates integrity, not "targeting."

The expert opinions supporting the Party's arguments in their summary judgment and preliminary injunction motions are reliable and relevant. The State's personal attacks on the Party's experts are baseless, its arguments lack merit, and its motion should be denied.

## ARGUMENT

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.[3]  The Rule is applied in accordance with "the liberal thrust of the

---

[3] Rule 702 states as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and(d) the expert has reliably applied the principles and methods to the facts of the case.

Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 588 (1993) (citations and internal quotation marks omitted).  Thus, "rejection of expert testimony is the exception rather than the rule." *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 531 (6th Cir. 2008) (quoting Fed.R.Evid. 702 Advisory Committee's Note, 2000 Amend.); *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) ("Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility").

The proponent of the testimony must show that its experts are, in fact, "experts in a particular scientific field." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* ("*Daubert II*") 43 F.3d 1311, 1315 (1995).  This Court has "broad discretionary powers in determining whether or not the proposed expert is qualified by knowledge, skill, experience, training, or education." *McKendall v. Crown Control Corp.*, 122 F. 3d 803, 806 (9th Cir. 1997).

The proponent must also show that the opinion "meets a certain standard of reliability before it is admitted." *Daubert II*, 43 F.3d at 1316.  Reliability exists if the opinion "reflects scientific knowledge." *Daubert II*, 43 F.3d at 1315.  This "require[s] some objective, independent validation of the expert's methodology." *Id.* at 1316.

Finally, the proponent must show that the evidence is relevant to the

particular case in which it is offered.  Put differently, the proponent must satisfy

the "fit" requirement by establishing that the testimony is "relevant to the task at

hand."  *Daubert II*, 43 F.3d at 1315.  "The relevancy bar is low, demanding only

that the evidence logically advances a material aspect of the proposing party's

case."  *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1197 (9th Cir.

2014), quoting *Daubert II*, 43 F.3d at 1315.

     In its summary judgment and preliminary injunction motions pending before

this Court, the Party relies upon its experts' opinions that (1) Republican

candidates shift their messaging when campaigning in open primaries and (2) there

is a crossover rate of 10% by partisan voters in open primaries, a figure that

increases to 20-30% when independent voters are included.  Both sets of opinions

are reliable and relevant.  The State's motion should therefore be denied.


I    THE PARTY'S EXPERTS ARE QUALIFIED TO RENDER OPINIONS
     CONCERNING MONTANA'S OPEN PRIMARIES

     The State criticizes the qualifications of the Party's experts.  Doc. 86, pp. 3-

4.  These criticisms are unfounded.  Dr. Saunders is an Associate Professor of

Political Science at Colorado State University.  Doc. 55-2, p. 1.  He received his

Ph.D. in Political Science from Emory University in 2001.  *Id.*, p. 1.  Since then, he

has taught political science classes at Northern Illinois University and Colorado

State University.  Dr. Saunders has published numerous articles in peer-reviewed

journals, including the following:

- "A New Barrier to Participation: Heterogeneous Application of Voter Identification Policies."  2010. *Electoral Studies* 29(1):66-78.

- "Is Polarization Really a Myth?"  2008.  *Journal of Politics* 70(2):542-555.

- "The Effect of Election Administration on Voter Confidence: A Local Matter?"  2007. *PS: Political Science and Politics* 40(4):655-662

- "Exploring the Bases of Partisanship in the American Electorate: Social Identity vs. Ideology."  2006. *Political Research Quarterly* 59(2):175-18

- "A New Kind of Balancing Act: Electoral Certainty and Ticket-Splitting in the 1996 and 2000 Elections."  2005. *Political Research Quarterly* 58(1):68-77

- "Why Can't We All Just Get Along? The Reality of a Polarized America." 2005. *The Forum: A Journal of Applied Research in Contemporary Politics* 3(2):1-14.

- "Issues, Ideology, and the Rise of Republican Identification."  2005. *American Review of Politics* 26(4):291-304.

- "Ideological Realignment and Active Partisans in the American Electorate." 2004. *American Politics Research* 32(3):285-309.

- "Ideological Realignment in the US Electorate."  1998.  *Journal of Politics* 60(3):634-652.

*Id.*, pp. 1-2.  He has previously qualified as an expert witness on issues concerning

open primaries.   *Ysursa*, 765 F.Supp.2d at 1274.

Dr. Greene is a Professor of Political Science at North Carolina State

University.  Doc. 55-4, p. 1.  He received his Ph.D. in Political Science from Ohio

State University in 1999.  *Id.*  Since that time he has authored or co-authored

numerous published articles, including but not limited to the following:

- One Vote out of Step? The Effects of Salient Roll Call Votes in the 2010 Election."  2012.  *American Politics Research*

- "The Structure of Partisan Attitudes: Reexamining Partisan Dimensionality and Ambivalence."  2005.  *Political Psychology*, 26(5):809-822

- "Social Identity Theory and Party Identification."  2004. *Social Science Quarterly* 85:136-153.

- "The Political Psychology of Party Identification." 2003.  *Electoral Democracy.*

- "The Social-Psychological Measurement of Partisanship." 2002. *Political Behavior* 24:171-197.

- "The Social Calculus of Voting."  2002.  *American Political Science Review* 96:57-7

-  "Finding the Weak Link: The Choice of Institutional Venues by Interest Groups."  2002. *American Review of Politics.* 23:19-38.

- "The Psychological Sources of Partisan-Leaning Independence."  2000. *American Politics Quarterly* 28:511-537.

- "Party Attachments and State Election Laws."  2000. *Political Research Quarterly* 53:57-70.

- "Understanding Party Identification: A Social Identity Approach."  1999. *Political Psychology* 20:393-403.

*Id.*, pp. 1-2.  The Party submits that Drs. Saunders and Greene are qualified to offer

expert testimony concerning Montana's open primary system.

II    THE EXPERTS' OPINIONS CONCERNING MESSAGE-SHIFTING
      BY CANDIDATES IN OPEN PRIMARIES ARE ADMISSIBLE

   A.   The Opinions Concerning Candidate Message-Shifting in Open
        Primaries Are Reliable Because They Are Supported By Peer-
        Reviewed Studies As Well As Montana-Specific Evidence

The Party's experts opine that a "broader less ideologically extreme

electorate in an open, rather than a closed, state legislative primary should often

result in primary candidates modifying their positions in a moderate direction to

appeal to this electorate" and "this strategic position-taking in a more moderate

direction has been occurring in Montana."  Doc. 55-1, p. 13.  The State makes no

mention of these opinions in its *Daubert* motion and instead criticizes the Party's

experts in general for not performing independent testing.  Doc. 86, pp. 6, 10, 11.

Independent testing is not necessary for admission of expert testimony

because "trained experts commonly extrapolate from existing data."  *City of

Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014),

quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Eclipse

Electronics v. Chubb Corp.*, 176 F.Supp.2d 406, 412 (E.D. Pa. 2001) ("an expert

should not be required to 'reinvent the wheel' and start his inquiry from square one

in order to be deemed qualified under *Daubert*").  Thus, experts can show the

reliability of their opinions by providing "proof that the research and analysis

supporting the proffered conclusions have been subjected to normal scientific

9

scrutiny through peer review and publication." *Daubert II,* 43 F.3d at 1317.[4]

Drs. Saunders and Greene rely upon several published studies, including one showing that members of Congress from states with closed primaries take more extreme policy positions than representatives from states with open primaries. Doc. 71-10, pp. 29, 54, 102-103, citing Gerber and Morton (1998) "Primary Election Systems and Representation," *Journal of Law Economics & Organization* 14(2): 304–324. They also rely on several studies showing moderation of messaging by presidential and congressional candidates. Doc. 55-1, p. 13.

The State does not challenge the reliability of these studies. Indeed, its own expert cites several of them in his report. Doc. 93-3, pp. 10-11.[5]

---

[4] See, *e.g.*, *Speaks v. Mazda Motor Corp.*, 2015 WL 4719905, *4 (D. Mont. 2015) (testimony of design defect expert who performed no testing and instead relied upon peer-reviewed studies and literature in forming his opinions was admissible); *In re Zimmer Nexgen Knee Implant Products Liability Litigation*, 2015 WL 3669933, *11 (N.D. Ill. 2015) (biochemical engineer who relied upon peer-reviewed literature concerning loosening of knee implants was permitted to testify); *In re NJOY, Inc.*, 2015 WL 4881091, *8-10 (C.D. Cal. 2015) (economist's use of price premium surveys conducted by others did not make his opinions unreliable); *Woodard v. Stryker Corp.*, 2012 WL 3475079, *11 (D. Wyo. 2012) (court admitted physicians' statistical analysis of four studies by others to demonstrate causal link between medical device and chondrolysis); *Buck v. Ford Motor Co.*, 810 F.Supp.2d 815, 844 (N.D. Ohio 2011) (engineer's opinion derived from published research studies qualified him to offer expert testimony because either "hands on testing" or "review of experimental, statistical, or other scientific data generated by others in the field" may suffice as a reasonable methodology upon which to base an opinion).

[5] The State's expert did not cite any studies disputing the conclusion that open primaries affect candidate messaging. He instead claimed that none of the Party's

10

Drs. Saunders and Greene also rely on Montana-specific evidence to support their opinions.  They reviewed a sworn statement from Brad Molnar, a long-time Party campaign consultant with a lengthy career as a Republican officeholder. Doc.  55-1, p. 13.  Molnar advises candidates to avoid issues that encourage union members to crossover into Republican primaries, such as right-to-work and school choice.  Doc.  55-6, pp. 6-7, ¶¶ 8-9, 15.  Many Republican primary candidates avoid these issues.  *Id.*, ¶ 14.  Molnar also noted that, as a result of efforts by groups like the MEA-MFT to encourage members to crossover into Republican primaries, he will continue advising candidates to avoid such issues.  *Id.*, ¶ 13-15.[6]

The State ignores the record when it disputes the experts' characterization of the MEA-MFT as "allied" with the Democratic Party.  Doc. 86, p. 14.  Dr. Saunders reviewed the deposition of MEA-MFT President Eric Feaver and investigated the union's activities, contribution patterns, and exhortations to members to vote in Republican primaries and concluded the union was "a Democratically oriented organization."   Doc. 71-10, pp. 63, 157-58; Doc. 55-1,

---

studies address open versus closed primaries.  Doc. 93-3, p.11.  This is incorrect. The Gerber and Morton study, which is referenced in the State's expert report but not discussed by him, Doc. 93-3, p. 31, expressly compared issue-positioning by members of Congress in states with open primaries versus those with closed primaries.  Doc. 71-10, pp. 29, 54, 102-103.

[6] Though not cited in the expert report, Senate Majority Leader Matthew Rosendale testified that he also instructs candidates in contested Republican primaries to avoid right-to-work issues in order to avoid encouraging cross-over voting.  Doc. 71-4, p. 66.

pp. 19-20.  Its policy goals are similar to those of the Democratic Party.  Doc. 71-5,

pp. 191-94; Doc. 71-10, pp. 155-56.  The union admits that it attempts to "fracture"

the Republican Party.  Doc. 71-5, p. 85.  It contributed over $55,000 to Democrats

in 2014, but none to Republicans.  Doc. 55-1,  pp. 19-20.  The MEA-MFT

endorsed 11 Democrats during the 2012 primaries but refused to endorse any

Republicans.  Doc. 71-5, pp. 41, 43.  The union later endorsed candidates in all 125

legislative races for the 2012 general election, all of whom were Democrats.  *Id.,*

pp. 43-44, 167.  The union has not endorsed a Republican over a Democrat for

statewide office since 1996.  *Id.*, p. 62.

    The Party's experts reviewed the MEA-MFT's exhortations to members

during the 2014 primaries, which also reveal the union's political orientation.  Doc.

55-1, pp. 19-22.  On May 5, 2014, President Feaver assured his members that "not

all Republicans are alike" and that "[y]our vote in Republican Party primaries for

legislative candidates who believe government must play a positive role in our

society is absolutely essential."  Doc. 71-5, p. 201.  Three weeks later, he sent

another email to his members again assuring them that not all Republicans are bad:

"Vote for solution driven, problem solving, responsible Republicans. *They do exist*

*you know*."  *Id.*, p. 189. (emphasis added).  The union also stated, both through the

press and on an individual basis, that "those who usually vote Democratic should

consider voting in the GOP primary to support the Republican that most clearly

12

reflects their views." *Id.*, pp. 56-57, 185.  These messages were not tailored for a Republican audience.

There is overwhelming evidence showing the MEA-MFT is allied with the Democratic Party.  The Party's experts reasonably relied upon this evidence, along with the studies and sworn testimony they reviewed, in opining that Republican candidates will continue shifting their messaging away from the Party's platform as a result of Montana's open primary system, particularly on issues such as right to work.  Doc. 55-1, p. 14.

The State asserts that the Party's experts relied upon data from "unknown sources."  Doc. 86, p. 7.  This is patently false.  For starters, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004).  Moreover, "an expert is not required to verify all the facts on which he relies." *Tilstra v. Boumatic*, 791 F.3d 749, 753 (7th Cir. 2015).

In any event, the State grossly mischaracterizes the record.  Senate Majority Leader Rosendale, House Majority Leader Keith Regier, former Senator Scott Boulanger, Trevis Butcher, and Brad Molnar gave sworn statements identifying who they were, their relationship with the Republican Party, and, in the case of Rosendale and Molnar, details regarding how they advised candidates to tailor their messaging to reduce the risk of crossover voting.  Doc. 55-6, Doc. 71-4, p.

66.  Review of these sworn statements does not constitute reliance upon "unknown sources" and nowhere in his deposition did Dr. Greene suggest otherwise - quite the contrary.  Doc. 87-1, p. 54 ("If the source is Mr. Rosendale saying, 'This is my experience in the Montana Legislature,' then that is what I would incorporate.")

Notably, though the State's expert questioned the opinions drawn from these witness statements, he did not question the veracity of the statements themselves.  See, *e.g*., Doc. 93-3, p. 19 ("I did not separately calculate legislative scores and assume that they were calculated as described in Mr. Butcher's declaration").  The State fails to explain why the Party's experts erred in trusting sworn witness statements that the State's own expert trusted.

The State ignores the opinions of the Party's experts that Montana's open primaries result in Republican primary candidates shifting their messaging away from the Party platform.  As shown above, their opinions are supported by peer-reviewed studies as well as Montana-specific evidence.  These opinions satisfy *Daubert's* reliability prong.

B    The Opinions Regarding Candidate Message-Shifting Resulting From Montana's Open Primaries Are Highly Relevant

The opinions of the Party's experts concerning the effects of open primaries on candidate behavior are highly relevant to this case.  The Supreme Court held that a "deleterious effect" of California's blanket primary was to "favor nominees

14

with moderate positions." *Jones*, 530 U.S. at 580.  The Court relied upon a study by Professor Gerber showing that members of Congress from blanket primary states moderated their policy positions.  *Id.*  This evidence was sufficient for the Court to conclude that blanket primaries shift candidate messaging.  *Id.*  In fact, the Court considered the point so obvious that "it is unnecessary to cumulate evidence of this phenomenon."  *Id.*[7]

In this case, the Montana Republican Party's supporting evidence includes a study by Professor Gerber showing that members of Congress from states with closed primaries are less moderate than their counterparts from states with open primaries.  Doc. 71-10, pp. 29, 54, 102-103.  The Party's expert opinions are thus clearly relevant because they are based upon the same type of evidence, from the same researcher, that the Supreme Court in *Jones* found relevant.  *Jones*, 530 U.S. at 580.

The Party's experts rely on several other studies as well.  Doc. 55-1, p. 13.  Their opinions are made all the more relevant by the Montana-specific evidence they rely upon, such as how Republican candidates avoid issues disapproved of by the MEA-MFT, the largest union in Montana and one that carefully targets Republican primaries.  Doc. 71-5, pp. 55, 84, 184.

---

[7] Lower courts also appear to take this phenomenon as a given for both blanket and open primaries.  See footnote 2, *supra.*

The State argues that the MEA-MFT evidence is irrelevant because there is no proof that the union changed the votes of any of its members in 2014 and there might be "other possible causes of [Sen.] Boulanger's defeat."  Doc. 86, p. 15.  The State misses the point.  The Party is not offering expert testimony to show how union activism affects *voters*, but rather how it affects *candidates* who reasonably believe that union crossover voting could change the outcome of their primaries and tailor their messaging accordingly.  See, *e.g.*, Doc. 55-1, p. 13.

The Party's opinions showing how Montana's open primaries shift messaging by Republican candidates away from the Party platform are highly reliable, highly relevant and, as the Supreme Court has made clear, likely dispositive.  *Jones*, 530 U.S. at 580.  This might explain why the State's *Daubert* motion makes no mention of them.

III   THE EXPERTS' OPINIONS CONCERNING THE RATE OF
CROSSOVER VOTING IS ADMISSIBLE

A.   The Opinions Concerning Crossover Voting Rates Are Supported
By Peer-Reviewed Studies

Drs. Saunders and Greene opine that the average crossover voting rate is 10% for partisans voting in another party's primary, a rate that rises to 20 to 30% when independent voters are included.  Doc. 55-1, p. 10.  They rely upon numerous peer-reviewed studies of crossover voting in calculating these figures.  *Id.*  These figures are consistent with the opinions Dr. Saunders offered on behalf

16

of Idaho authorities in *Ysursa*.  *Ysursa*, 765 F.Supp. 2d at 1274.  They are also

consistent with other studies relied upon by other courts.[8]

The Party's experts further opine that these figures are applicable to

Montana.  Montana is a "very typical, two-party competitive state that has

Democrats, independents, and Republicans" and "has many similarities to many

states" such as ideological balance and single-member districts.  Doc. 93-10, pp.

13, 27-28.  Given these similarities, the figures derived from the studies cited in the

report can properly be applied to Montana.  *Id.,* p. 28.

The State derides the Party's experts for relying upon peer-reviewed studies

in determining the rate of crossover voting.  Doc. 86-16.  As shown earlier, this

criticism lacks merit.[9]

The State also claims that because none of the studies relied upon by the

Party's experts are Montana-specific, no inference can be made regarding

crossover voting in Montana.  Doc. 86, p. 6.  Courts have held otherwise.  For

example, the Supreme Court cited expert testimony that included crossover rates in

Washington state's blanket primaries in evaluating crossover voting in California's

blanket primaries.  *Jones*, 530 U.S. at 578; see also *Jones*, 169 F.3d at 657 (citing

---

[8]  See, e.g., *Jones*, 169 F.3d at 657 (citing study showing crossover rates of 5%, 10%, and 11-15% in closed primary states, open primary states, and blanket primary states, respectively.)

[9] See footnote 4, *supra*.

study showing crossover rates of 5%, 10%, and 11-15% in closed primary states, open primary states, and blanket primary states, respectively).

The Party's experts have explained why similar inferences about Montana can be properly based upon crossover data from the peer-reviewed studies cited in their report.  Doc. 93-10, pp. 13, 27-28.   The State offers no evidence to refute this explanation, other than bare assertions that such inferences cannot be made.  This is not sufficient to exclude the Party's opinion evidence concerning crossover voting rates in Montana.

The State claims that alleged inconsistencies between Dr. Saunders' report in *Ysursa* and his report in this case require exclusion of the latter.  Doc. 86, pp. 15-18.  This line of attack is not relevant to a *Daubert* motion, however, because courts do not "exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960, 969 (9th Cir. 2013).

In any event, the record does not support the State's claims.  The State repeatedly accuses the Party's experts of "targeting" crossover data.  The State's own expert, however, describes Dr. Saunders' analysis in *Ysursa* of crossover voting as "very thorough" with an "extensive review of the relevant literature."  Doc. 93-3, p. 7.  For the report in this case, Dr. Saunders reviewed the same literature.  Compare Doc. 55-1, p. 10, with Doc. 87-2, p. 63.  He also reviewed the two crossover studies published since his 2010 *Ysursa* report, something

acknowledged by the State's expert.  Doc. 93-3, p. 7.

The State cites as evidence of "targeting" the following quote from Dr.

Greene's deposition: "[W]e focused on the evidence that we felt was most

supportive of the case we were making."  Doc. 87-1, p. 98.  Dr. Greene's complete

answer to the question, however, was as follows:

> I would say it is the difference between a report of this nature and
> trying to publish something for peer review; and we focused on the
> evidence that we felt was most supportive of the case we were
> making. *And when we talked about and looked at the totality of the*
> *evidence,* we still felt quite confident that you're going to get more
> crossover voting with open primary systems, despite a particular
> article that did not find that.

Id., pp. 98-99 (emphasis added).  When read in its entirety -- particularly the

portions omitted by the State -- Dr. Greene's answer evidences thoroughness, not

"targeting."

The State also describes Dr. Saunders' criticisms in *Ysursa* of a voter survey

prepared by Idaho Republicans as somehow inconsistent with his refusal in this

case to attempt to prepare a Montana voter survey.  Doc. 86, pp. 15-16.  In *Ysursa*,

Dr. Saunders described in detail why the Idaho Republicans' survey was

unreliable.  Doc. 87-2, pp. 29-48.  In this case, Dr. Saunders forthrightly explained

that a reliable voter survey specific to Montana would have to be taken near the

time of a primary election, which is why he didn't attempt to prepare one.  Doc.

55-1,  p. n.5.  The State doesn't explain why these statements are inconsistent.

19

Dr. Saunders acknowledges that a valid Montana survey would provide the best evidence of crossover rates in Montana.  Doc. 93-10, p. 13.  He did not claim, however, that such a survey is the *only* means by which valid estimates of crossover voting can be made.  In fact, he said exactly the opposite.  *Id.*

The State criticizes Dr. Saunders for opining that independent voters should be included in crossover rates, an argument that is supposedly inconsistent with his report in *Ysursa*.  To be sure, there is disagreement in the field of political science as to whether independents ought to be considered "crossover" voters.  *Jones*, 169 F.3d at 656, n. 21.

No such disagreement exists in the legal field.  Courts uniformly categorize independent voters as crossovers in evaluating associational claims.  *Jones*, 530 U.S. at 578-79 & n.9;  *Arizona Libertarian Party v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003) (*Jones* "focused on the potential for the participation of *nonparty members*, including registered members of other parties, to influence the choice of the nominee at the primary and to cause partisan candidates to change their message to appeal to a more centrist voter base") (emphasis added); *Ysursa*, 765 F.Supp.2d at 1274 n.3.  Thus, whether independents should be categorized as crossover voters for First Amendment purposes is an issue of law lying outside the scope of expertise of both Dr. Saunders and the State's expert.  Their opinions on this legal issue are therefore irrelevant.

There is certainly no inconsistency concerning the calculation of the crossover rates themselves.  While testifying against Idaho Republicans challenging their state's open primary system, Dr. Saunders opined that the crossover rate for partisan identifiers is 10% and 20-30% when independents are included.  *Ysursa*, 765 F.Supp. 2d at 1274.  While testifying for Montana Republicans challenging their state's open primary, Dr. Saunders' arrived at the same figures.  Doc.  55-1, p. 10.  His opinions in both reports are consistent with each other and with those from other studies relied upon by the Ninth Circuit in *Jones*.[10]  And though the State's expert disputes whether Dr. Saunders' estimate of crossover voting in open primary states throughout the nation can be applied to Montana, nowhere in his report does he dispute the validity of the estimate itself.

The State offers no explanation for why the Party's experts are wrong in applying nationwide crossover voting rates found in open primary states to Montana, or why the Supreme Court and the Ninth Circuit in *Jones* were wrong in applying the same kind of data to California.  The State's arguments about the reliability of the opinions of the Party's experts concerning crossover voting rates in Montana should be rejected.

---

[10]  See footnote 8, *supra*.

B.    Evidence of Crossover Voting Rates is Relevant to Show the Likelihood of Future Republican Primaries Being Decided by Non-Republicans

Evidence of crossover voting is highly relevant to a case involving a challenge to a state's primary election system because such voting can alter the outcome of primary elections and result in Republican nominees who are not favored by a majority of Republican voters.  This constitutes a separate constitutional violation of the Montana Republican Party's associational rights. *Jones,* 530 U.S. at 581 ("There is simply no substitute for a party's selecting its own candidates").  This is true even if the number of primary elections that are actually decided by crossover voting is small.  *Id.* at 579.

Crossover voting is most likely to occur, and be decisive, when there is "asymmetric competition," *i.e.*, when one party's primary is competitive and the other party's primary is not.  *Jones*, 984 F.Supp. at 1299.  Noting that ten California legislative races in 1996 involved a contested primary for one party without a contest in the other and that a crossover rate of 5% could have changed the outcome in some of the races had the crossover voters voted for the same candidate, the district court concluded that "it is likely that in the fullness of time some California primary races will be decided by cross-over voters, even if the number of such occasions is not large."  *Id*.

Montana has a similar level of asymmetric competition. The state averages 3.57 legislative races each election cycle involving an uncontested Democratic

primary (*i.e.*, either one or zero Democrats running) and a contested Republican primary decided by less than 5% of the vote.  Doc. 55-1, pp. 32-36; Doc. 93-3, p. 26.  Like the courts in *Jones* and *Ysursa*, the Party's experts in this case concluded that the average crossover rate for Montana's open primaries, as with the rate in other open primary states, is approximately 10% for partisan voters.  Doc. 55-1, p. 10. When independent voters are included, this rate rises to 20-30%.  *Id.*  Even with a 10% crossover rate, "the results of the primaries are more likely than not affected by crossover voting." *Id.,* p. 17. When independent voters are factored in, the effects are even more disruptive and result "in more moderate legislators being elected, thus distorting the consistency and broadening the ideological diversity among the Republican Party's officeholders in the Montana Legislature."  *Id.*

Even when crossover voting is defined narrowly as members of other parties voting in the Republican primary, Montana has a crossover rate of 10%, the same crossover rate as found in open primaries throughout the country by the district courts in *Jones* and *Ysursa*.  *Jones*, 984 F.Supp. at 1298; *Ysursa*, 765 F.Supp. 2d at 1274.  Thus, "it is likely that in the fullness of time some [Montana] primary races will be decided by cross-over voters, even if the number of such occasions is not large." *Jones*, 984 F.Supp. at 1299.  Saddling a political party with even one unwanted nominee can severely transform it, thereby violating its First Amendment rights.  *Jones*, 530 U.S at 579.

The crossover rate calculated by the Party's experts is highly relevant to this case.  The State's motion should therefore be denied.

IV     THE PARTY WILL NOT SEEK ADMISSION OF OPINIONS
        CONCERNING "REVERSE ROLL OFF"

The State contends that the opinions of the Party's experts concerning reverse roll-off data should be excluded.  Doc. 86, pp. 19-21.  The Party has not relied upon these opinions in any of the briefs it has filed and will not rely upon them in any other briefs filed in conjunction with the summary judgment and preliminary injunction motions currently pending in this Court.  Accordingly, the Party requests that the Court reserve any ruling on the admissibility of these opinions until a trial date is set, something that might not occur if any of the motions pending before this Court prove to be dispositive.

## CONCLUSION

For all of the foregoing reasons, the Party respectfully requests this Court deny the State's *Daubert* motion.

DATED: October 2, 2015            Respectfully submitted,
                                  Monforton Law Offices, PLLC


                                  /s/ Matthew G. Monforton
                                  Matthew G. Monforton


                                  Attorney for the County Central
                                  Committee Plaintiffs

24

The James Brown Law Office, PLLC

/s/ James E. Brown
James E. Brown

Attorney for Plaintiff Montana Republican Party

## <u>CERTIFICATE OF COMPLIANCE WITH L. R. 7.1(d)(2)(E)</u>

I hereby certify that this document, excluding caption, tables and certificate of compliance, contains 5752 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: October 2, 2015  Respectfully submitted,
           Monforton Law Offices, PLLC

           <u>/s/ Matthew G. Monforton</u>
           Matthew G. Monforton

           Attorney for the County Central
           Committee Plaintiffs

           The James Brown Law Office, PLLC

           <u>/s/ James E. Brown</u>
           James E. Brown

           Attorney for Plaintiff Montana Republican Party

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY this 2nd day of October, 2015, that a copy of the foregoing will be delivered this day via the Court's ECF system to the following:

TIMOTHY C. FOX Montana Attorney General
J. STUART SEGREST
PATRICK M. RISKEN
Assistant Attorneys General
Deputy Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
ssegrest@mt.gov
prisken@mt.gov


DATED: October 2, 2015          Respectfully submitted,
                                Monforton Law Offices, PLLC

                                <u>/s/ Matthew G. Monforton</u>
                                Matthew G. Monforton

                                Attorney for the County Central
                                Committee Plaintiffs


                                The James Brown Law Office, PLLC

                                <u>/s/ James E. Brown</u>
                                James E. Brown

                                Attorney for Plaintiff Montana Republican Party

27