# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| RAVALLI COUNTY REPUBLICAN CENTRAL COMITEE, GALLATIN COUNTY REPUBLICAN CENTRAL COMMITTEE, SANDERS COUNTY REPUBLICAN CENTRAL COMMITTEE, DAWSON COUNTY REPUBLICAN CENTRAL COMMITTEE, STILLWATER COUNTY REPUBLICAN CENTRAL COMMITTEE, RICHLAND COUNTY REPUBLICAN CENTRAL COMMITTEE, CARBON COUNTY REPUBLICAN CENTRAL COMMITTEE, FLATHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE, MADISON COUNTY REPUBLICAN DENTRAL COMMITTEE, BIG HORN COUNTY REPUBLICAN DENTRAL COMMITTEE, MONTANA REPUBLICAN PARTY<br><br>          Plaintiffs,<br><br>v.<br><br>LINDA McCULLOCH, in her official capacity as Montana's Secretary of State, *et al.*,<br><br>          Defendants. | **CV-14-58-H-BMM**<br><br><br>**ORDER** |

This order addresses the following motions filed by the parties: Plaintiffs' motion for summary judgment (Doc. 88); the State's motion for summary judgment (Doc. 91); and Plaintiffs' motion for a preliminary injunction. (Doc. 70.)

## I. BACKGROUND

Montana voters in 1912 approved an initiative that requires the political parties to choose their nominee through an open primary. *The American Year Book* 60-61 (Franci G. Wickware ed., 1913). This system has governed Montana's primary elections, with only slight modifications, for the last century. The two major political parties must use this primary system to determine their candidates. Mont. Code Ann. § 13–10–601.  The system promotes the notion that the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

 The State prepares separate ballots for each party. Mont. Code Ann. § 13–10–209. Voters choose to vote either the Republican or the Democratic ballot. Mont. Code Ann. § 13–10–301(2). This "open" primary system allows a person to vote without being "required to declare publicly a party preference or to have that preference publically recorded." *Democratic Party of the U.S. v. LaFollette*, 450 U.S. 107, 111 n.4 (1981).

2

Montana's system, like most open primary states, limits a voter to one party's nominees for all offices. A voter may not support, for example, a "Republican nominee for Governor and a Democratic nominee for attorney general." *California Democratic Party v. Jones*, 530 U.S. 567, 575 n. 6 (2000). The candidate from each party who receives the most votes receives the party's nomination for public office. Mont. Code. Ann. § 13–1–103.

Plaintiffs have challenged Montana's open primary requirement as unconstitutional. (Doc. 1.) Plaintiffs argue that Montana's open primary inflicts First Amendment injuries upon them by forcing them to associate with non-Republican voters. Plaintiffs allege that non-Republican voters may vote strategically in a closely-contested Republican primary race instead of a run-away Democratic primary race in order to elect a Republican candidate whose "views are more centrist than those of the party base." This strategic voting represents a phenomenon described as "crossover voting." Plaintiffs assert that Montana's system as applied to the Republican Party inflicts First Amendment injuries by preventing Plaintiffs from identifying their members, affecting election outcomes, and changing campaign messaging by candidates.

II. DISCUSSION

**A. Political Parties' Associational Rights in Primary Elections**

The United States Supreme Court has addressed challenges to a blanket primary system, *Jones*, 530 U.S. 567; a jungle primary system, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008); a closed primary, *Tashijian v. Republican Party of Connecticut*, 479 U.S. 208 (1986); prohibitions on "fusion" candidates, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997); and a semi-closed primary, *Clingman v. Beaver*, 544 U.S. 581 (2005). The Supreme Court has yet to address directly the constitutionality of an open primary system of the type employed in Montana. The Court will attempt to analyze these decisions of the Supreme Court to determine the appropriate framework under which to address Plaintiffs' challenge to Montana's open primary system.

Blanket Primary.

The California Democratic Party challenged California's blanket primary system. *Jones*, 530 U.S. at 567. California's blanket primary system listed every candidate regardless of party affiliation on each ballot. *Id.* A voter could choose freely among the candidates for each office regardless of the candidate's party. The highest vote-winner of each party received that party's nomination for the general election. *Id.*

The Supreme Court reasoned that a political association's right to exclude proves most important when the political party selects its nominee. *Id.* at 575. California's blanket primary system "forc[ed] political parties to associate with . . . those who at best, have refused to affiliate with the party, and at worst, have expressly affiliated with a rival." *Id.* at 577. The Supreme Court also noted, however, that associational rights of political parties should be construed neither, as absolute, nor as comprehensive, as rights enjoyed by wholly private associations. *Jones*, 530 U.S. at 593 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 360 (1997).

Jungle Primary.

Washington replaced its blanket primary after the Supreme Court's decision in *Jones* with what is known as a "jungle primary." *Washington State Grange*, 552 U.S. at 447. The primary ballot lists all of the candidates for each office. *Id.* at 447-48. The candidates themselves remain free to attach a party designation to their name on the ballot. The top two vote getters advance to the general election regardless of party affiliation. *Id.* The Court rejected a facial challenge that the system violated the Washington State Republican Party's right to freedom of association. *Id.* at 458-59. The Supreme Court reasoned that the primary election did not select the party nominee and the parties remain free to endorse, support, or withdraw support from any candidate. *Id.* at 453-54.

5

<u>Closed Primary.</u>

The Connecticut Republican Party sought to invite independents to vote in the primary. *Tashjian*, 479 U.S. at 211. A divided Supreme Court struck down a Connecticut law that limited a party's primary election to voters who previously had registered as members of that party. *Tashjian*, 479 U.S. at 210-11. The Supreme Court concluded that no substantial state interest supported Connecticut's decision to limit the primary election to registered party members. *Id.* at 225.

<u>Fusion Ban.</u>

*Timmons* addressed the very narrow question of whether Minnesota could prevent a candidate from appearing on the ballot for more than one party. *Timmons*, 520 U.S. at 353-54. This ban on "fusion" candidates imposed only a minor burden on the party's associational rights. *Id.* at 369. The party remained free to nominate any qualified candidate other than a candidate who appeared on the ballot of another party. *Id.* The Supreme Court further recognized that the regulation of access to ballots does not implicate parties' internal affairs and core associational activities. *Timmons*, 520 U.S. at 360.

<u>Semi-closed Primary.</u>

The Libertarian Party of Oklahoma ("LPO") wanted to open its primary to all registered Oklahoma voters regardless of party affiliation. *Clingman*, 544 U.S. at 583. Oklahoma's semi-closed primary system allows only registered members of

a political party to vote in the party's primary, unless the party opened its primary to registered independent voters. *Id.* The law did not regulate the "LPO's internal processes, its authority to exclude unwanted members, or its capacity to communicate with the public." *Id.* As a result, the Supreme Court declined to apply strict scrutiny. *Id.* at 593.  The Supreme Court recognized that "anyone can join a political party merely by asking for the appropriate ballot at the appropriate a time." *Id.* at 590-91 (citing *Jones*, 530 U.S. at 596 (Stevens, J., dissenting)).

**B. Summary Judgment Motions**

The parties have submitted competing motions for summary judgment. Plaintiffs rely on the Supreme Court's reasoning in *Jones* to allege that Montana's open primary system "inflicts several First Amendment injuries upon [Plaintiffs]." (Doc. 93 at 5.)  The State contends that Plaintiffs have failed to meet the burden of proof required for the Court to award summary judgment. (Doc. 89 at 4.) The State argues that Plaintiffs cannot provide an objective way to determine who qualifies as a "Republican." The State argues further that the Court cannot assess whether non-Republicans actually vote in the Republican primary.

### 1. Plaintiffs' Motion for Summary Judgment

The Elections Clause of the United States Constitution, Article I, § 4, cl. 1, provides that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof."

This same broad power afforded to the state legislature for federal elections applies with equal force to "state control over the election process for state offices." *Tashjian*, 479 U.S. at 217. Elections represent a quintessential form of state action. *Jones*, 530 U.S. at 590. As the Supreme Court decisions recognize, states must regulate elections reasonably to reduce election and campaign related disorder. *Timmons*, 520 U.S. at 359 (1997).

States may regulate these elections as long as they act within the limits imposed by the Constitution. *Jones*, 530 U.S. at 573. The Supreme Court repeatedly has announced that it is "too plain for argument" that "a State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion." *Jones*, 530 U.S. at 572. In this regard, "the State's interest in enhancing the democratic character of the election process overrides whatever interest the Party has in designing its own rules for nominating candidates." *Lightfoot v. Eu*, 964 F.2d 865, 873 (9th Cir. 1992).

States retain broad power to regulate the election process. *Clingman*, 544 U.S. at 586. A regulation that imposes a severe burden on First Amendment associational rights must survive strict scrutiny. *Id.* The State must show only an "important regulatory interest," however, when a "reasonable, nondiscriminatory" regulation imposes a less severe burden. *Id.* The Court must determine whether

Montana's open primary requirement imposes a severe burden on Plaintiffs. *Id.* The Court should not be tasked with determining "whether the state legislature was acting wisely in enacting a [specific primary system] . . . , or whether the Republican Party makes a mistake in seeking to depart from the practice." *Tashjian*, 479 U.S. at 223.

<u>Identification of Party Members.</u>

Plaintiffs first argue that Montana's open primary prevents the Party from identifying its members. Plaintiffs assert that the freedom to associate "necessarily presupposes the freedom to identify the people who constitute the association." *La Follette*, 450 U.S. at 122. Plaintiffs further cite *LaFollette* for the proposition that an open primary necessarily invalidates their right to freedom of association. Plaintiffs misplace reliance on *LaFollette*.

The Supreme Court in *LaFollette* addressed only the very narrow question of whether Wisconsin, once it had chosen to operate a Presidential preference open primary, may bind the Democratic Party of the United States to honor the binding primary results, even though those results had been reached in a manner contrary to National Democratic Party rules. *LaFollette*, 450 U.S. at 120. The Supreme Court expressly disavowed the Wisconsin Supreme Court's framing of the question to be the constitutionality of the State's "open" primary law. *Id.* at 120-21. In fact, in dicta, the Supreme Court noted that the Wisconsin Supreme Court's

decision to uphold the constitutionality of the open primary "may well be correct." *Id*. at 121. The Supreme Court instead focused on the narrow question of whether Wisconsin could compel the National Democratic Party to seat a delegate at its Convention chosen in a way that violates the rules of the National Democratic Party. *Id.*

The Supreme Court relied on its earlier decision in *Cousins v. Wigoda*, 419 U.S. 477 (1975), in which it rejected the notion that Illinois possessed a compelling interest in the selection process of delegates to the Democratic National Convention. The Supreme Court stated flatly that the disposition in *Cousins* "controls here." *LaFollette*, 450 U.S. at 121. Wisconsin had asserted that its interest in preserving the overall integrity of the electoral process, providing secrecy of the ballot, increasing voter participating in primaries, and preventing harassment of voters, proved sufficiently compelling to support the constitutionality of the law. *Id.* at 124-26. The Supreme Court disagreed. *Id.* at 125-26. All of the asserted compelling interests, as noted by the Supreme Court, "go to the conduct of the Presidential preference primary." *Id.* at 125. By contrast, none of these asserted compelling interests supported the narrow question presented to the Supreme Court of whether Wisconsin could impose "voting requirements upon those who, *in a separate process*, are eventually selected as delegates." *Id.* at 126. (emphasis added).

These efforts by Wisconsin to control the delegate selection process to the Democratic Party's National Party Convention seem more analogous to the invalid efforts by California to control internal party rules in *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214 (1989). There the Supreme Court struck down regulations regarding terms of office for party leadership. *Id.* at 232. The Court thus determines the reasoning in *LaFollette* to be of limited assistance in evaluating the constitutionality of Montana's open primary law beyond the dicta that the Wisconsin Supreme Court may well have been "correct" in upholding Wisconsin's open primary law. *LaFollette*, 450 U.S. at 121. The Court instead looks to *Jones* and *Clingman* to evaluate the severity of the burden that Montana's open primary system imposes on Plaintiff's associational rights.

Plaintiffs claim that *Clingman* supports their position that Montana's open primary requirement violates Plaintiffs' right to identify members. Plaintiffs argue that the State has deprived the Republican Party of its First Amendment right to identify voters who associate with the Republican Party during the primary election. Plaintiffs allege that their inability to identify voters, in turn, imposes a severe burden upon their First Amendment right to associate. The State argues that it has taken no affirmative steps to inhibit the Republican Party from internally identifying a list of people who associate with the Republican Party. The State plays no role to administer party registration.

11

The Oklahoma State Election Board in *Clingman* denied the Libertarian Party's request to open its upcoming primary election to all registered voters regardless of party affiliation. *Clingman*, 544 U.S. at 585.  The Libertarian Party of Oklahoma challenged the State Election Board's decision. *Id.* The Supreme Court addressed Oklahoma's "important regulatory interests" in its semi-closed primary system. *Id.* at 593.

The Court recognized that the system aided parties by providing "essential information" through voter registration lists. *Id.* at 594. Nothing in the First Amendment requires that a state administer or fund voter registration lists. Oklahoma remained "free to allow the [Libertarian Party] to invite registered voters of other parties to vote in its primary." *Id.* at 598. The Court reasoned, however, that the "democratic process" rather than the Court should make that choice. *Id. Clingman* expressly declined to apply strict scrutiny as the law did not regulate party's internal processes or its capacity to communicate with the public. *Id.*at 583. *Clingman* provides little support for Plaintiffs' claim that Montana's open primary system impedes their ability to identify members.

The Republican Party creates lists of potential members for fundraising purposes. (Doc. 93-1 at 18.) Plaintiffs make no claim that the State limits the Republican Party's ability to maintain its own party lists. The Republican Party mails "membership" cards to potential Republicans and "ask [them] to renew their

membership in the Republican Party" with a donation. *Id.* at 16. The First

Amendment imposes no duty on a state to fund or administer voter registration

lists. *Clingman*, 544 U.S. at 594. Moreover, the Supreme Court in *Washington*

*State Grange* rejected a challenge to a jungle primary. *Washington State Grange*,

552 at 444. Washington does not register voters by party. Wash. Rev. Code Ann. §

29A.08.166. The Court remains unconvinced that Montana has a constitutional

obligation to register voters by party in light of *Washington State Grange.*

    Crossover Voting.

    Plaintiffs have submitted expert reports from Kyle Saunders, Ph.D, and

Steven Greene, Ph.D (collectively the "Party Experts") to support their position

that crossover voting occurs in Montana. The Party Experts' report evaluates "both

empirical and anecdotal [evidence]" regarding Montana's open primary elections.

(Doc. 71-2 at 1.) The State points out that Party Experts conducted no independent

data collection in Montana to determine the percentage of crossover voters in

Montana.

    Plaintiffs instead have used data collected in other states and applied it to

Montana's open primary. Party Experts have concluded that 10% of Montana

voters participate in crossover voting. Party Experts have suggested that a 10% rate

of crossover voting has the potential to affect election outcomes. Plaintiffs argue

that this crossover rate provided sufficient evidence in *Jones*, 530 U.S. at 568, and

*Idaho Republican Party v. Ysursa*, 765 F. Supp. 2d 1266, 1274 (D. Idaho 2011), to determine that an election could be "severely transform[ed]" by crossover voters. *Jones*, 530 U.S. at 579.

The Party Experts estimate that 10% of partisan Montana voters crossover in Montana's open primary (Doc. 93 at 30.) Plaintiffs assert that the mere threat of crossover voting may change the outcome of an election. As discussed, however, Plaintiffs have failed to corroborate the Party Experts' crossover rate with state specific statistical information, similar to that provided in *Jones*.

Plaintiffs' lack of Montana specific data complicates the Court's evaluation of whether Montana's open primary system imposes a severe burden in light of the Supreme Court's opinion in *Jones,* 530 U.S. at 567. Plaintiffs assert a crossover voting rate of 10%, but fail to provide evidence of whether that crossover rate accounts only for non-Republican voters voting in the Republican primary. Plaintiffs have provided no evidence to rebut the claim that a portion of the 10% of crossover voters could be voting in Democratic primaries.

The State focuses on this lack of Montana specific evidence of crossover voting in arguing that genuine issues of material fact exist that should defeat Plaintiffs' motion for summary judgment. The State further argues that Plaintiffs cannot show that non-Republican voters have voted, or will vote, in the Republican primary. Plaintiffs rely on *Ysursa* for the proposition that expert testimony that

14

estimates a 10% crossover voting rate provides sufficient evidence to conclude that crossover voters actually alter election outcomes. (Doc. 71 at 27-28.)

The court in *Ysursa* concluded that Idaho's open primary statute violated the Idaho Republican Party's First Amendment rights. *Ysursa*, 765 F. Supp. 2d at 1277. The court relied on the Supreme Court's reasoning in *Jones. Id.* at 1269-75. The court determined that no "meaningful distinction" existed between the open primary in Idaho and the blanket primary in *Jones*. *Ysursa*, 765 F. Supp. 2d at 1275. Idaho's open primary, like Montana's open primary, required voters to choose one party's ballot. *Id.* at 1268-69. Idaho voters, like Montana voters, did not register a party affiliation. *Id*.

The court in *Ysursa* decided the case after a bench trial. *Id*. at 1272. The court denied summary judgment based on "concerns that the record was inadequate" to determine whether crossover voting actually existed in Idaho's open primary comparable to the evidence of crossover voting in California's blanket primary. *Id.* The court noted that it "could not simply borrow the statistics, opinions, and surveys from *Jones* because that case dealt with a blanket primary instead of an open primary." *Id.* The court stated that a trial would be necessary to determine to what extent crossover voting exists in Idaho and whether and to what extent the threat of any "crossover" voting affects the campaign messaging of the party and its candidates. *Id.*

15

The Court likewise here possesses concerns that the record proves inadequate to determine on summary judgment whether crossover voting actually occurs in Montana. The Court declines to rely on data for California voters from *Jones* when that case involved a blanket primary rather than an open primary. A voter could choose candidates from any party who all were listed on the same ballot. *Jones*, 530 U.S. at 570. The Court similarly declines to rely too heavily on data from *Ysursa* when Idaho's political environment differs dramatically from Montana's political environment. Defendant's experts in *Ysursa*, the same Party Experts here, described Idaho as the "most one-party state and least electorally competitive state in the United States." *Id.* at 1273. Montana represents a more electorally competitive environment (Doc. 71-3 at 12.)

The Party Experts acknowledged that the Republican Party primaries represent the "only game in town" in a one-party state like Idaho. *Ysursa*, 765 F. Supp. 2d at 1273. This crossover voting allowed non-Republicans in Idaho to exert some "meaningful influence in elections." *Id.* The district court determined that the Idaho political landscape supported these theories. For instance, Republicans held 28 of the 35 seats in the Idaho State Senate; Republicans held 57 of the 70 seats in the Idaho House of Representatives; and Republicans held all five state-wide elected offices, both United States Senate seats, and both United States Representatives. *Id.* at 1273.

16

The State's expert alleges that only 1% of the total Montana Republican primaries where no Democratic candidate appeared on the ballot could be considered highly competitive. (Doc. 93-3 at 12.) The State's expert defines highly competitive as an election with less than a 5% victory margin. *Id.* The State's expert further alleges that only an additional 2% of the total Montana Republican primaries where no Democratic candidate appeared on the ballot could be considered highly competitive. *Id.* The State's expert alleges that this evidence demonstrates that "very few Republican primaries" potentially could be affected by crossover voters. *Id.* These differing interpretations of the Idaho data and its applicability to Montana further highlights the need to develop a factual record upon which to evaluate the burden on Plaintiffs' associational rights. *Ysursa*, 765 F. Supp. 2d at 1272.

The court's analysis in *Alaskan Indep. Party v. Alasaka*, 545 F.3d 1173 (9th Cir. 2008), proves instructive to the question of a political party's control over a primary election. The Alaska Independence Party alleged that Alaska's primary system burdened its associational rights "because a candidate may seek the party's nomination against the wishes of the party's leadership." *Id.* at 1180. The court acknowledged that the Alaska system undoubtedly intruded on the party's associational rights because it limited the party's ability to "choose a candidate-selection process that will in its view produce the nominee who best represents its

17

political platform." *Id.* at 1176 (quoting *N.Y. Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 202 (2008)).

The court considered the conflict between the party's desire to enforce "greater top-down control and the State's mandate that rank-and-file party voters have the opportunity to vote for any affiliated member who seeks the nomination." *Alaskan Indep. Party*, 545 F.3d at 1179. The court expressed skepticism that such a conflict imposes a severe burden on the party's associational rights. *Id.* at 1179-80. The court discounted the burden in prohibiting the party's leadership from selecting or screening prospective candidates in favor of selecting the party's nominee democratically from a slate of all qualified candidates who seek the party's nomination. *Id.* at 1180. The court expressed further doubt that Alaska's system imposed a severe burden on the party's associational rights when the party possesses the right to endorse or distance itself from any candidate who appears on the primary ballot. *Id.* at 1180 *(*citing *Eu*, 489 U.S. at 223).

Plaintiffs similarly possess the ability to endorse or distance itself from candidates who appear on the primary ballot. Unlike Alaska, which required the party to accept any candidate who registered with the party to appear on its primary ballot, Montana requires Plaintiffs to allow any voter to participate in its primary election who seeks its ballot. The Court returns then to the question of

18

how to determine whether non-Republicans actually vote in Republican primary elections in Montana.

Plaintiffs have yet to articulate how to determine whether a Montana voter qualifies as a "Republican." Plaintiffs have cited to no rule or directive of the Montana Republican Party that defines party membership. Counsel for the Plaintiffs argued at the hearing that a person must "register and publically affiliate with the Republican Party." A state possesses no constitutional responsibility to administer or fund voter registration lists. *Clingman*, 544 U.S. at 594. How a person publically affiliates remains unclear.

As noted by one commentator, the fact remains that in any closed-primary state "you are a Democrat if you say you are; no one can effectively say you are not; and you can become a Republican any time that the spirit moves you simply by saying that you have become one." Austin Ranney, *Curing the Mischiefs of Faction: Party Reform in America* 166-167 (1975). In other words, the closed primaries appear to be "just a hair more closed" than open primaries. *Id.*

Plaintiffs have failed to show that a citizen voting in a Republican primary remains "unaffiliated" with the Republican Party. Plaintiffs rely on *Jones* to support their assertion that choosing a ballot or a candidate at the ballot box fails to constitute affiliation. (Doc. 103 at 9.) The blanket primary system challenged in *Jones* differs, however, from Montana's open primary. Voters in California's

19

blanket primary could choose among candidates of any party without having to forego the right to vote for candidates of other parties. *Jones*, 530 U.S. at 570. Montana's open primary system forces voters affirmatively to choose to vote one party's ballot in every race before casting a vote.

As noted by Justice O'Connor the act of casting a ballot in a given primary election may "constitute a form of association that is at least as important as the act of registering." *Clingman*, 544 U.S. at 600 (O'Connor, J., concurring). Justice O'Connor further recognized that the episodic nature of voting does not undermine its association significance: "it simply represents the special character of the electoral process, which allows citizens to join together at regular intervals to shape government through the choice of public officials." *Id.*

Campaign Messaging.

Plaintiffs argue that, even if a genuine dispute exists as to whether crossover voting actually occurs in Montana, they still should be granted summary judgment on their claim that Republican candidates are forced to change their message to reach more centrist voters. Specifically, Plaintiffs argue that non-Republican voters' intervention in Republican primaries has caused consultants to advise candidates to avoid issues that may encourage non-Republicans, such as the MEA-MFT union members, to vote in the Republican primary.

20

Plaintiffs allege that the Montana Education Association-Montana Federation of Teachers ("MEA-MFT") engages in a "concerted effort" to encourage "non-Republican identifying voters" to vote in state legislative Republican primaries. (Doc. 71-2 at 19-21.) The Party Experts allege that MEA-MFT, Montana's largest labor union, allies with the Democratic Party. *Id.* The Party Experts' report points to an email sent by MEA-MFT's President as evidence of MEA-MFT's effort to influence Republican primaries. (Doc. 71-2 at 20.) The email purportedly directs MEA-MFT members to vote for moderate Republicans. *Id.*

Plaintiffs argue that Montana's open primary severely burdens Plaintiffs' right to associate by forcing candidates to alter their messaging. Plaintiffs have submitted the Declaration of Brad Molnar in support. Plaintiffs also have submitted declarations from Republican Party candidates. These candidates claim to have changed their campaign messaging to account for crossover voting. (Doc. 71-8, Doc. 71-9, Doc. 71-11.) The State dismisses this type of "anecdotal" evidence as insufficient to evaluate a possible constitutional violation.

Molnar informs that he conducts seminars for Republican candidates and that he has advised numerous candidates on how to run for office. (Doc. 93-7 at 2.) He explains that he advises Republican candidates, particularly those who run in contested primaries, "to attempt to avoid issues that may antagonize unions,

21

environmental organizations, pro-abortion and as importantly their supportive 'dark money' organizations." *Id.* Molnar further urges these Republican candidates "to avoid discussing right-to-work issues, global warming, federal land transfer, as well as support for school choice unless specifically asked by legitimate voters." *Id.*

Plaintiffs cite *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006), to support their argument that the Court should strike down the open primary requirement based solely on the assertion that Republican Party candidates perceive that they must change their campaign messaging in the open primary system. Plaintiffs overstate *Miller's* reliance on campaign messaging.

The Virginia law in *Miller* allowed the incumbent state legislator to select the method of nomination for his seat. *Id.* at 316. The incumbent indicated that he planned to run and selected the open primary system. *Id*. A Republican district committee ("Committee") wished to exclude voters who had voted in another party's primary in the last five years. *Id.* Once a primary had been selected, however, the Virginia law allowed "all persons qualified to vote" to vote in the primary regardless of party affiliation. *Id.*

The Fourth Circuit reversed the district court's decision to dismiss the Committee's claim for lack of standing. The court determined that the Committee's claims of having to associate with members of other parties during

their candidate selection process and having to account for these members of other parties in framing their campaign messaging bestowed standing upon the Committee to bring a constitutional challenge. *Id.*at 317-18.

On remand, the district court in *Miller v. Brown*, 465 F. Supp. 2d 584 (E.D. Va. 2006) aff'd, 503 F.3d 360 (4th Cir. 2007), found that Virginia's law imposed a severe burden on the associational rights of the Committee. The district court provided no factual analysis, however, as *Jones*, 530 U.S. at 578, *Bayless*, 351 F.3d at 1282, and *Democratic Party of Hawaii v. Nago*, 982 F.Supp.2d 1166, 1181-82 (D. Haw. 2013), require to analyze the severity of the burden.

The Fourth Circuit later analyzed the merits of the Committee's challenge. The Virginia Board of Elections did not challenge on appeal the district court's conclusion that the open primary severely burdened the Committee's right of free association as applied in that election. *Id.* As a result, the court accepted, without analysis, the Committee's claim that the threat of crossover voters or forced changes to campaign messaging imposed a severe burden on the Committee. *Id.* at 368-69. *Miller* failed to perform the same factual analysis that courts in the Ninth Circuit have performed when evaluating the severity of the burden imposed by a primary election.

Plaintiff's reliance on *Miller* for the proposition that the potential effect on campaign messaging supports the invalidation of Montana's open primary law

without the benefit of an evidentiary record also ignores the more recent decision

in *Greenville County Republican Party Exec. Comm. v. South Carolina*, 824

F.Supp. 2d 655 (D.S.C. 2011). A local Republican Party asserted a facial challenge

to South Carolina's open primary system. The court recognized that any election

law will "impose some burden upon individual voters and political organizations."

*Id.* at 662 (citing *Burdick v. Takushi*, 504 U.S. 428, 430 (1992)). The mere fact that

a state's system "creates barriers does not of itself compel close scrutiny."

*Greenville County Republican Party*, 824 F.Supp.2d at 662 (quoting *Burdick*, 504

U.S. at 433).

  The court acknowledged that under South Carolina's open primary system a

registered voter may request, on election day, the ballot for any party's primary in

which the voter intends to vote, regardless of whether the voter previously had

registered as a member of the party. *Greenville County Republican Party*, 824

F.Supp.2d at 663. The court noted, however, that "the voter may only vote in one

party's primary election." *Id.* The court declined to uphold a facial challenge to the

South Carolina law that would contradict precedent, including *Miller*, 503 F.3d

360 (4th Cir. 2007), that generally requires an evidentiary record to assess the

burden imposed on the political party's associational rights. *Greenville County*

*Republican Party*, 824 F.Supp.2d at 664.

<u>Need for Evidentiary Records.</u>

A facial challenge considers a statute's application to all conceivable parties. *Washington State Grange*, 552 U.S. at 449. An as-applied challenge, which Plaintiffs bring here, tests the application of the statute to a plaintiff's specific factual circumstances. *See Washington State Grange*, 552 U.S. at 444. A party generally must develop an evidentiary record to prove that a voting system imposes a severe burden on their associational rights. *Nago*, 982 F.Supp.2d at 1177.

*Jones* relied on survey data to conclude that the "prospect of having a party's nominee determined by adherents of an opposing party" presented "a clear and present danger." *Jones*, 530 U.S. at 578. The survey in *Jones* showed that 37% of self-identified Republicans planned to vote in the Democratic primary. The Supreme Court also considered data that showed that "the total votes cast for party candidates in some races was more than *double* the total number of *registered party members*." *Id.* (emphasis in original). The evidentiary record in *Jones* supported the theory that the blanket primary system in California likely had altered the identity of the nominee and changed candidate messaging.

Understanding that *Jones* relied on empirical evidence to establish that the political parties in that case had suffered a severe burden, the Ninth Circuit has determined that a constitutional challenge to a primary election presents a factual

issue that must be proven. *See Bayless*, 351 F.3d at 1282; *See also Alaskan Indep. Party*, 545 F.3d at 1179-80. The district court in *Nago* addressed a facial challenge to Hawaii's open primary election system brought by the Democratic Party of Hawaii ("DPH"). *Nago*, 982 F. Supp. 2d at 1168.

Hawaii law required candidates to be nominated by primary election. *Id.* at 1169. Voters in Hawaii could cast votes in a primary election without declaring a party preference. *Id.* The court denied the facial challenge for two reasons: (1) The DPH failed to show that the open primary should be considered "unconstitutional in all of its applications," and (2) the DPH "failed to prove a severe burden." *Id.* at 1177. "Proving a severe burden must be done 'as-applied' with an evidentiary record." *Id.*

The court cited *Jones*'s characterization of the unconstitutional blanket primary as "qualitatively different from a closed primary." *Nago*, 982 F. Supp. 2d at 1176 (citing *Jones*, 530 U.S. at 577). *Jones* distinguished the blanket primary from an open primary system "even when it is made quite easy for a voter to change his party affiliation the day of the primary, and thus, in some sense to 'crossover.'" *Id. Jones* reasoned that in an open primary "at least [a voter] must formally become a member of the party; and once he does so, he is limited to voting for candidates of that party." *Nago*, 982 F. Supp. 2d at 1176 (quoting *Jones* 530 U.S. at 577).

26

*Nago* recognized that even in *Jones*, where the Court invalidated the blanket primary system, the Court relied on evidence in the form of statistical surveys of past primary elections and expert witness testimony to determine that the blanket primary presented a "clear and present danger" that a party's nominees could be determined by "adherents of an opposing party." *Nago*, 982 F.Supp.2d at 1176 (quoting *Jones*, 530 U.S. at 570).

*Nago* addressed a challenge brought by the DHP — the largest party in the state. The evidence in *Jones* indicated that "the impact of voting by non-party members is much greater upon minor parties." *Nago*, 982 F.Supp.2d at 1176(quoting *Jones*, 530 U.S. at 570). *Nago* declined to import the California evidence in *Jones* due to questions about its applicability to a major party in Hawaii. *Id.* at 1182-83.

The court could not determine that the DPH had been "severely" burdened based on the mere assertion that "it will be, or can be, forced to 'associate' with voters who are 'adherents of opposing parties.'" *Id.* at 1182. The court recognized the possibility that crossover voting exists in Hawaii, but also recognized the possibility that "a large percentage of primary voters who were not formally registered with the DPH" but who affiliated with the DPH by voting in the Democratic primary "fully considered themselves to be Democrats." *Id.* The court

27

pointed out that the DPH lacked "empirical evidence" that had been present in *Jones. Id*.

*Nago* further recognized that the Ninth Circuit in *Bayless* had interpreted *Jones* in a similar manner. *Id.* at 1181. *Bayless* remanded the district court's grant of summary judgment in favor of the Arizona Libertarian Party regarding the constitutionality of Arizona's semi-closed primary system. *Bayless*, 351 F.3d at 1282. The Libertarian Party challenged Arizona's election law that prohibited registered members of other political parties from voting in the Libertarian Party primary. The court first cited *Jones*'s conclusion that minor parties, such as the Arizona Libertarian Party, stood at "greater risk" of having non-party members influence the choice of the party's nominee and of having partisan candidate choose their message to appeal to a more centrist voter base. *Bayless*, 351 F.3d at 1282 (citing *Jones*, 530 at 578).

Even with respect to minor parties, however, *Jones* treated the risk "that nonparty members will skew either primary results or candidates' positions as a factual issue." *Id.* A plaintiff bears the burden "of establishing that risk." *Id.* It seems self-evident under the court's reasoning in *Bayless* that to force, Arizona Libertarian Party, a minor party, at greater risk of harm, to establish these risks, also would require a major party, such as the Montana Republican Party, to bear the burden to establish these risks. *Nago*, 982 F.Supp.2d at 1179.

The Court agrees that the question of whether Montana's open primary requirement imposes a severe burden on a party's associational rights "turns on factual questions." *Arizona Libertarian Party, Inc. v. Bayless*, 351 F.3d 1277, 1282 (9th Cir. 2003). The Court in *Bayless* remanded the matter back to the district court to develop a factual record and analyze that factual record in light of *Jones*. *Id.* The court noted the distinction between the blanket primary system in *Jones* with its unlimited potential for crossover voting and the Arizona system that limits a voter to one party's ballot. *Id.*

Plaintiffs must establish these risks through the development of an evidentiary record. The Court has no method to measure the burden, if any, that Montana's open primary system imposes on Plaintiffs without proof that such a burden exists. Proof in this case "requires an evidentiary record." *Nago*, 982 F.Supp.2d at 1180. *See also Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008) (emphasizing the inherently factual nature of the inquiry when a court assesses the potential burden that an election law imposes).

A genuine issue of material fact exists that precludes the entry of summary judgment. Whether non-Republicans in Montana can vote, or actually have voted in a Republican primary, remains unresolved. The related question of whether the possibility of these non-Republican voters in primary elections causes Republican

candidates to alter their campaign messaging also remains unresolved without the benefit of cross-examination.

The declarations presented by Plaintiffs assert general claims regarding Republican candidates. Plaintiffs further cite to alleged efforts by the MEA-MFT to influence Republican primary elections for state legislative races. MEA-MFT claims to endorse candidates who share their interests, regardless of party affiliation. MEA-MFT endorsed candidates in 24 contested primary elections in 2014. (Doc. 93-5 at 188.) The MEA-MFT claims that 18 of its endorsed candidates for the Montana legislature won primary elections, including 9 Democrats and 9 Republicans.

Plaintiffs have attempted to identify MEA-MFT's political interests. Plaintiffs have not identified the actual party affiliation, if any, of individual MEA-MFT members. Plaintiffs have not provided evidence to allow the Court to assess whether MEA-MFT's efforts in endorsing Democratic and Republican candidates actually have had any effect on primary elections. The Court cannot yet determine from the evidentiary record what level of burden Montana's open primary system imposes on Plaintiffs' associational rights in form of changes to campaign messaging. In turn, the Court cannot weigh Plaintiffs' asserted injury against the State's justification for such burden imposed by its open primary law.

### 2. *The State's Motion for Summary Judgment*

The State argues that it should be entitled to summary judgment. The State alleges that Plaintiffs have failed to meet their burden of establishing that Montana's open primary requirement imposes a severe burden on their associational rights. The State essentially argues that Plaintiffs have failed to present evidence that shows Montana's open primary system actually causes crossover voting or a change in campaign messaging. The State argues that it must show only an "important regulatory interest" when no severe burden on First Amendment rights has been established. *Clingman*, 544 U.S. at 586. The State contends that its interests in "preserving the integrity of its election process," "protecting the privacy of a person's vote" and "encouraging voter participation" qualify as important regulatory interest that justify Montana's open primary requirement. (Doc. 89 at 29-30.)

Plaintiffs have failed to provide Montana specific data to warrant summary judgment. Plaintiffs have presented sufficient evidence, however, to raise a genuine issue of material fact to prevent the Court from awarding summary judgment in favor of the State. Plaintiffs allege that a candidate may make decisions based on knowledge that unaffiliated voters participate in the primary. Plaintiffs allege that the mere threat of crossover voters could cause candidates to change decisions about campaign messaging. The Supreme Court has recognized

31

that the effect can be deleterious to the Party when candidates change their

message to "curry favor" with persons who are more "centrist than those of the

party base." *Jones*, 530 U.S.at 580.

Plaintiffs' expert testimony provides an estimated rate of crossover voters in

Montana based on peer reviewed studies from other states. (Doc. 93-2 at 10.)

Plaintiffs also have provided expert testimony that Republican candidates in

Montana have shifted their message to appeal to potential crossover voters.

Plaintiffs have submitted evidence of MEA-MFT speech that may indicate an

effort to encourage crossover voting. This evidence represents admissible and

relevant evidence. Plaintiffs have submitted sufficient evidence to show that

genuine issues of material fact exists as to whether crossover voting actually

occurs in Montana and to whether Republican candidates reasonably change their

campaign messaging to attract potential crossover voters. These issues must be

resolved at trial.

## C. Preliminary Injunction

Plaintiffs request that this Court enjoin the State from "forcing the Montana

Republican Party to associate during primary elections with non-members." (Doc.

71 at 33.) A plaintiff who seeks a preliminary injunction must satisfy four

requirements. The plaintiff first must establish that the plaintiff likely will succeed

on the merits. Second, the plaintiff must establish that the plaintiff likely will suffer

irreparable harm in the absence of preliminary relief. Third, the plaintiff must establish that the balance of equities tip in the plaintiff's favor. Fourth, the plaintiff must establish that an injunction serves the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Injunctive relief constitutes an "extraordinary remedy" that never should be awarded as a matter of right. *Id.* at 22–24.

A party generally must develop an evidentiary record to prove that a voting system imposes a severe burden on their associational rights. *Nago*, 982 F.Supp.2d at 1177. As discussed, Plaintiffs have failed to develop an evidentiary record that establishes that Montana's open primary law imposes a severe burden on their associational rights. The State must show only an "important regulatory interest" when a law imposes a "less than severe burden." *Clingman*, 544 U.S. at 586.  The Court cannot yet determine from the evidentiary record what level of burden, if any, the open primary system imposes on Plaintiffs' associational rights. Plaintiffs cannot show that they are likely to succeed on the merits without an evidentiary record that shows Montana's open primary law severely burdens their associational rights. *Nago*, 982 F. Supp. 2d at 1177.

Plaintiffs rely on the recent decision in *Utah Republican Party, v. Herbert*, 2015 WL 6695626 (D. Utah Nov. 3, 2015), to support their position that open primary elections force association with unaffiliated voters and thus should be

33

deemed unconstitutional regardless of whether an evidentiary record has been established. A new law in Utah enacted in 2014 required that a qualified political party must allow unaffiliated voters to participate in the primary. *Id*. at *1. The Republican Party and the Constitution Party of Utah ("CPU") promptly challenged the provision of Utah's law that allowed unaffiliated voters to vote in their primary elections. *Id.* at *4-5.

Voters in Utah have the option to register party affiliation and become a member of a party or remain unaffiliated. *Id*. at *3–4. Utah's voter-base consisted of 610,654 unaffiliated registered voters, 640,000 registered Republicans, and 4,183 registered members of the CPU. *Id*.

The district court in Utah determined that the unaffiliated voter provision severely burdened the political party's rights. *Id.* at *11. The court reasoned that the election law unconstitutionally forced the political parties to associate with unaffiliated voters in the primary. *Id.* at *12. The state offered no narrowly tailored compelling interests to support imposition of the burden. *Id.* at *13–14.

It remains unclear in Montana that the open primary system forces the Republican Party to associate with unaffiliated voters. The district court in Utah evaluated evidence of 610,654 unaffiliated voters who potentially could vote in the Republican Party primary or CPU primary. *Id*. at *4. In Montana, unlike in Utah, voters do not register a party affiliation before voting. Party Expert Green admitted

34

that conducting a phone survey or reviewing the ballot box would be the only ways to determine party affiliation in Montana. (Doc. 87-1 at 88.) Green also admitted that no survey has been conducted in this case. *Id.*  In other words, all Montana voters remain unaffiliated until they select a ballot. *Clingman*, 544 U.S. at 591.

Factual questions still exist regarding whether any non-Republicans actually have voted or can vote in the Republican primary. The former executive director of the Montana Republican Party conceded that "there is no exact way to become a member" of the Montana Republican Party. (Doc. 71-1 at 15.) The State suggests that a voter affiliates with the Republican Party when the voter selects the Republican primary ballot. The Supreme Court has recognized that "anyone can join a political party merely by asking for the appropriate ballot at the appropriate a time." *Clingman*, 544 U.S. at 591 (citing *Jones*, 530 U.S. at 596 (Stevens, J., dissenting)). Plaintiffs have not shown yet that a voter who selects the Republican primary ballot, and foregoes the opportunity to vote for candidates of any other party, fails to qualify as a Republican. *Cf. Jones*, 530 U.S. at 570-79.

The Court shares Justice O'Connor's skepticism whether "judicial inquiry into the genuineness, intensity, or duration of a given voter's association with a given party" represents a fruitful vehicle to approach constitutional challenges to election laws. *Clingman*, 544 U.S. at 602 (O'Connor, J, concurring). The skepticism seems appropriate in light of Party Expert Green's admission that

35

Plaintiffs' percentage of crossover voters represents "an estimate" based on scholarly research, rather than Montana specific data. (Doc. 87-1 at 89.) Plaintiffs will struggle to succeed on the merits without being able to demonstrate that non-Republicans in Montana actually vote in the Republican primary.

Plaintiffs also have failed to establish that a preliminary injunction would be necessary to prevent irreparable harm. A court typically grants a preliminary injunction when the plaintiff presents an urgent need for speedy action to protect the plaintiff's rights. *Lydo v. Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). The Court has attempted to address Plaintiffs' claims in a timely manner due to the importance of the issues raised. Plaintiffs' conduct has not expedited the process.

Plaintiffs have amended their complaint on four separate occasions. Each amendment required a delay to allow the State to file an amended answer. The Court denied Plaintiffs' first motion for summary judgment on January 8, 2015 (Doc. 40.) Plaintiffs, as is their right, timely filed an interlocutory appeal. (Doc. 41.) Plaintiffs eventually abandoned the appeal on May 14, 2015, but not before nearly five months had lapsed. The Court also set multiple hearings to consider Plaintiffs' motion to disqualify opposing counsel. The Court vacated each of those hearings at the request of Plaintiffs. The Court cites these examples not to criticize Plaintiffs, but to demonstrate that any urgency regarding the need for a speedy

decision in the matter arises, at least in part, from Plaintiffs' conduct during the course of this litigation.

Plaintiffs challenge a century-old primary election system. Plaintiffs' claim focuses on a specific event—the 2016 primary election. The relief sought demonstrates no urgent need for action to prevent irreparable harm under these circumstances.

**ORDER**

The Court DENIES Plaintiffs' Motion for Preliminary Injunction. (Doc. 70.)

The Court DENIES Defendant's Motion for Summary Judgment. (Doc. 88.)

The Court DENIES Plaintiffs' Motion for Summary Judgment. (Doc. 91.)

DATED this 14th day of December, 2015.

_____
Brian Morris
United States District Court Judge